Melvin Jones Jr - Pro Se Plaintiff

1935 Hosler St - Flint, Michigan 48503

Ph #810-962-6225

Email: meljonesjr@gmail.com


IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT MICHIGAN

CASE # 2:21-cv-10937  AJT  EAS

Honorable Judge: Arthur J. Tarnow

TRANSFERED to Judge Levy

Pro Se Plaintiff Melvin Jones Jr.'s MORE

DEFINITIVE Statement Amended Complaint per the

District Courts Order that Jones submit/ file such

BY JUNE 18th, 2021


Melvin Jones Jr, Federal EPA,  City of Flint, Wells Fargo Bank, HUD, and The State of Michigan -  Plaintiffs

v.

NAPOLI LAWFIRM, attorney Patrick Lanciotti and attorney Hunter and Attorney Corey Stern -- Defendants

----------------------------------

## INTRODUCTION:

____Please note: I, Melvin Jones Jr., am experiencing [episodic] blurred–vision due to my serious vision impairments.... And therefore, to MAKE SURE that I meet the courts order that a MORE DEFINITIVE statement be submitted/ filed by me PRIOR to June 18th, 2021.... I am filing such EARLY here.

On  MAY 3rd, 2021  ...the Detroit Federal District Court issued an order which ordered [me] to file/ submit MORE DEFINITIVE STATEMENT AMENDED COMPLAINT by June 18th, 2021 ---- and the instant amended complaint is meant to attempt to suffice and meet said order issued by Honorable Judge Tarnow.

By order signed by Honorable Judge Tarnow.... This instant civil case was transferred to the Ann Arbor Federal District Court (e.g. where the FLINT WATER CRISIS LAWSUIT is currently pending FINAL settlement approval).

*In the State of Michigan.... (as best that I, Melvin Jones Jr., can understand such.... With the AID of my informal caregiver Colleen Connors).... Is that ALL [plaintiffs for example] who MAY be considered as having a possible SIGNIFICANT stake in a lawsuit MUST/ SHOULD be plead in the heading of a complaint so as to give notice of the defendants of such [and/ or Plaintiffs who MAY not have actual standing, but are NONETHELESS.... Real parties of interest, and such is attempted to be done here by Pro Se Jones (e.g. see page #1).*

____**Plaintiff Melvin Jones Jr., is a disabled person per MCL 257.19a.  And, Jones' Michigan State Driver's License is medically suspended due to what can best be described by Jones as linked to a communication impairment.  Additionally, Jones has serious vision impairment (e.g. as defined [at a bare minimum by the Americans with Disability Act [ADA])--- and Jones requires large print.**

*Further, due to my/ Melvin Jones Jr.'s medical disability I AM NOT ABLE TO PRESENT MY CASE IN THIS LAWSUIT [i.e. which is to say, I appreciate the Honorable Court being willing to allow me to attempt to amend my complaint to explain the reason that I believe that I as a Black African American indigent disabled resident of the City of Flint.*

*I, Melvin <u>Jones Jr. LACK the capacity (i.e. either financially to pay for an attorney) or actual physical ability)) to present his case :</u>*

<u>JONES' DISABILITY accommodation request</u>:

_____*Please take note that I, Melvin Jones Jr., have submitted VIA email a Disability Accommodation request as to my "Communication Impairment" which (I believe) is ROOTED/ LINKED to my Michigan State Drivers license being "medically suspended" .... And such will remain NOT plead here....*

*But MY right is reserved/ preserved to present such on appeal to the 6th Circuit Court of Appeals if needed.*

*_____Plaintiff Jones, believes that he/ Jones, HAS shown an adequate basis to request counsel to provide representation under 28 U.S.C. § 1915(e)(1).*

*I am UNABLE to determine if this lawsuit is appropriate for Class Action Certification.*

*And… more to the point, Jones believes that pursuant to an email which remains confidential (e.g. sent to attorney defendants, and VEOLIA NORTH) and Honorable Judge Tarnow's law clerk….. That it is appropriate that VEOLIA NORTH BE DISMISSED FROM THIS LAWSUIT.*

## JONES CLAIMS AGAINST THE ATTORNEY DEFENDANTS:

*Claims: under the Americans with Disability Act, 42 USC S. 1981, and 42 USC S. 3613) and he has provided adequate basis to appoint counsel under that statute. For actions under said statues provides discretionary authority for appointing counsel "in such circumstances as the court may deem just." It*

*provides no statutory right to counsel, only "a statutory right to request appointed counsel at court expense." The Court has "extremely broad" discretion to appoint counsel here. For example, the Tenth Circuit has identified factors that courts consider when evaluating a motion for appointment of counsel. Appointment of counsel is only appropriate under § after the plaintiff has affirmatively shown "(1) financial inability to pay for counsel; (2) diligence (e.g. in the related Flint Water Crisis case ...Jones WAS previously represented by NAPOLI LAW FIRM.... However, in mandamus # 21-1174 --- Jones RAISED ISSUES OF CONCERN AS TO THE "LEAD BONE SCAN METHOD AND DEVICE NOT BEING SAFE FOR HUMANS.... And (in short) NAPOLI LAWFIRM withdrew their representation of disabled Jones (e.g. I feel that I WAS WRONGLY ABANDONED by Napoli in said instance).... Especially given that I believe that I was CORRECT IN MY COCERNS) in attempting to secure counsel; and (3) meritorious allegations of discrimination." As "an aid in exercising discretion" in close cases, the Court should also consider whether the plaintiff has the "capacity to present the case without counsel." For the reasons aforementioned ... I, Melvin*

*Jones Jr. believe that I should be appointed counsel in the instant case (e.g. even if such proceeds as an individual lawsuit).*

## JURISDICTION:

*Federal Question, 42 USC S. 1983, 42 USC S. 3613, and the Americans with Disability Act; and 42 USC S. 1981, 42 USC S. 1982.*

<u>On or about late February 2021</u> – – – *On the basis of me being a Black African American who is disabled (e.g. my being disabled is linked to me being Black African American)... and Napoli Law Firm violated {e.g. in contravention of 42 USC S. 1981}* <u>sought to deprive me and/ or interfere with my EQUAL RIGHT [e.g. as a black disabled person]</u> *to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings (e.g. whereby I was abandoned as a client due to me [i.e. in the 6th Circuit Court of Appeals [for example] sought to assert my equal*

*right[s] as a disabled Black person to to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings.  For example.... see the "introduction section" of my AMENDED COMPLAINT.*

*When Black African American such as myself are SO HURT by the connotation of WHAT IT MEANS FOR WHITE ATTORNEYS TO USE A  handheld XRF Analyzer (a.k.a "bone lead scan device") ON A PRIMARILY BLACK AFRICAN AMERICAN COMMUNITY ? Well.... To me, i.e. Black AFrican American Flint Resident --- such IS EXACTLY THE SORT OF INSENSITIVE INSTITUTIONALIZED IMPLICIT-BIAS (e.g. at a bare minimum) that CAUSED THE FLINT WATER CRISIS IN THE FIRST PLACE. And, I am so hurt by this issue.*

*The OBVIOUS history of the United States' race discrimination against Black African Americans [i.e. I feel] MUST be also viewed in context of INFERENCE*

*OF RACE ANIMUS AGAINST ME BY NAPOLI LAW FIRM due to me being a black person whom is diabled [e.g. as to the race animus implications as to Napoli Law Firm's use of a device (WHICH IS NOT INTENDED FOR USE ON HUMAN BEINGS] upon the primarily Black African American population of the City of Flint]... in regards to Napoli Law Firms violation/ deliberate of my rights protected by 42 USC. S. 1981 and 42 USC  S. 1982.*

*For example,*

*"**Discrimination against blacks linked to dehumanization**, study finds Crude historical depictions of African Americans as ape-like may have disappeared from mainstream U.S. culture, but research presented in a new paper by psychologists at Stanford, Pennsylvania State University and the University of California-Berkeley reveals that many Americans subconsciously associate blacks with apes. In addition, the findings show that society is more likely to condone violence against*

*black criminal suspects as a result of its broader inability to accept African Americans as fully human, according to the researchers. Co-author Jennifer Eberhardt, a Stanford associate professor of psychology who is black, said she was shocked by the results, particularly since they involved subjects born after Jim Crow and the civil rights movement. "This was actually some of the most depressing work I have done," she said. "This shook me up. You have suspicions when you do the work intuitions you have a hunch. But it was hard to prepare for how strong [the black-ape association] was how we were able to pick it up every time." (see the affixed attachment hereto).*

*Here, NAPOLI LAW FIRM views me as less than human on account of me (Melvin Jones Jr.) being disabled Black African American {i.e. my serious medical disability is linked to my family heredity/ ancestry of being Black African American}.*

_**HARM:** on account of NAPOLI law firms conduct (e.g. Attorney Lanciotti, Napoli and Shkolnic)... I, Melvin Jones Jr., suffer continuing damages to both my person and property (e.g. both real property and personal property)._

_**Jones' further MORE DEFINITIVE STATEMENT(s):**_

_I, Melvin Jones Jr., am a Black Disabled Resident of the City of Flint ....(sadly) – – – – I believe and have observed that my immune system has a REDUCED  ability to  fend–off infection, and so it is AT BEST an open question IF the Covid–19 vaccine will be directly beneficial to me as a result of me being what I can best describe as to such (e.g. "immunocompromised"). I, Melvin Jones Jr., am providing my affidavit here to give additional context for the District Court here, as to Pro Se [my] i.e. Melvin Jones Jr.'s DILIGENT, EARNEST, and VALID, and MERITORIOUS basis for filing_

*and pursuing [h]is civil lawsuit (e.g. the instant lawsuit) #2:21-cv-10937. On or about May 13th, 2021.... I watched a video titled/ captioned as " Delta XRF Quick Start Tutorial" .....and the link to said XRF video can be copy and pasted from the link which is IMMEDIATELY below: https://www.youtube.com/watch?v=W9HCYYK93 RE By recollection and observation.... During my watching the XRF video which is approximately 5 minutes, is that there are THREE MAIN SAFETY ISSUES which MUST be adhered to when using a portable XRF ANALYZER, which are (e.g. see the three (3) attachments affixed to my affidavit here):*

*1.) NEVER point or aim an XRF Analyzer to yourself [i.e. a human].,*

*2.) NEVER point or aim an XRF Analyzer to another person {e.g. a human},*

*3.) NEVER point or aim an XRF Analyzer at any body part (i.e. of a human).*

*Additionally, such (as noted in item # 1 through #3 above) is because XRF Analyzers use and operate by way of IONIZED RADIATION (ionizing radiation), whereby (as I understand such ...there is A POSSIBILITY of RADIOACTIVITY. What I mean to say by this is that: Ionizing radiation is a type of energy released by atoms that travels in the form of electromagnetic waves (gamma or X-rays) or particles (neutrons, beta or alpha). The spontaneous disintegration of atoms is called radioactivity, and the excess energy emitted is a form of ionizing radiation. And, by my belief.... The BONE SCANS which are the subjects of many of the filings by me in my civil case # 2:21-cv-10937 are due to NAPOLI law firm (e.g. attorney HUNTER and Lanciotti) use of the SAME XRF TECHNOLOGY upon the unsuspecting indigent, poor,*

*primarily Black, and Disabled population of the City of Flint. Specifically, I feel VERY HURT and victimized by the NAPOLI LAWFIRM in that I, Melvin Jones Jr., sincerely believe that I was wrongfully abandoned by NAPOLI LAWFIRM on the basis of me being Black and Disabled and indigent.... Whereby such was done to SHUT ME UP (e.g. prevent me from submitting testimony, being a party, and such) in the 6th Circuit Court and District Court as to my concerns about [for example] the NApoli Law Firms use XRF TECHNOLOGY {i.e. ionizing radiation for BONE SCANS UPON THE FLINT RESIDENTS which IS POTENTIALLY VERY HARMFUL TO HUMANS}. And, due to my concerns about said XRF TECHNOLOGY as to Napoli Law Firms BONE SCANS being used upon the residents of the City of Flint.... I, Melvin Jones Jr., in or about late April 2021 CANCELLED my bone scan appointment which was set to take place at the Napoli Law Firm's bone scan office.*

*Additionally, I (Melvin Jones Jr.) did NOT receive disclosures of any kind from as to the POTENTIAL DANGERS TO HUMANS OF THE XRF TECHNOLOGY as to the Bone Scans being conducted at the Napoli Law Firm, from EITHER attorney Corey Stern NOR anyone from the Napoli Law Firm. Which is to say, by observation and belief.... I, Melvin Jones Jr. am a HUMAN who is Black, Disabled and Indigent.*

## JONES' embedded MOTION for the District Court to ASK for ADVISORY OPINIONS FROM the MI AG office and MI State Supreme Court:

*Context for Jones' instant Motion (i.e. as part of my more definitive statement complaint) is that..... Here, in the GREAT STATE OF MICHIGAN... The Michigan State*

Supreme Court has stated in its 'final report' {e.g. which is affixed hereto}....

TRUST:  IS THE ONLY CURRENCY MICHIGAN COURTS HAVE IS TRUST – the trust of the people we serve. Our judiciary builds that trust by being accessible and engaged with the public. Whether physical or virtual, an open courthouse door sends a clear signal that our justice system must work for everyone. At the same time, an engaged judiciary must deliver justice solutions where people live, shaking free from the limitations imposed by old–fashioned rules, complicated language, and imposing buildings.

CIVIL JUSTICE GAP. However successful in keeping our courts running, virtual justice must

*be measured against the pre-pandemic reality: Courts were falling short in meeting their mission to provide access to justice for all, and particularly so when it comes to addressing the needs of lower-income and minority communities. This failure is glaringly clear when it comes to our civil justice system and critical concerns that burden families, including the risk of eviction, access to public benefits, barriers to employment, family law issues like parenting time or custody disputes, and elder abuse, among many others. In fact, we know from surveys that nearly nine in ten low-income individuals with a civil legal problem receive little or no legal help. This civil justice gap persists despite the tireless efforts of*

*Michigan legal aid organizations and our national leadership with MichiganLegalHelp.org, a program of online resources and walk-in self-help centers that have helped millions of state residents. JUSTICE FOR ALL. With funding from the National Center for State Courts, the Michigan Supreme Court formed the Justice for All (JFA) Task Force in May 2019 to assess the current state of our civil justice system and develop a strategic action plan to ensure 100 percent access to justice. This Strategic Plan and Inventory Report represents the culmination of countless hours of work to inventory resources, identify gaps and barriers, and create a road map for the future that leads to a more welcoming,*

*understandable, and trusted civil justice system. The Supreme Court is grateful to the Task Force and its work groups, and to hundreds of community stakeholders, attorneys, judges, and court staff who came together and contributed to this landmark project. Ultimately, the success of this initiative depends on the ability of stakeholders to break down the barriers to change and build a service-focused culture, simplify and streamline processes, create new and affordable ways to match legal services with public needs, and collaborate in the community to get more resources and get more out of those resources. This report identifies specific, concrete, and doable steps Michigan can take*

*to build a civil justice system that will be a model for the nation, and we ask state leaders and residents statewide to join us on the road to justice for all."*

*Source: (see attached Michigan State Supreme Court Final JFA Report)*

**That said…. I, Pro Se Plaintiff Melvin Jones Jr. NOW motion the Federal District Court to:**

**1.)  Ask the Michigan State Attorney General (i.e. Dana Nessel) to "weigh-in" on [h]er (e.g. AG Nessel's) opinion IN DETAIL about the approximately [over] $200,000,000.xx in attorney fees which the Plaintiffs' Attorneys are seeking as to the "companion" case (e.g. the Flint Water Crisis Settlement as to the FWC case**

*#16-cv-10444) to the instant civil lawsuit {i.e. #21-cv-10937}*

*whereby AG Nessels "weighting in" shall be filed in the INSTANT LAWSUIT, and*

*2.)  The District Court (additionally) ASK the Michigan Attorney General (e.g. Dana Nessel) to "weigh-in" whereby such is provided by AG Nessel in GREAT DETAIL as to the defendants' (i.e. Attorney Stern, Hunter, and Lanciotti {and NAPOLI LAW FIRM}) LACK OF COMPLIANCE with Michigan State LARA regulation as to the timing of start of the BONE SCAN procedure upon the residents of the City of Flint [w.r.t.] Michigan LARA regulation as to mandatory registration of said BONE SCAN XRF analyzer prior to start of*

usage of such upon the residents of the City of Flint; and

3.) The District Court ALSO seek the SAME "weighting in" (e.g. ADVISORY OPINION) from the Michigan State Supreme Court as to items set forth in # 1 and # 2 above.... To include additional matter of ANY advisory opinion of the defendant attorneys (i.e. Attorney Stern, Hunter, and Lanciotti {and NAPOLI LAW FIRM}) possible or actual attorney misconduct (i.e. ethical violations, etc.) as to the specific FACTS ALLEGED in the instant civil lawsuit.

## Conclusion:

Simply put.... Here the issues presented seem to have a nexus and intertwined implication as to resolution which MANDATES that the Federal

District Court DEFER to the Michigan State Attorney General's Office [and] ALSO DEFER to the Michigan State Supreme Court (e.g. consistent with [AT A BARE MINIMUM] Disabled Pro Se Plaintiff Black African American, Melvin Jones Jr.'s Michigan State Constitutional Rights).

The "bone scans" conducted by Attorney Stern and Attorney Hunter upon the unsuspecting Black African American residents of the City of Flint was unethical human experimentation {i.e. said duped Black African American residents of the City of Flint DID NOT GIVE INFORMED CONSENT TO SUCH --- nor did the duped Black African American residents of Flint WHO signed up for an appointment for said bone scans give informed consent [i.e. and also suffer damages here] , which is more clearer shown by an example:

The generally accepted medical science procedure is, in essence, to first conduct toxicity and safety tests on animals … and only then — and only if the experimental results pass muster with the FDA — will researchers move on to human trials. This is

*clearly far from what Halford did. He may be dead but associates who worked with him could now be at risk of prosecution. More broadly, the case raises fundamental questions of scientific and medical ethics.*

## UNETHICAL HUMAN EXPERIMENTATION:

*Unethical human experimentation is human experimentation that violates the principles of medical ethics. Such practices have included denying patients the right to informed consent, using pseudoscientific frameworks such as race science, and torturing people under the guise of research.*

*Nita A. Farahany, a professor of law and philosophy at Duke Law School said: "Conducting clandestine research experiments and intentionally circumventing research approval and oversight practices is unethical, unwise, and does not enable adequate validation of science."*

*Source:*

*https://www.pbs.org/wnet/religionandethics/2018/07/16/ethical-concerns-raised-illicit-human-experiments/34881/*

*It often seems like we've have come a long way since the notorious Tuskegee Syphilis Experiment that extended over a now-incredible four decades during the mid-twentieth century. That prolonged and appalling abuse of African-American patients' rights finally resulted in the National Research Act of 1974 being*

*passed, the beginnings of our present legal apparatus known more fully as 'Protection of Human Subjects of Biomedical and Behavioral Research'. Now, 44 years later, the Halford case must give us pause.*

*The generally accepted medical science procedure is, in essence, to first conduct toxicity and safety tests on animals … and only then — and only if the experimental results pass muster with the FDA — will researchers move on to human trials. This is clearly far from what Halford did. He may be dead but associates who worked with him could now be at risk of prosecution. More broadly, the case raises fundamental questions of scientific and medical ethics.*

*A company he formed, Rational Vaccines – which is now under the investigators' scrutiny – has declined to comment on the case, apart from saying it will cooperate with the federal inquiries, and is now adopting a more "classical" approach to product development. It has also shut down its website.  One of the company's biggest investors is Silicon Valley billionaire Peter Thiel, who supports libertarian activists who want to cut back governmental regulation of scientific research. (He also is known for funding the multi-million dollar 2016 lawsuit that effectively killed Gawker, the gossip and investigative journalism website.)*

*Halford's university, Southern Illinois (SIU), shared in a patent on the prospective vaccine with the Rational Vaccines company, but initially denied any responsibility in the matter of overseas*

*experimentation. Taylor's reporting found not only the off-shore efforts (in the Caribbean islands of St Kitts and Nevis), but in addition the discomforting fact that herpes sufferers had also been injected in rooms at a Holiday Inn Express and a Crowne Plaza hotel just a few miles off-campus in Springfield, Illinois.*

*The university then admitted there had been "serious noncompliance with regulatory requirements and institutional policies and procedures." Again, as with the company, any criminal responsibility among Halford's university colleagues will be for the FDA's officials to assess.*

*Source:*

*https://www.pbs.org/wnet/religionandethics/2018/07/16/ethical-concerns-raised-illicit-human-experiments/34881/*

<u>The "bone scans" conducted by Attorney Stern and Attorney Hunter upon the unsuspecting Black African American residents of the City of Flint was unethical human experimentation {i.e. said duped Black African American residents of the City of Flint DID NOT GIVE INFORMED CONSENT TO SUCH --- nor did the duped Black African American residents of Flint WHO signed up for an appointment for said bone scans give informed consent [i.e. and also suffer damages here]....</u>

*JURY DEMAND*:

    *NONE.*

*PRAYER FOR RELIEF*:

    *As deemed Just and Fair by the Honorable Court.*

*Respectfully Submitted,*

*Date: May 18th, 2021*

*Signed:*..........................................................................................

    *Melvin Jones Jr. - Black African American Pro Se Plaintiff*

Journal of Personality and Social Psychology
2008, Vol. 94, No. 2, 292–306

Copyright 2008 by the American Psychological Association
0022-3514/08/$12.00    DOI: 10.1037/0022-3514.94.2.292

# Not Yet Human: Implicit Knowledge, Historical Dehumanization, and Contemporary Consequences

Phillip Atiba Goff
The Pennsylvania State University

Jennifer L. Eberhardt
Stanford University

Melissa J. Williams
University of California, Berkeley

Matthew Christian Jackson
The Pennsylvania State University

Historical representations explicitly depicting Blacks as apelike have largely disappeared in the United States, yet a mental association between Blacks and apes remains. Here, the authors demonstrate that U.S. citizens implicitly associate Blacks and apes. In a series of laboratory studies, the authors reveal how this association influences study participants' basic cognitive processes and significantly alters their judgments in criminal justice contexts. Specifically, this Black–ape association alters visual perception and attention, and it increases endorsement of violence against Black suspects. In an archival study of actual criminal cases, the authors show that news articles written about Blacks who are convicted of capital crimes are more likely to contain ape-relevant language than news articles written about White convicts. Moreover, those who are implicitly portrayed as more apelike in these articles are more likely to be executed by the state than those who are not. The authors argue that examining the subtle persistence of specific historical representations such as these may not only enhance contemporary research on dehumanization, stereotyping, and implicit processes but also highlight common forms of discrimination that previously have gone unrecognized.

*Keywords:* dehumanization, racial bias, historical representations, implicit knowledge, stereotyping

The Black man has no rights which the White man is bound to respect. . . . He may justly and lawfully be reduced to slavery . . . and treated as an ordinary article of traffic and merchandise.—Chief Justice, Roger Brooke Taney (*Dred Scott v. Sandford*, 1856)

The United States has a shameful history of dehumanizing Black Americans. As quoted above, Chief Justice Taney states clearly what many 19th century U.S. citizens believed: that Blacks were inherently inferior to Whites and therefore could be justifiably subjugated. In fact, the very first article of the U. S. Constitution declares that, when determining state populations, "all other persons"—by which it meant enslaved Africans—should be counted as three fifths of a human being. The formal dehumanizing language used in the laws of this developing nation reflected the biases present in the majority population.

Contemporary approaches to racial prejudice suggest that these more egregious forms of racial bias have been relegated to the past. It is commonly thought that old-fashioned prejudice has given way to a modern bias that is implicit, subtle, and often unintended. This new understanding of racial bias may have led researchers and laypeople alike to believe that the dehumanization and subjugation of Blacks was primarily a historical phenomenon. However, as recently as the early 1990s, California state police euphemistically referred to cases involving young Black men as N.H.I.—No Humans Involved (Wynter, 1992). One of the officers who participated in the Rodney King beating of 1991 had just come from another incident in which he referred to a domestic dispute involving a Black couple as "something right out of *Gorillas in the Mist*" (Kennedy, 1998). Assuming that these incidents are not confined to police officers, is it possible that, at the same time that contemporary racial bias has become more subtle, these extreme forms of dehumanization nonetheless remain? The present research studies were designed to investigate this possibility.

## The Peculiar History of the "Negro-Ape Metaphor"

Dehumanizing representations of African peoples are nearly as old as Europeans' first contact with West Africa (Ovington, 1929). Early European maritime writings described primitive people who seemed more closely related to apes than to White explorers (Dapper, 1688). As theories of race moved from theological to biological, the rationale for racial hierarchy relied even more

Phillip Atiba Goff and Matthew Christian Jackson, Department of Psychology, The Pennsylvania State University; Jennifer L. Eberhardt, Department of Psychology, Stanford University; Melissa J. Williams, Department of Psychology, University of California, Berkeley.

This research was supported by a Stanford University Dean's Award awarded to Jennifer L. Eberhardt. We thank Hilary Bergsieker for her assistance with the videotape used in Study 5. We also thank Courtney M. Bonam, Brooke Allison Lewis Di Leone, Cynthia Levine, Valerie D. Jones, and Larisa Heiphetz for their helpful comments on earlier versions of this article.

Correspondence concerning this article should be addressed to Phillip Atiba Goff, Department of Psychology, The Pennsylvania State University, 441 Moore Building, University Park, PA 16802-2130 or to Jennifer L. Eberhardt, Department of Psychology, Stanford University, Jordan Hall–Building 420, Stanford, CA 94305. E-mail: philgoff@psu.edu or jle@psych.stanford.edu

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

heavily on the "Negro-ape metaphor," as Lott (1999) described it. Although this linkage predates scientific racism, it drew increased interest and popularity when Franz Boas, the preeminent anthropologist of his time, and even Charles Darwin, speculated that there might be an evolutionary spectrum among primates (Lott, 1999) containing monkeys and apes at the least evolved end, continuing through savage and/or deformed anthropoids, and culminating with Whites at the other end (as most evolved; Jahoda, 1999). Peoples of African descent, therefore, were theorized to reside somewhere between the deformed and the simian.

The "scientistic" grounding for this representation was used to bolster growing stereotypes that peoples of African descent were innately lazy, aggressive, dim, hypersexual, and in need of benevolent control. It is not surprising, then, that the portrayal of African peoples as apelike became an iconographic representation rivaling even minstrelsy for popularity in visual culture during the 19th and early 20th centuries (Dyer, 1997). In fact, many of the U.S.'s first blockbuster movies played on this iconography. For instance, though it is frequently referenced in popular culture as the classic story of "Beauty and the Beast," the 1933 movie *King Kong* (Selznick, Cooper, & Schoedsack, 1933) also has other allegorical undertones. From Kong's association with the caricatured Black savages on the "Island of Skulls," to his "Negro features," many film scholars argue that "King Kong" permanently inscribed a racist cautionary tale about interracial romance into U.S. cinematic iconography. The film's "carrier of blackness is not a human being, but an ape" that, after attempts to contain him fail, "makes off with not just any woman, but a *white* woman" (Snead, 1994, p. 8). In other words, "Beauty" was White and "the Beast" was Black. The popularity of this and other movies with similar themes mirrored racial tensions in the United States during the early part of the 20th century.

As anti-African hostilities have gentled across the globe, this representation has fallen out of favor among popular audiences. However, given that the stereotypes that have been supported by this Black–ape linkage remain in U.S. culture (e.g., Devine & Elliot, 1995), has this representation really disappeared? That is, do people still associate Blacks and apes? And, if so, then might this association influence perception and judgment in important ways?

### Dehumanization Research in Social Psychology

Historians, linguists, and philosophers have engaged in scholarship on dehumanization for the better part of two centuries. From this scholarship, we know that associations between humans and nonhuman animals have been used to justify slavery in the United States, the Jewish Holocaust of World War II, and widespread violence against immigrants around the world (Chalk & Jonassohn, 1990; Lott, 1999; O'Brien, 2003; Santa Ana, 2002). Dehumanization is viewed as a central component to intergroup violence because it is frequently the most important precursor to moral exclusion, the process by which stigmatized groups are placed "outside the boundary in which moral values, rules, and considerations of fairness apply" (Opotow, 1990, p. 1). Groups that are morally excluded do not count in a moral sense. Consequently, anything that is done to someone who is morally excluded is permissible, no matter how heinous the action.

Though psychologists are not entirely new to this conversation, the contributions of psychologists to the literature of dehumanization have been relatively scant. For instance, Allport's classic treatise on

the nature of prejudice makes numerous references to dehumanization but scant references to empirical work on the matter (see, e.g., Allport, 1954, p. 414). Similarly, Staub and colleagues discuss dehumanization (Staub, 1989; Staub & Bar-Tal, 2003), yet their treatment of dehumanization, like Allport's, is mostly descriptive. Staub and his colleagues document the prevalence of dehumanization in group-violence contexts, asserting that it seems to be a necessary precursor to genocide (e.g., Bar-Tal & Teichman, 2005). However, there was little empirical research to cite.

Only recently have social psychological researchers begun to investigate empirically how people attribute "humanness" to others. Leyens and his colleagues, for instance, have examined the attribution of secondary—more human—emotions (Demoulin et al., 2004, 2005; Gaunt, Leyens, & Demoulin, 2002; Leyens et al., 2001, 2003; Vaes, Paladino, Castelli, Leyens, & Giovanazzi, 2003; Vaes, Paladino, & Leyens, 2004, 2006). Their research suggests that emotions such as jealousy, sympathy, or hope are routinely denied to out-groups and preferentially attributed to in-group members. Research by Vaes, Paladino, and Leyens (2002) provides evidence that associating an individual with secondary emotions—rather than primary emotions—can lead to increased altruism and empathy. This feeling of superior "humanity," then, contributes to feelings of intergroup antipathy and in-group bias while simultaneously obstructing attempts at intergroup empathy and prejudice reduction (Vaes et al., 2003). Because secondary emotions are an important part of what makes us "human," this denial constitutes a form of dehumanization.[1]

Research by Haslam and his colleagues suggests that the intergroup process documented by Leyens and colleagues (2001) may also occur interpersonally (Haslam, 2006). Haslam argued that the social cognitive underpinnings of dehumanization have been largely ignored and that, much like stereotyping, dehumanization may be an uncontrolled, perhaps even unavoidable form of social cognition. Rather than focusing on the role of emotion in intergroup processes, Haslam and his colleagues focus on spontaneous trait attributions relevant to interpersonal contexts (Haslam, 2006; Haslam, Bain, Douge, Lee, & Bastian, 2005; Loughnan & Haslam, 2007). This reflects Haslam's conception of "humanness" as constituted by typically human traits (e.g., curious, selfish) as opposed to Leyens' conception of "humanness" as constituted by uniquely human emotions—or secondary emotions (e.g., contemplative, ambitious, and moral). Haslam argued that people attribute more typically human traits to the self than they do to others and that this attributional bias occurs despite differences in self-enhancement motivations.

There is emerging neuroscientific evidence for dehumanization as well. For instance, in a recent neuroimaging study, Harris and Fiske (2006) demonstrated that members of extreme out-groups

---

[1] It is interesting that Leyens and his colleagues (Leyens et al., 2001) refer to this process as "infrahumanization" rather than "dehumanization." This is, perhaps, intended to foreground the fact that, in their research, out-groups are not likened to nonhumans but rather are denied a preferred human "essence." Given the morally loaded history of the word *dehumanization*, use of the term *infrahumanization* may also make the quotidian and cognitive aspects of the phenomenon more salient. For the purposes of the present research, however, processes associated with stripping groups or individuals of human "essence" and processes that compare groups or individuals with nonhumans are both referred to as *dehumanization*.

GOFF, EBERHARDT, WILLIAMS, AND JACKSON

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

are so dehumanized that they may not even be encoded as social beings. When participants viewed targets from highly stigmatized social groups (e.g., homeless people and drug addicts) who elicit disgust, the region of the brain typically recruited for social perception (the medial prefrontal cortex) was not recruited. Those who are the least valued in the culture were not deemed worthy of social consideration on a neurological level. Given that Harris and Fiske used groups that are traditionally represented in a dehumanizing fashion, it is reasonable to believe, as they conclude, that there is a neurological correlate to extreme social devaluation and moral exclusion (Opotow, 1990).

When taken together, contemporary research on dehumanization suggests that privileging the "humanity" of one's own group is a common occurrence. This recent experimental research has primarily been devoted to understanding the processes of dehumanization by focusing on intergroup and interpersonal processes without regard to specific targeted individuals or groups. And, although some have begun to empirically investigate the dehumanization of those from various extreme out-groups, dehumanization researchers have been slow to measure the more extreme behavioral consequences of dehumanization. Indeed, with few exceptions (e.g., Vaes et al., 2002), they have been slow to measure any behavioral consequences at all.

The present research, therefore, departs from the previous literature in two important ways. First, we examine dehumanization processes by focusing on a particular case study of a group that has been represented as less than human. Specifically, we consider the implicit association between Blacks and apes. Consequently, our research is aided by examining the specific history of this cultural representation. Second, in the present research, we not only focus on how basic cognitive processes are altered by dehumanization but also focus on how bias in criminal justice contexts can be linked to dehumanization. Specifically, we demonstrate that a Black–ape association influences the extent to which people condone and justify violence against Black suspects, and we link this association to the death-sentencing decisions of jurors. Thus, the present research addresses some of the more extreme, negative outcomes of dehumanization that have captivated social justice research throughout history.

## Cultural Memory and Implicit Knowledge

A casual perusal of contemporary representational culture will reveal that the ugly history of explicitly depicting Blacks as apes seems to have disappeared both from the general media and from the cultural memory of the United States. As detailed below, most college undergraduates in the United States seem to have forgotten the unpalatable history of Blacks depicted as apes—if they ever knew it to begin with—and print media seems to have substituted ape-relevant words and coded language for explicit Black–ape analogies. However, this raises an important question, namely: Is it possible to hold an implicit association between apes and Blacks if one is unaware that such an association ever existed?

Contemporary wisdom suggests that explicit knowledge is the precursor to implicit racial associations. Indeed, the vast majority of social psychological research on stereotyping assumes people have explicit knowledge of the stereotypes about a group, even as those stereotypes may be triggered implicitly in specific situations (for a review, see Fiske, 1998). Researchers have documented people's

explicit knowledge of the societal stereotypes about Blacks in particular (e.g., Devine, 1989; Devine & Elliot, 1995; Dovidio & Gaertner, 1998; Judd, Park, Ryan, Brauer, & Kraus, 1995; Lepore & Brown, 1997; Levy, Stroessner, & Dweck, 1998). In the United States, for example, Blacks are construed as violent, threatening, criminal, unintelligent, uneducated, lazy, poor, athletic, and musical. People can very easily list the stereotypes of Black Americans, and because these stereotypes are so strong and well rehearsed, they come to influence perception and behavior—even when people do not personally endorse them and are motivated to be racially egalitarian (e.g., Correll, Park, Judd, & Wittenbrink, 2002; Devine, 1989; Dovidio, Evans, & Tyler, 1986; Dovidio & Gaertner, 1998; Eberhardt, Goff, Purdie, & Davies, 2004; Gaertner & McLaughlin, 1983; Wittenbrink, Judd, & Park, 1997).

Here, we argue that *implicit* knowledge of racial associations can be equally strong. "Apelike" is not a stereotype that people typically list as associated with Blacks. It is not an association that immediately springs to mind. It is not an association that is deliberately contemplated and openly discussed. People deny explicit awareness of this association, yet because the association is maintained in metaphors, visual tropes, and through the convergence of other related stereotypes, these factors alone—without the aid of explicit awareness—could perpetuate a Black–ape association. Thus, although social conventions may have rendered extinct the explicit representation of Blacks as apelike, we hypothesize that the association has persisted in the minds of Whites and non-Whites alike and has come to influence their perception and behavior. The notion that "implicit knowledge" may inform people's mental associations and that these associations may have dire consequences organized the present investigation.

## Overview of the Present Studies

In Study 1, we tested the principal hypothesis, namely that there exists an implicit association between Blacks and apes. We also examined the extent to which this association was broadly held (i.e., by both Whites and non-Whites). In Studies 2 and 3, we tested the bidirectional strength of this Black–ape association and investigated whether apes might also be associated with other non-White groups (i.e., Asians). In Study 4, we argued that the Black–ape association is maintained through implicit knowledge. We documented participants' lack of explicit awareness of a Black–ape association and demonstrated that implicit attitudes about Blacks do not predict the strength of the association. Finally, in Studies 5 and 6, we demonstrated that this dehumanizing association is linked to dire outcomes in criminal justice contexts.

## Study 1

Do people associate Blacks with apes in contemporary U.S. society? And, if so, is this an association held by Whites and non-Whites alike? Borrowing a "degraded objects" paradigm used by Eberhardt and colleagues (Eberhardt et al., 2004), we examined the Black–ape association in Study 1 by measuring whether the mere presence of Black male faces facilitates identification of ape images. Participants were subliminally primed with Black faces, White faces, or a nonface control image. Next, they were presented with degraded images of animals (line drawings of apes and non-apes), which they were asked to identify as quickly as possible. For each animal, image quality was

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

improved in small increments (frame by frame), making the animal increasingly easy to identify. For both White and non-White study participants, we predicted that exposure to the Black male faces would facilitate identification of the ape images, whereas exposure to the White male faces would not.

*Method*

*Participants*

One hundred twenty-one male undergraduates (60 White, 61 non-White) at Stanford University participated in this study in exchange for partial course credit or $10. Participants ranged in age from 18 to 20 ($M = 18.64$). Of the 61 non-White participants, 7 identified as Black or African American, 39 identified as Asian or Asian American, 5 identified as Latino/a or Hispanic, and 10 identified as mixed-race.

*Design*

Study 1 took the form of a 3 (race of prime: Black prime vs. White prime vs. no prime) × 2 (race of participant: White vs. non-White) × 2 (animal type: apes vs. non-apes) mixed-model design, with animal type serving as the within-subject factor. The picture frame at which participants could accurately identify the animal served as the principal dependent variable.

*Materials*

*Face stimuli.* Participants were subliminally exposed to color photographs of either 50 Black adult male faces with neutral expressions, 50 White adult male faces with neutral expressions, or a no-prime control image that was an uninterpretable line drawing created using Adobe Photoshop software. The faces were of Stanford students or employees. The height, weight, age, and attractiveness of the persons photographed did not vary as a function of race. The backgrounds on the photographs were standardized using Adobe Photoshop software.

*Object stimuli.* Participants saw movies of four apes and eight non-apes. Non-apes were chosen from pretesting. Twenty-five participants were asked "What animals are least associated with people?" The following eight animals were most often mentioned and therefore used in the study: alligator, dolphin, duck, elephant, fish, kangaroo, seagull, and squirrel. For all 12 animals, a black-and-white line drawing was created, and pixelated "noise" was then added to that image using Adobe Photoshop software. This caused the images to look as if they were on a television with "snow" or bad reception. Noise was added in equal increments 40 times, creating 41 picture frames of each animal ranging from an extremely degraded image of the animal to a clear image of the animal with no degradation added. These picture frames were then shown in a sequence from most degraded (Frame 1) to least (Frame 41). Each frame was presented for 500 ms. Pretesting revealed that the ape movies were as easy to detect as the non-ape movies.

*Procedure*

Participants completed the study individually. Participants were greeted by one of several White experimenters who told them they would be engaging in two unrelated tasks. The first task was an "attentional vigilance task," as per previous research (Eberhardt et al., 2004). Participants were told they would see a focus dot at the center of the screen and were instructed to keep their eyes on it. Participants were told that a pattern of light would flash on the computer screen to the left or right of the focus dot. For each flash, participants were instructed to "press the *k* button if the flash appeared on the right-hand side of the screen and the *d* button if the flash appeared on the left-hand side of the screen" and to do so as quickly as possible. The participants were seated such that each flash of light appeared in a quadrant of the screen at an average of 6° from the focus dot. Each flash of light consisted of a premask (composed of a composite of blurred faces) displayed for 100 ms, then a Black face, White face, or uninterpretable neutral image displayed for 30 ms, and finally, a postmask (that was identical to the premask) displayed until the participant hit the response key. Detection latency was measured from the onset of the postmask to the moment the participant hit the response key to indicate that the flash of light occurred on the left or right of the focus dot. One third of the participants were subliminally primed with Black faces during this task, one third were primed with White faces, and one third were primed with the neutral image. Participants completed 10 practice trials followed by four blocks of 25 experimental trials, after which the experimenter set up the computer to run the object identification program.

Participants were told that the second portion of the experimental session would involve an unrelated study designed to test the speed at which people can identify objects. Participants were told that they would see a series of short "movie-like segments" of objects that would start off "fuzzy" and become increasingly easier to identify, as per previous research (Eberhardt et al., 2004). They were told to push (as quickly as possible) a computer keyboard key to indicate the point at which they could identify what the object was and to then write down the name of the object identified. The number of frames that the participants viewed before accurately identifying the objects (which were always animals, both apes and non-apes) served as our primary dependent measure. After completing the object identification task, participants completed the Modern Racism Scale (MRS; McConahay, 1986) and the Motivation to Control Prejudice Scale (MCP; Dunton & Fazio, 1997). Administering these scales allowed us to test the hypothesis that a Black–ape association exists independent of individual differences in explicit anti-Black prejudice or attitudes about prejudice. Finally, participants were probed for suspicion, fully debriefed, and thanked for their participation.

*Results*

*Data Reduction*

Debriefing responses confirmed that participants were not aware of the race primes.[2] Trials in which participants misidentified an animal were removed. This represented a relatively small number of trials (fewer than 10%) and no more than one error per group per participant. Therefore, analyses were conducted on participants' correct responses. There was no effect of race prime or of participant race on the number or type of errors made ($F < 1$).

---

[2] Participants reported no knowledge of subliminal primes in all subsequent studies as well.

GOFF, EBERHARDT, WILLIAMS, AND JACKSON

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

### Effects of Race Priming on Animal Identification

The principal dependent variable was the number of frames needed to accurately identify the animals. We expected that participants primed with Black faces would identify ape images after viewing fewer frames than participants who were not primed. We did not expect race of the participant to be a significant predictor of the principal dependent variable.

After determining that the distribution of our principal dependent variable was not statistically skewed, we submitted the frame data to a 3 (race of prime: Black prime vs. White prime vs. no prime) × 2 (race of participant: non-White vs. White) × 2 (animal type: apes vs. non-apes) mixed-model analysis of variance (ANOVA), with animal type serving as the within-subject factor. As suspected, this analysis revealed no effect of race of participant, $F(2, 118) < 1$, $ns$. There was no main effect of animal type, $F(2, 118) < 1$, $ns$. And consistent with our pretesting, participants in the control condition did not differ in the number of frames required to identify apes and non-apes, $F(1, 118) < 1$, $ns$. There was a significant main effect of prime condition, $F(2, 118) = 4.87$, $p < .01$, $\eta^2 = .08$. However, this was qualified by the predicted two-way interaction, $F(2, 118) = 8.49$, $p < .001$, $\eta^2 = .13$ (see Figure 1).

Consistent with our primary hypothesis, simple effects tests revealed that participants required fewer frames to identify the ape images when primed with Black male faces ($M = 20.16$, $SD = 3.59$) than when not primed ($M = 22.76$, $SD = 3.04$), $F(1, 118) = 5.44$, $p < .05$, $\eta^2 = .04$. Moreover, participants required more frames to identify the ape images when primed with White male faces ($M = 26.23$, $SD = 10.28$) than when not primed ($M = 22.76$,

$SD = 3.04$), $F(1, 118) = 9.32$, $p < .01$, $\eta^2 = .07$. Thus, participants' ability to identify apes was both facilitated by Black male faces and inhibited by White male faces. This conclusion is bolstered by the fact that participants primed with Black male faces required fewer frames to identify apes ($M = 20.16$, $SD = 3.59$) than non-apes ($M = 23.35$, $SD = 4.16$), $F(1, 118) = 8.72$, $p < .01$, $\eta^2 = .07$, whereas participants primed with White male faces required more frames to identify apes ($M = 26.23$, $SD = 10.28$) than non-apes ($M = 22.91$, $SD = 5.57$), $F(1, 118) = 8.74$, $p < .01$, $\eta^2 = .07$.

These effects were not moderated by participants' MRS or MCP scores when participant scores were included as covariates, $F$s(1, 117) < 2, $ns$.

### Discussion

Though explicit representations of Blacks as apes may be relegated to history, the mental association lingers and appears to exert some influence on visual perception. Simple exposure to Black faces reduced the number of frames participants required to accurately identify ape images. This Black–ape facilitation effect was observed among White and non-White participants alike. And this effect was not moderated by participants' explicit racial attitudes or their motivation to control prejudice. Surprisingly, participants not only exhibited a Black–ape facilitation effect but also exhibited a White–ape inhibition effect as well. This unanticipated White–ape inhibition effect may have resulted from a negative association between Whites and apes. That is, if Blacks are mentally represented as less evolved (and therefore closer to apes), then Whites



*Figure 1.* Mean frame number at which the animal could be detected as a function of animal type and race prime (Study 1). Error bars represent the average standard error for each condition.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

may be represented as most evolved (and therefore, farthest removed from apes).

Having established that a Black–ape association is present, next, we tested the strength of the association. In previous research (Eberhardt et al., 2004), we have argued that strong mental associations tend to be bidirectionally associated. Study 2, therefore, was designed to test the strength of the Black–ape association by empirically testing the bidirectionality of it. We primed study participants with images of apes (or not) and examined the extent to which exposure to these images directed their attention to Black faces. Just as exposure to Black faces may lead people to think about apes (as we found in Study 1), exposure to apes may lead people to think about Blacks.

## Study 2

In Study 2, we hypothesized that participants primed with apes would exhibit an attentional bias toward Black faces. A finding that Blacks and apes are bidirectionally associated would indicate that this association is not only present in contemporary society but also strong and well rehearsed. To examine this issue, we used a modified dot-probe paradigm (originally introduced by MacLeod, Mattews, & Tata, 1986, to examine the extent to which clinically anxious patients exhibited an attentional bias toward threat-relevant stimuli). In the present study, we presented participants with two faces on the computer screen simultaneously (one Black and one White face). These faces disappeared, and a dot probe appeared in the place where one of the faces used to be. The participant was asked to locate the dot probe as quickly as possible on the computer and to use one of two response keys to indicate whether it was on the left or the right of a centered focus dot. As is traditional in dot-probe studies, we used the time it took participants to locate the dot probe as a proxy for visual attention. We predicted the participants would be especially fast at finding the dot probe when it was in the location of the Black face and they had been primed with apes. In other words, we expected that exposure to apes would activate an association with Blacks and therefore lead participants to look at the Black face.

### Method

#### Participants

Sixty-three White male Stanford University students participated in this study in exchange for partial course credit or $10. Participants ranged in age from 18 to 23 ($M = 19.28$). Data for the first 5 participants were lost due to a computer malfunction. All analyses are, therefore, run on the remaining 58.

#### Design

Participants were randomly assigned to a 2 (prime type: apes vs. no prime) × 2 (dot-probe position: Black face position vs. White face position) between-subjects design. Dot-detection latency served as the primary dependent variable.

#### Materials

*Face stimuli.* Four faces (two Black and two White) from the original set of 100 used in Study 1 were chosen as targets in Study 2. All 4 faces were matched on attractiveness and stereotypicality in a pretest.

*Object stimuli.* The four ape line drawings from Study 1 were used for Study 2. A jumbled line drawing was used for the "no prime" condition.

*Vigilance task.* The "vigilance task" used to prime participants was nearly identical to the task used in Study 1. However, instead of subliminally priming participants with Black or White male faces, participants were subliminally primed with the four ape line drawings or the jumbled line drawing. The pre- and postmasks were jumbled line drawings as well.

*Dot-probe task.* Consistent with previous research, participants were told that they would participate in a "facial interference" task as the second part of the study (Eberhardt et al., 2004). They were told that the task was intended to measure whether a delay is produced when faces "distract participants" from their task of attentional vigilance. Actually, this was a dot-probe task, intended to measure attentional bias toward Black or White faces. After two practice trials in which no faces were displayed, but, instead, the word *FACE* appeared to the left or right of the focus dot, participants were again presented with a focus dot for a randomly determined interval (between 2 and 6 s). One of the Black and one of the White male faces then simultaneously appeared. One face appeared 6° to the right of the focus dot, whereas the other face appeared 6° to the left. The computer randomly determined which faces would be displayed (between the two for each race). Faces were presented for 450 ms, after which a faint gray dot probe appeared where one of the two faces had appeared previously. The computer, again, randomly determined the location of the dot probe. Participants were instructed to "press the *k* button if the dot appeared on the right-hand side of the screen and the *d* button if the dot appeared on the left-hand side of the screen." They were also instructed to ignore the faces and to press either the *k* or the *d* button as quickly as possible. Dot-detection latency was measured from the time the target gray dot probe was displayed to the point at which participants indicated their responses. As in previous research on attention and social representations (Eberhardt et al., 2004), participants completed a single "dot-probe" trial.

#### Procedure

Participants completed the study individually. Participants were greeted by one of several White experimenters and told that they would take part in two unrelated tasks. The first was a simple vigilance task (the priming task), and the second was a "facial interference" task designed to gauge how distracted participants would become when presented with faces before a crucial attentional task (the dot-probe task). After completing the two computer tasks, participants completed the MRS, MCP, and the Attitude Towards Blacks scale (ATB; Brigham, 1993). Participants were then probed for suspicion, thoroughly debriefed, and thanked for their participation.

### Results

#### Data Transformation

The skewness statistic of the reaction time data was more than twice the standard error of the skewness statistic ($M = 2.44$, $SE =$

GOFF, EBERHARDT, WILLIAMS, AND JACKSON

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

.31). After natural log and square root transformations failed to reduce the skewness of dot-detection latencies, the data were submitted to a reciprocal transformation ($M = 0.35$, $SE = .31$), as recommend by Bargh and Chartrand and consistent with previous research (Bargh & Chartrand, 2000; Eberhardt et al., 2004). All subsequent analyses were performed on the transformed data. Because the pattern of means was nearly identical, however, we present the raw detection latencies in Figure 2 for ease of interpretation.

### Effects of Animal Priming on Visual Attention

We submitted the transformed dot-detection latencies to a 2 (prime type: apes vs. no prime) × 2 (dot-probe position: Black face position vs. White face position) between-subjects ANOVA. As anticipated, the two-way interaction was significant, $F(1, 54) = 31.55$, $p < .001$, $\eta^2 = .37$. This interaction was not moderated by participants' MRS, MCP, or ATB scores, $Fs(1, 53) < 2$, $ns$. Simple effects tests revealed that participants in the no-prime condition were faster to detect the dot probe when it was placed near the White face ($M = 1.10$ E $-3$, $SD = 3.60$ E $-4$) than when it was placed near the Black face ($M = 5.00$ E $-4$, $SD = 4.10$ E $-4$), $F(1, 54) = 15.43$, $p < .001$, $\eta^2 = .22$. That is, when there was no prime at all, White participants directed their eyes toward White faces. However, participants primed with apes were faster to detect the dot probe in the Black face position ($M = 1.20$ E $-3$, $SD = 4.90$ E $-4$) than the White face position ($M = 6.00$ E $-4$, $SD = 3.40$ E $-4$), $F(1, 54) = 16.14$, $p < .001$, $\eta^2 = .23$. This suggests that activating the concept of apes directed participants'

attention away from White male faces and toward Black male faces.

Participants who saw the dot probe in the Black face position were faster to detect it when primed with apes than when not primed, $F(1, 54) = 14.30$, $p < .001$, $\eta^2 = .21$. Conversely, participants who saw the dot probe in the White face position were slower to detect it when primed with apes than when not primed, $F(1, 54) = 17.28$, $p < .001$, $\eta^2 = .24$.

### Discussion

The results of Study 2 are consistent with our prediction that activating the concept of apes would activate the concept of Blacks and thus produce an attentional bias toward Black male faces. When White participants were not primed, they appeared to display an in-group preference—that is, their attention was directed to White faces more so than Black faces. When subliminally primed with ape images, however, Black faces captured their attention. Although we believe this attentional bias toward Black faces is due to participants' specific associations of Blacks with apes, it is also possible that activating the concept of apes simply produces an attentional bias toward the face of any out-group member. Out-group members, in general, may be considered less human than in-group members. Indeed, an in-group/out-group explanation for the above results would be consistent with much of the contemporary social psychological research on dehumanization (Haslam, 2006). Study 3 was designed to test the possible role of a generalized out-group bias by replacing the White male face with an Asian male face. White participants in Study 3, then, saw faces of



*Figure 2.* Mean dot-detection latency as a function of prime and dot-probe location (Study 2). Error bars represent the average standard error for each condition.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

out-group members only. We predicted that, even under these conditions, participants would direct their eyes toward the Black male face when primed with apes.

### Study 3

In Study 3, participants were presented with the same dot-probe task as in Study 2. They were presented, however, with a Black male face and an Asian male face (rather than Black and White faces). Second, to ensure that any arresting properties of color were removed, the faces were converted to line drawings. Again, it was hypothesized that participants' attention would be diverted to the Black male face when primed with apes. However, in the absence of an ape prime, given the lack of an in-group member, it was hypothesized that participants' attention would be equally distributed.

#### Method

##### Participants

Forty-nine White male Stanford University students participated in this study in exchange for partial course credit or $10. Participants ranged in age from 18 to 21 ($M = 18.70$).

##### Design

Participants were randomly assigned in a 2 (prime type: apes vs. no prime) × 2 (dot-probe position: Black face position vs. Asian face position) between-subjects design. Again, dot-detection latency served as the primary dependent variable.

##### Materials

*Object stimuli.*  The same object stimuli used in Study 2 were used in Study 3.

*Face stimuli.*  Four faces, two Black and two Asian, were chosen as targets in this study. All four faces were matched on attractiveness and stereotypicality in a pretest. These faces were then transformed into black-and-white line drawings.

##### Procedure

The procedure for Study 3 was identical to Study 2 with the exception that participants saw one Black face and one Asian face, displayed simultaneously as line drawings.

#### Results

##### Data Transformation

Data transformation followed the protocol for Study 2. The skewness statistic of the reaction time data was more than twice the standard error of the skewness statistic ($M = 1.54$, $SE = .34$). After natural log and square root transformations failed to reduce the skewness of dot-detection latencies, the data were submitted to a reciprocal transformation ($M = 0.42$, $SE = .34$). All subsequent analyses were performed on reciprocally transformed data. Because the pattern of means was nearly identical, we present the raw detection latencies in Figure 3 for ease of interpretation.

##### Effects of Animal Priming on Visual Attention

We submitted the transformed detection latencies to a 2 (prime type: apes vs. no prime) × 2 (dot-probe position: Black face



*Figure 3.*  Mean dot-detection latency as a function of prime and dot-probe location (Study 3). Error bars represent the average standard error for each condition.

Case 5:21-cv-10937-JEL-EAS   ECF No. 52, PageID.654   Filed 05/17/21   Page 36 of 134

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

position vs. Asian face position) between-subjects ANOVA. There was a main effect of dot-probe position, such that participants were generally faster to find the dot probe in the Black face position than in the Asian face position, $F(1, 45) = 7.99$, $p < .01$, $\eta^2 = .15$. This was qualified, however, by the anticipated two-way interaction, $F(1, 45) = 4.22$, $p < .05$, $\eta^2 = .09$, which was not moderated by participants' MRS, MCP, or ATB scores, $Fs(1, 44) < 2.5$, $ns$. Simple effects tests confirmed that, when participants were primed with apes, they were faster to detect the dot probe in the Black face position ($M = 1.67$ E $-3$, $SD = 3.45$ E $-4$) than in the Asian face position ($M = 1.22$ E $-3$, $SD = 2.94$ E $-4$), $F(1, 45) = 12.64$, $p < .001$, $\eta^2 = .22$. However, there was no difference between detection latencies when participants were not primed, $F(1, 45) < 1$, $ns$. Moreover, consistent with the findings of Study 2, participants who saw the dot probe in the Black face position were faster to see it when primed with apes ($M = 1.67$ E $-3$, $SD = 3.45$ E $-4$) than when not primed ($M = 1.33$ E $-3$, $SD = 3.98$ E$-4$), $F(1, 45) = 6.87$, $p = .01$, $\eta^2 = .13$. In contrast, prime type did not influence dot-detection latency for participants who saw the dot in the Asian face position, $F(1, 45) < 1$, $ns$.

### Discussion

The attentional bias toward Black faces observed in the ape-prime condition does not appear to be driven by a generalized out-group bias. Rather, there appears to be an association between Blacks in particular and apes that is determining where people look.

We have clear evidence now that a Black–ape association is present and strong—exerting influence on both visual perception and attention; yet, to what might the association be attributed? We argue that the association can be driven by implicit knowledge—even in the absence of strong, anti-Black prejudice. Across three studies, in fact, we have already demonstrated that individual differences in explicit anti-Black attitudes are not significantly related to the existence and strength of the Black–ape association. In Study 4, we demonstrate that this association can exist even in the absence of implicit anti-Black attitudes and explicit knowledge of the association.

### Study 4

The primary purpose of Study 4 was to examine possible causes of the Black–ape association. Specifically, we tested the hypotheses that the Black–ape association is driven by implicit anti-Black attitudes or explicit knowledge of the association rather than by implicit knowledge.

To test the possibility that the Black–ape association is driven by implicit anti-Black attitudes, participants took two model Implicit Association Tests (IAT; Greenwald, McGhee, & Schwartz, 1998). Half the participants were randomly assigned to first take a personalized IAT (Olson & Fazio, 2004). The other half first took an IAT that required them to categorize stereotypically Black and White names by race at the same time they categorized animal names as either great apes or big cats. After completing one or the other IAT, participants left the lab and returned no less than 24 hr later to complete the second IAT (i.e., whichever IAT they had not taken previously).

The personalized IAT required participants to categorize names as stereotypically Black or White and to indicate whether they like or dislike various objects about which there is no agreed upon cultural norm for evaluating (e.g., peanuts). In one version of this personalized IAT, participants indicate that they like an item with the same response key that they use to indicate that a name is White, and they indicate that they dislike an item with the same response key that they use to indicate that a name is Black. In a second version, these pairings are reversed (Black and like, White and dislike). By asking participants to indicate personal opinions about culturally neutral words (e.g., peanuts or football) rather than asking them to categorize culturally valued (e.g., *birthdays* or *flowers*) and devalued (e.g., *vomit* or *garbage*) words, the personalized IAT attempts to measure an individual's personal association between *Black* and *bad* without including any "extra-personal knowledge" that Blacks are associated with *bad* in the larger society (Olson & Fazio, 2004). The faster participants are at responding when the Black names and disliked items share the same response key, and the slower they are at responding when the Black names and liked items share the same response key, the more personal implicit bias they are thought to harbor against Blacks. The personalized IAT, then, was our measure of pure implicit anti-Black attitudes, "uncontaminated" by societal values and norms (Olson & Fazio, 2004).

The second IAT was a "dehumanization IAT" that we developed. For this IAT, participants again categorized stereotypically Black and White names by race, yet they also simultaneously categorized animals as either great apes or big cats. We predicted that participants would be faster to associate stereotypically Black names and apes than they would be to associate stereotypically Black names and big cats. Moreover, we reasoned that if participants associated Blacks with apes as a result of omnibus negative attitudes, then there should be no "dehumanizing IAT" effect after controlling for the personalized IAT. If, however, the personalized IAT did not reduce the size of the dehumanizing IAT effect, then this result would be consistent with our implicit knowledge hypothesis. To further test the implicit knowledge hypothesis, participants were asked explicitly about their awareness of the stereotype of Blacks as apes.

Study 4 was also designed to test two alternative explanations for the findings obtained in Studies 1–3, namely that the association of Blacks and apes is due either to an association of apes with violence or to an association of apes with Africa. With this in mind, we designed our dehumanization IAT so that it contained words associated with big cats—a group of animals that is seen as both more violent and more closely associated with Africa than apes. Thus, it was possible to determine whether participants associated Blacks with apes per se or merely associated Blacks with violent aggression and/or Africa.

### Method

#### Participants

Sixty-nine White male Pennsylvania State University undergraduates participated in this study for partial course credit. Participants ranged in age from 18 to 26 ($M = 19.27$). Due to researcher error, 4 participants became aware of the study's hypothesis and were, therefore, eliminated from analysis. All analyses were conducted on the remaining 65 participants.

Case 5:21-cv-10937-JEL-EAS   ECF No. 52, PageID.655   Filed 05/17/21   Page 37 of 134

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

## Materials

Names and words for the personalized IAT were taken from Olson and Fazio (2004). The same names were used again for the "dehumanization IAT." In addition to these names, eight big cat and eight ape words were chosen. Pretesting revealed that the big-cat words included in Study 4 were more strongly associated with aggression and violence on a 7-point Likert scale ($M = 5.43$) than were ape words ($M = 3.79$), $t(23) = 6.36$, $p < .001$, $\eta^2 = .64$. Pretesting also revealed that the big-cat words were more strongly associated with Africa on a 7-point Likert scale ($M = 4.57$) than were ape words ($M = 3.94$), $t(23) = 2.10$, $p < .05$, $\eta^2 = .16$. The ape words were *ape*, *monkey*, *baboon*, *chimp*, *chimpanzee*, *orangutan*, *gorilla*, and *primate*.[3] The big-cat words were *lion*, *tiger*, *panther*, *puma*, *cheetah*, *cougar*, *leopard*, and *feline*. All stimuli were presented as words, rather than pictorially.

## Procedure

Participants completed the study in groups of up to 7 people. In the first session, half the participants were randomly assigned to take the personalized IAT, and the remaining half took the dehumanization IAT. Participants were then asked to come back for a second session, no less than 24 hr later. (All but 3 participants returned within 3 days, and all participants returned within 7 days.) Participants then completed whichever IAT they had not completed previously.

After completing both IATs, participants completed a brief "stereotype knowledge" questionnaire. The questionnaire included six statements: three about African Americans and three about European Americans. The statements were (a) "I am aware of the stereotype that African Americans are violent"; (b) "I am aware of the stereotype that African Americans like to whisper"; (c) "I am aware of the stereotype that African Americans are like apes"; (d) "I am aware of the stereotype that European Americans are tall"; (e) "I am aware of the stereotype that European Americans are rich"; and (f) "I am aware of the stereotype that European Americans are culturally insensitive." Participants responded by simply circling yes or no. This questionnaire was designed to allow respondents to answer honestly about their awareness of historically dehumanizing representations of Blacks. Participants were then probed for suspicion, thoroughly debriefed, and thanked for their participation.

## Results

### Data Reduction

Data reduction followed the protocol outlined by Greenwald, Nosek, and Banaji (2003).

### IAT Effects

Submitting the personalized IAT responses to a one-way ANOVA revealed that participants were faster to categorize words in the Black–bad condition than in the Black–good condition, $F(1, 64) = 15.34$, $p < .001$, $\eta^2 = .19$. Similarly, submitting the dehumanization IAT responses to a one-way ANOVA revealed that participants were faster to categorize words in the Black–ape condition than in the Black–big-cat condition, $F(1, 64) = 43.00$,

$p < .001$, $\eta^2 = .40$. More important, as predicted, this effect held even when covarying for effects of the personalized IAT, $F(1, 63) = 30.46$, $p < .001$, $\eta^2 = .32$, while the personalized IAT was, itself, not a significant covariate, $F(1, 63) < 1$, *ns*, in this ANOVA.

### Stereotype Knowledge

Only 9% of all respondents indicated knowledge of the stereotype that Blacks are apelike. This was similar to the percentage who indicated knowledge that Blacks like to whisper (6%), a nonstereotype. These findings are in stark contrast to previous findings that document a high degree of explicit knowledge of cultural stereotypes about Blacks (e.g., Devine & Elliot, 1995). These findings are also in stark contrast to the 94% of present respondents who indicated being aware of the stereotype that Blacks are violent, and the 89% of respondents who indicated being aware of the stereotypes that Whites are rich and culturally insensitive.

### Discussion

As predicted, participants were faster to categorize target words when *Black* was paired with *ape* than when *Black* was paired with *feline*. Thus, across four studies, we have shown that participants associate Blacks and apes.[4] In Study 4, we also demonstrated that participants were not simply associating *Black* with violent aggression or Africa, as the big cats were seen as more violent and African than were the apes. This bias toward pairing *Black* and *ape* was virtually unchanged when covarying for participants' scores on the personalized IAT, indicating that individuals' implicit anti-Black bias was not responsible for the Black–ape association. In addition, few participants indicated knowledge of the historical representation of Blacks as apes, further supporting the hypothesis that the Black–ape association functions without the benefit of explicit cultural knowledge of the association.

### Study 5

What are the material consequences of the Black–ape association? Historically, the "Negro-ape metaphor" was used to justify subjugation of and violence against Black people (Fredrickson, 2002; Lott, 1999). Despite our demonstrations of the continued presence and strength of the Negro-ape metaphor, the function of this metaphor in contemporary society is unclear. Can the activation of this association in contemporary society lead people to condone violence against Black targets, despite individual differences in anti-Black prejudice? Study 5 was designed to examine this question. Specifically, we subliminally primed participants

---

[3] Though not all of the "ape" words can correctly be called *apes*, these words were found to be strongly associated with the concept "ape" among lay people.

[4] One might argue that although these data demonstrate participants' willingness to associate Blacks with apes, the data do not demonstrate that participants are more willing to associate Blacks with apes than with humans. Even early anthropologists who explicitly likened Africans to apes, however, would not argue that Africans were categorically nonhuman—merely that they were not yet as human as Whites (Lott, 1999). And it is this sentiment, we argue, that is reflected in our findings.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

with words associated with apes or big cats, and we asked them to view a videotape of a group of police officers beating a suspect whom the participants were led to believe was Black or White. We predicted that the participants primed with the ape words would be the most likely to condone violence directed at the suspect, but only when they thought the suspect was Black.

### Method

#### Participants

One hundred twenty-one White male undergraduates at The Pennsylvania State University participated in this study in exchange for partial course credit. Participants ranged in age from 18 to 25 ($M = 19.04$). Three did not wish to view violent videos and were excused from the study before participation began. Two participants' data were lost due to computer failure. One participant was suspicious of the experimental hypothesis as a result of conversations with a previous participant. All analyses were therefore run on the remaining 115 participants.

#### Design

Participants were randomly assigned in a 2 (animal prime type: apes vs. big cats) × 2 (race of target: Black vs. White) between-subjects design. Violence justification served as our primary dependent variable.

#### Materials

*Personalized IAT.* The personalized IAT was administered using the identical protocol as that used in Study 4.

*Vigilance task.* The vigilance task was identical to the priming task used in Studies 1–3, with the exception that the primes in Study 5 were animal words, and the masks were letter strings. The same animal words used in Study 4 were used in Study 5.

*Video.* A 2-min video clip included footage of a number of police officers violently subduing a single suspect. We made the race of the suspect clear by displaying a mug shot photo of either a Black or White suspect (matched on attractiveness and stereotypicality) at the beginning of the video clip. The video informed participants that the suspect, although described by his family as "a loving husband and father," had a serious criminal record and may have been high on "a mind-altering substance—possibly PCP—at the time of the arrest." The video also indicated that the suspect had been wanted for some time and that the footage of the police beating followed a lengthy pursuit on foot.

*Video questionnaire.* The video questionnaire consisted of the following four questions rated on a Likert scale ranging from 1 (*not at all*) to 7 (*extremely*): "How violently did the suspect resist?" "How justified were the police in using the amount of force they used?" "How much did the suspect deserve the treatment he received?" and "How much did the suspect's behavior make violence necessary?" These four items combined to form a highly reliable scale indicating participants' ideas about how justifiable the police violence was ($\alpha = .90$).

#### Procedure

Participants were greeted by one of several White experimenters who informed them that they would be taking part in a two-part study. The first part would be a categorization task (which was actually the personalized IAT). The second part would be completed no less than 24 hr later and would be a video-rating task.

Participants completed the personalized IAT in the first session and returned for a second session no less than 24 hr later but no more than 1 week after their initial session. Upon returning for their second session, participants were told that they would complete two unrelated tasks. The first was the "vigilance task" from Studies 1–3, containing either ape words or big-cat words as subliminal primes.

After completing the "vigilance task," participants were shown a video clip of a police beating—ostensibly from a television show similar to the show *COPS*. After watching the video clip and completing the questionnaire, participants were asked questions about how justified the police violence was in the video. Finally, participants were probed for suspicion, thoroughly debriefed, and thanked for their participation.

### Results

We submitted participants' ratings of how justified the beating was to the planned 2 (animal prime type: apes vs. big cats) × 2 (race of suspect: Black vs. White) between-subjects ANOVA. This revealed the anticipated two-way interaction (see Figure 4), $F(1, 111) = 7.13$, $p < .01$, $\eta^2 = .06$, and was not moderated by the personalized IAT, $F(1, 110) < 1$, *ns*. Simple effects tests revealed that participants who believed the suspect to be White perceived the police as no more justified in using violence when primed with apes ($M = 2.86$, $SD = 1.29$) than when primed with big cats ($M = 3.13$, $SD = 1.69$), $F(1, 111) < 2$, *ns*. However, participants who believed the suspect to be Black perceived the police as more justified in using violence when they had been primed with apes ($M = 3.88$, $SD = 1.46$) than when they had been primed with big cats ($M = 2.90$, $SD = 1.51$), $F(1, 111) = 5.85$, $p < .05$, $\eta^2 = .05$. Similarly, whereas participants who had been primed with big cats did not think the police more justified in beating the White or the Black suspect, $F(1, 111) < 2$, *ns*, participants who were primed with apes thought that the police were more justified in beating the Black suspect than the White suspect, $F(1, 111) = 6.47$, $p = .01$, $\eta^2 = .06$.

### Discussion

Study 5 demonstrates that the Black–ape association can alter participants' judgments about violence against a Black target. Participants were more likely to believe that the beating the Black suspect received was justified when primed with apes than with big cats. Moreover, these findings were not attenuated by individual differences in implicit anti-Black bias. Taken together, this suggests that implicit knowledge of a Black–ape association led to marked differences in participants' judgments of Black criminal suspects.

In Study 5, we demonstrated that the Black–ape association can alter judgments of criminal suspects when activated; yet, how likely is the association to become spontaneously activated outside of the laboratory context? In the final study, we looked for the presence of the association in actual criminal cases in which jurors were instructed to render judgments of life or death.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.



*Figure 4.* Mean violence justification rating as a function of prime and race of suspect (Study 5). Error bars represent the average standard error for each condition.

We also explored one possible mechanism for the maintenance of this dehumanizing association between Blacks and apes: metaphorical representations. Though the explicit likening of Blacks to apes has all but disappeared in popular U.S. media, the representation may persist in coded language. Is it possible that newspaper coverage of stereotypical African Americans—such as Black criminals—is still replete with words that conjure simian images to mind? Perhaps subtle metaphors that go largely unnoticed in media continue to have great effect—and can even be linked to life-and-death decisions.

### Study 6

In his landmark book on metaphorical representations in popular media, Otto Santa Ana (2002) argued that media outlets tacitly compare Mexican immigrants to insects, among other things. Santa Ana argued that in newspapers, this happens when words such as *swarm* or *crawl* are used to describe Mexican immigrants. Santa Ana further argued that these words, linking Mexican immigrants to insects, create an implicit metaphor that, although hidden to casual readers, powerfully impacts the ways in which they conceive of Mexican immigrants and issues surrounding immigration. In Study 6, we extended Santa Ana's hypothesis to the representation of Blacks as apelike.

Using a large data set compiled by death penalty researchers, David Baldus and colleagues (Baldus, Woodworth, Zuckerman, Weiner, & Broffitt, 1998), we examined death-eligible cases between 1979 and 1999 in Philadelphia, Pennsylvania. From this data set, we extracted 153 cases for which we had both mug shots of the defendant and press coverage of the case in the *Philadelphia*

*Inquirer*. The *Inquirer* has not only a strong national reputation but also nearly exclusive responsibility for handling Philadelphia's local news in print. We predicted that the news coverage of Black death-eligible defendants would be more likely to contain apelike representations than the news coverage of death-eligible White defendants and that these representations would be related to death-sentencing judgments.

### Method

#### Death-Eligible Cases

Data on 153 death-eligible cases (15 with White defendants, 138 with Black defendants) were taken from the Baldus data set (Baldus et al., 1998), a comprehensive database of over 600 death-eligible cases that advanced to the penalty phase in Philadelphia, Pennsylvania from 1979 to 1999. Cases were selected if the defendant was Black or White, if the mug shot of the defendant was available, and if the case received coverage in the *Philadelphia Inquirer*. For each case, the Baldus data set contained demographic information for the defendant and victim (e.g., race and socioeconomic status) as well as factors related to the criminal case, including aggravating circumstances, mitigating circumstances, and crime severity. We used these factors as covariates in the present data analyses.

#### Newspaper Articles

*Developing a coding list.* Four coders searched electronic copies of the *Philadelphia Inquirer* from 1979 to 1999 for mentions of

GOFF, EBERHARDT, WILLIAMS, AND JACKSON

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

defendants in the Baldus database (Baldus et al., 1998). Each article that contained a mention of a defendant was then compiled into an article database. The article database contained 788 articles. Each article was then coded for the presence of 54 words that connoted bestial or subhuman qualities. Words were chosen from a random sampling of 5% of the total articles. Next, the words were presented to 24 naïve raters who read each word in context (taken from sentences in the newspaper articles). Raters were asked to "think of an animal" that was associated with the target word in each sentence. Thirty-five words[5] elicited *ape*, *monkey*, or *gorilla* from more than 12 respondents (50%). Finally, to further confirm that these words elicited the concept "ape," all 35 words were then presented to a new group of 24 naïve raters, again in context. This time, the raters were asked to "think of an animal" that was called to mind after reading all 35 sentences. Of the 24 respondents, 17 answered *ape*, *monkey*, or *gorilla*. Thus, we established that the words in the coding list, both individually and as a set, were associated with apes.

*Scoring the news articles.*   Different raters searched the collection of articles for each ape-relevant word on the coding list. Raters were given instructions borrowed from work by the sociolinguist Otto Santa Ana (2002) in his book on metaphor and racial representations. Each time a word from the coding list was found, it was read in context to ensure it was being used appropriately (i.e., that *spring* was being used as a verb rather than in reference to a season). Each death-eligible case was then given a score for the total number of ape words used to describe it in the press and a score for the total number of articles that covered the case.

### Results

We submitted the data to an analysis of covariance, controlling for the total number of articles on each case. As predicted, we found that Black defendants (8.53 mentions, $SD = 12.35$) were described in the press with more ape-relevant words than were White defendants (2.2 mentions, $SD = 2.34$), $F(1, 151) = 4.61$, $p < .05$, $\eta^2 = .03$.

We next tested the relationship between ape portrayals in the press and defendants being put to death. When controlling for the total number of articles, defendant socioeconomic status, victim socioeconomic status, aggravating circumstances, mitigating circumstances, and crime severity, Black defendants who were put to death were more likely to have apelike representations in the press (12.69 mentions, $SD = 16.66$) than were those whose lives were spared (6.22 mentions, $SD = 8.43$), $F(1, 130) = 4.88$, $p < .05$, $\eta^2 = .04$. Though a similar trend was found for Whites, with those sentenced to death more likely to receive apelike representations in the press (2.57 mentions, $SD = 2.82$) than those whose lives were spared (1.88 mentions, $SD = 1.96$)—perhaps because of the paucity of White death-eligible cases—this pattern was not statistically significant for Whites, $F(1, 7) < 1$, *ns.* Taken together, the results of Study 6 suggest that Black defendants are more likely to be portrayed as apelike in news coverage than White defendants and that this portrayal is associated with a higher probability of state-sponsored executions.

### Discussion

Though Study 6 was not a controlled experiment, the observed pattern of data suggests that apelike representations of Black

Americans persist in the press—though hidden in metaphor rather than explicitly rendered. Moreover, despite the fact that we controlled for a substantial number of factors that are known to influence criminal sentencing, these apelike representations were associated with the most profound outcome of intergroup dehumanization: death.

### General Discussion

A series of six studies provide evidence of a bidirectional association between Blacks and apes that can operate beneath conscious awareness yet significantly influence perception and judgments. In Studies 1–3, we demonstrated a strong bidirectional association between Blacks and apes that directs visual perception and attention. These studies established that neither explicit prejudice nor in-group status moderate this association. Studies 1 and 2 also demonstrated that there was a bidirectional White–ape inhibition effect. This is consistent with prior research by Eberhardt and colleagues (Eberhardt et al., 2004) showing that, whereas Blacks and crime were positively associated, Whites and crime were negatively associated. That Whites and apes are negatively associated is also consistent with early biologically racist accounts of evolution that rendered Blacks as least evolved (ergo closest to apes) and Whites as most evolved (ergo farthest from apes) (Jahoda, 1999; Lott, 1999). This apparent interrelatedness of Black and White images in cultural representations and mental representations deserves further study.

After having established that individuals mentally associate Blacks and apes, Study 4 demonstrated that this implicit association is not due to personalized, implicit attitudes and can operate beneath conscious awareness. In Study 5, we demonstrated that, even controlling for implicit anti-Black prejudice, the implicit association between Blacks and apes can lead to greater endorsement of violence against a Black suspect than against a White suspect. Finally, in Study 6, we demonstrated that subtle media representations of Blacks as apelike are associated with jury decisions to execute Black defendants.

We used broad stimulus sampling procedures to ensure that our results were not due to stimulus artifacts. In Study 1, we subliminally primed participants with a broad range of Black faces and White faces (50 of each group) to ensure that the ape facilitation effect produced by exposure to the Black faces was not due to a small number of specific Black faces that just happened to appear as more "apelike." Our results also were not due to mere color matching. In Studies 1–3, we removed the color from our animal stimuli entirely by exposing participants to line drawings of animals. In Study 3, we removed the color from our face stimuli entirely by presenting line drawings of faces. In Studies 4 and 5, we removed the images of the animals entirely by presenting words associated with the animals rather than pictorial representations. And in Study 4, we removed the images of Blacks and Whites entirely by presenting stereotypical first names associated with Blacks and Whites rather than faces. Lastly, our results were

---

[5] The final list of words was *animal, ape, barbaric, beast, bellow, brute, claw, collar, crawl, crouch, flush, hairy, howl, hunt, husky, jungle, monster, net, pack, pounce, predator, prey, prowl, savage, scamper, scratch, slaughter, spring, stalk, stampede, swarm, tail, tame, trap,* and *wild.*

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

not due simply to apes being represented as aggressive or from Africa. Big cats were rated as more aggressive and more closely associated with Africa, yet participants still showed a bias toward associating Blacks with apes and not big cats, indicating a specific representational matching of Blacks and apes.

The present research, however, is not without limitations. Though Study 1 demonstrated that the Black–ape association was held by Whites and non-Whites alike, difficulty recruiting a racially diverse participant sample did not permit a more precise examination of racial variation in the Black–ape association. Due to recruitment difficulties, there were few Black participants in Study 1 and no Black participants in subsequent studies. Though one could argue that Blacks might share the implicit knowledge structures responsible for the Black–ape association, this implicit knowledge may have different consequences for Blacks put in the position of making judgments about targets who are in-group members (as in Study 5, for example). The possible moderating role of group identity should be included in future directions of this research.

These findings expand the growing literature on dehumanization by suggesting that historically rooted representations may differ from general intergroup processes. For instance, although Leyens and colleagues (Leyens et al., 2001) found that in-groups privilege their human "essences" but that nonhuman animals are not a necessary contrast, examining the "Negro-ape metaphor" highlights the significance of likening certain groups to nonhuman animals. Studies 1 and 2 also expand the literature on dehumanization by moving beyond an in-group/out-group model. Whereas previous research has focused on in-group bias, Study 1 demonstrated that specific dehumanizing representations of particular stigmatized groups may be widely held—regardless of one's group affiliation—within a given culture.

Additionally, with the exception of recent work by Vaes and colleagues (Vaes et al., 2003, 2002), few empirical studies highlight the behavioral consequences of dehumanization. Though the word *dehumanization* invokes notions of bias and discrimination, previous research has largely been confined to preferential ascriptions of emotions and character traits. The present research foregrounds dehumanization as a factor in producing implicit racial bias, and we associate it with deadly outcomes—thereby connecting the literatures of stereotyping, implicit processes, and dehumanization with real-world social injustices.

That implicit knowledge may contribute to these injustices also deserves strong consideration. Whereas contemporary research paradigms typically assume that explicit knowledge of a stereotype is necessary before that stereotype can be implicitly activated or applied, the present research offers evidence to the contrary. In Study 4, participants did not indicate explicit knowledge of the Black–ape association, despite their strong willingness to express knowledge of another negative stereotype of Blacks (i.e., they are violent). This suggests that historical representations are associated with contemporary outcomes in ways that are even more subtle than had previously been suspected. When paired with a knowledge of this country's history of racial oppression, this is a troubling notion that we hope will occasion researchers to investigate the precise mechanisms by which implicit knowledge functions.

Beyond each of these specific theoretical contributions, however, is a broader contribution we hope this research will make. Dehumanization is about consequences as much as mechanisms.

Though researching the mechanisms that undergird dehumanization is an important mandate for psychologists, it is essential that researchers not lose sight of the reason that dehumanization warrants attention in the first place. Dehumanization is a method by which individuals and social groups are targeted for cruelty, social degradation, and state-sanctioned violence. This research demonstrates that studying these outcomes need not be beyond the scope of social psychological analysis. Rather, examining specific historical representations, investigating the mechanisms of implicit knowledge, and exploring the cognitive antecedents of human–animal associations can all be in the service of remedying dehumanization's savage consequences.

## References

Allport, G. W. (1954). *The nature of prejudice*. Oxford, England: Addison-Wesley.

Baldus, D. C., Woodworth, G., Zuckerman, D., Weiner, N. A., & Broffitt, B. (1998). Racial discrimination and the death penalty in the post-Furman era: An empirical and legal overiew, with recent findings from Philadelphia. *Cornell Law Review, 83,* 1638–1770.

Bargh, J. A., & Chartrand, T. L. (2000). The mind in the middle: A practical guide to priming and automaticity research. In H. T. Reis & C. M. Judd (Eds.), *Handbook of research methods in social and personality psychology* (pp. 253–285). New York: Cambridge University Press.

Bar-Tal, D., & Teichman, Y. (2005). *Stereotypes and prejudice in conflict: Representations of Arabs in Israeli Jewish society.* New York: Cambridge University Press.

Brigham, J. C. (1993). College students' racial attitudes. *Journal of Applied Social Psychology, 23,* 1933–1967.

Chalk, F., & Jonassohn, K. (1990). *The history and sociology of genocide: Analyses and case studies.* New Haven, CT: Yale University Press.

Correll, J., Park, B., Judd, C. M., & Wittenbrink, B. (2002). The police officer's dilemma: Using ethnicity to disambiguate potentially threatening individuals. *Journal of Personality and Social Psychology, 83,* 1314–1329.

Dapper, O. (1688). *Naukeurige Beschryving der Eilanden in de Archipel der Middellandsche Zee* [Precise description of the islands in the archipelago of the Mediterranean sea]. Amsterdam: J. Von Meurs.

Demoulin, S., Leyens, J. P., Paladino, M. P., Rodriguez-Torres, R., Rodriguez-Perez, A., & Dovidio, J. F. (2004). Dimensions of "uniquely" and "non-uniquely" human emotions. *Cognition & Emotion, 81,* 71–96.

Demoulin, S., Leyens, J. P., Rodriguez-Torres, R., Rodriguez-Perez, A., Paladino, P. M., & Fiske, S. T. (2005). Motivation to support a desired conclusion versus motivation to avoid an undesirable conclusion: The case of infra-humanization. *International Journal of Psychology, 40,* 416–428.

Devine, P. G. (1989). Stereotypes and prejudice: Their automatic and controlled components. *Journal of Personality and Social Psychology, 56,* 5–18.

Devine, P. G., & Elliot, A. J. (1995). Are racial stereotypes really fading? The Princeton Trilogy revisited. *Personality and Social Psychology Bulletin, 21,* 1139–1150.

Dovidio, J. F., Evans, N., & Tyler, R. B. (1986). Racial stereotypes: The contents of their cognitive representations. *Journal of Experimental Social Psychology, 22,* 22–37.

Dovidio, J. F., & Gaertner, S. L. (1998). On the nature of contemporary prejudice: The causes, consequences, and challenges of aversive racism. In J. L. Eberhardt & S. T. Fiske (Eds.), *Confronting racism: The problem and the response* (pp. 3–32). Thousand Oaks, CA: Sage.

Dred Scott v. Sandford, 60 U.S. 393 (1856).

Dunton, B. C., & Fazio, R. H. (1997). An individual difference measure of

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

motivation to control prejudiced reactions. *Personality and Social Psychology Bulletin, 23,* 316–326.

Dyer, R. (1997). *White.* London: Routledge.

Eberhardt, J. L., Goff, P. A., Purdie, V. J., & Davies, P. G. (2004). Seeing Black: Race, crime, and visual processing. *Journal of Personality and Social Psychology, 87,* 876–893.

Fiske, S. T. (1998). Stereotyping, prejudice, and discrimination. In D. T. Gilbert, S. T. Fiske, & G. Lindzey (Eds.), *The handbook of social psychology* (4th ed., pp. 357–411). New York: McGraw-Hill.

Fredrickson, G. M. (2002). *Racism: A short history.* Princeton, NJ: Princeton University Press.

Gaertner, S. L., & McLaughlin, J. P. (1983). Racial stereotypes: Associations and ascriptions of positive and negative characteristics. *Social Psychology Quarterly, 46,* 23–30.

Gaunt, R., Leyens, J. P., & Demoulin, S. (2002). Intergroup relations and the attribution of emotions: Control over memory for secondary emotions associated with the ingroup and outgroup. *Journal of Experimental Social Psychology, 38,* 508–514.

Greenwald, A. G., McGhee, D. E., & Schwartz, J. L. K. (1998). Measuring individual differences in implicit cognition: The implicit association test. *Journal of Personality and Social Psychology, 74,* 1464–1480.

Greenwald, A. G., Nosek, B. A., & Banaji, M. R. (2003). Understanding and using the Implicit Association Test: I. An improved scoring algorithm. *Journal of Personality and Social Psychology, 85,* 197–216.

Harris, L. T., & Fiske, S. T. (2006). Dehumanizing the lowest of the low: Neuroimaging responses to extreme out-groups. *Psychological Science, 17,* 847–853.

Haslam, N. (2006). Dehumanization: An integrative review. *Personality and Social Psychology Review, 10,* 252–264.

Haslam, N., Bain, P., Douge, L., Lee, M., & Bastian, B. (2005). More human than you: Attributing humanness to self and others. *Journal of Personality and Social Psychology, 89,* 937–950.

Jahoda, G. (1999). *Images of savages: Ancient roots of modern prejudice in Western culture.* New York: Routledge.

Judd, C. M., Park, B., Ryan, C. S., Brauer, M., & Kraus, S. (1995). Stereotypes and ethnocentrism: Diverging interethnic perceptions of African American and White American youth. *Journal of Personality and Social Psychology, 69,* 460–481.

Kennedy, R. (1998). *Race, crime, and the law.* New York: Vintage Books.

Lepore, L., & Brown, R. (1997). Category and stereotype activation: Is prejudice inevitable? *Journal of Personality and Social Psychology, 72,* 275–287.

Levy, S. R., Stroessner, S. J., & Dweck, C. S. (1998). Stereotype formation and endorsement: The role of implicit theories. *Journal of Personality and Social Psychology, 74,* 1421–1436.

Leyens, J. P., Cortes, B., Demoulin, S., Dovidio, J. F., Fiske, S. T., Gaunt, R., et al. (2003). Emotional prejudice, essentialism, and nationalism: The 2002 Tajfel lecture. *European Journal of Social Psychology, 33,* 703–717.

Leyens, J. P., Rodriguez-Perez, A., Rodriguez-Torres, R., Gaunt, R., Paladino, M. P., Vaes, J., & Demoulin, S. (2001). Psychological essentialism and the differential attribution of uniquely human emotions to ingroups and outgroups. *European Journal of Social Psychology, 31,* 395–411.

Lott, T. L. (1999). *The invention of race: Black culture and the politics of representation.* Malden, MA: Blackwell Publishers.

Loughnan, S., & Haslam, N. (2007). Animals and androids: Implicit associations between social categories and nonhumans. *Psychological Science, 18,* 116–121.

MacLeod, C., Mathews, A., & Tata, P. (1986). Attentional bias in emotional disorders. *Journal of Abnormal Psychology, 95,* 15–20.

McConahay, J. B. (1986). Modern racism, ambivalence, and the Modern Racism Scale. In J. F. Dovidio & S. L. Gaertner (Eds.), *Prejudice, discrimination, and racism* (pp. 91–125). Orlando, FL: Academic Press.

O'Brien, G. V. (2003). Indigestible food, conquering hordes, and waste materials: Metaphors of immigrants and the early immigration restriction debate in the United States. *Metaphor and Symbol, 18,* 33–47.

Olson, M. A., & Fazio, R. H. (2004). Reducing the influence of extrapersonal associations on the Implicit Association Test: Personalizing the IAT. *The Journal of Personality and Social Psychology, 86,* 653–667.

Opotow, S. (1990). Moral exclusion and injustice: An introduction. *Journal of Social Issues, 46,* 1–20.

Ovington, J. (1929). *A voyage to Suratt in the year 1689.* London: Oxford University Press.

Santa Ana, O. (2002). *Brown tide rising: Metaphors of Latinos in contemporary American public discourse.* Austin: University of Texas Press.

Selznick, D. O. (Producer), Cooper, C. C., & Schoedsack, E. B. (Directors). (1933). *King Kong* [Motion picture]. United States: RKO Radio Pictures.

Snead, J. (1994). *White screens/Black images: Hollywood from the dark side.* New York: Routledge.

Staub, E. (1989). *The roots of evil: The origins of genocide and other group violence.* Cambridge, England: Cambridge University Press.

Staub, E., & Bar-Tal, D. (2003). Genocide, mass killing and intractable conflict: Roots, evolution, prevention and reconciliation. In D. Sears, L. Huddy, & R. Jarvis (Eds.), *Handbook of political psychology* (pp. 710–751). New York: Oxford University Press.

Vaes, J., Paladino, M. P., Castelli, L., Leyens, J. P., & Giovanazzi, A. (2003). On the behavioral consequences of infrahumanization: The role of uniquely human emotions on intergroup relations. *Journal of Personality and Social Psychology, 85,* 1016–1034.

Vaes, J., Paladino, M. P., & Leyens, J. P. (2002). The lost e-mail: Prosocial reactions induced by uniquely human emotions. *British Journal of Social Psychology, 41,* 521–534.

Vaes, J., Paladino, M. P., & Leyens, J. P. (2004). Prise de perspective et expression d'émotions typiquement humaines: Dessiner un E sur le front [Perspective taking in an intergroup context and the use of uniquely human emotions: Drawing an E on your forehead]. *Revue Internationale de Psychologie Sociale, 17*(3), 5–26.

Vaes, J., Paladino, M. P., & Leyens, J. P. (2006). Priming uniquely human emotions and the in-group (but not the out-group) activates humanity concepts. *European Journal of Social Psychology, 36,* 169–181.

Wittenbrink, B., Judd, C. M., & Park, B. (1997). Evidence for racial prejudice at the implicit level and its relationship with questionnaire measures. *Journal of Personality and Social Psychology, 72,* 262–274.

Wynter, S. (1992). "No humans involved": An open letter to my colleagues. *Voices of the African Diaspora, 8,* 1–17.

Received February 13, 2007
Revision received July 12, 2007
Accepted July 18, 2007  ∎





**MICHIGAN JUSTICE FOR ALL TASK FORCE**

# Strategic Plan and Inventory Report

December 2020



**JUSTICE** FOR ALL

# A Message from Chief Justice Bridget M. McCormack and Justice Brian K. Zahra, liaison to the Justice for All Task Force

**TRUST.** The only currency Michigan courts have is trust – the trust of the people we serve. Our judiciary builds that trust by being accessible and engaged with the public. Whether physical or virtual, an open courthouse door sends a clear signal that our justice system must work for everyone. At the same time, an engaged judiciary must deliver justice solutions where people live, shaking free from the limitations imposed by old-fashioned rules, complicated language, and imposing buildings.

**CIVIL JUSTICE GAP.** However successful in keeping our courts running, virtual justice must be measured against the pre-pandemic reality: Courts were falling short in meeting their mission to provide access to justice for all, and particularly so when it comes to addressing the needs of lower-income and minority communities. This failure is glaringly clear when it comes to our civil justice system and critical concerns that burden families, including the risk of eviction, access to public benefits, barriers to employment, family law issues like parenting time or custody disputes, and elder abuse, among many others. In fact, we know from surveys that nearly nine in ten low-income individuals with a civil legal problem receive little or no legal help. This civil justice gap persists despite the tireless efforts of Michigan legal aid organizations and our national leadership with MichiganLegalHelp.org, a program of online resources and walk-in self-help centers that have helped millions of state residents.

**JUSTICE FOR ALL.** With funding from the National Center for State Courts, the Michigan Supreme Court formed the Justice for All (JFA) Task Force in May 2019 to assess the current state of our civil justice system and develop a strategic action plan to ensure **100 percent access to justice.** This *Strategic Plan and Inventory Report* represents the culmination of countless hours of work to inventory resources, identify gaps and barriers, and create a road map for the future that that leads to a more welcoming, understandable, and trusted civil justice system. The Supreme Court is grateful to the Task Force and its work groups, and to hundreds of community stakeholders, attorneys, judges, and court staff who came together and contributed to this landmark project.

Ultimately, the success of this initiative depends on the ability of stakeholders to break down the barriers to change and build a service-focused culture, simplify and streamline processes, create new and affordable ways to match legal services with public needs, and collaborate in the community to get more resources and get more out of those resources. This report identifies specific, concrete, and doable steps Michigan can take to build a civil justice system that will be a model for the nation, and we ask state leaders and residents statewide to join us on the road to justice for all.

# Justice for All Project Overview

The Michigan Supreme Court formed the Justice for All (JFA) Task Force in May 2019 to assess the current state of our civil justice system and develop a strategic plan to ensure **100% access to justice for people in Michigan**. The National Center for State Courts provided the framework and funding for this project through its Justice for All Initiative.

This *Strategic Plan and Inventory Report* is the result of an 18-month collaborative project led by the Michigan State Bar Foundation, the State Bar of Michigan, the State Court Administrative Office, and the Michigan Legal Help Program. The 18-member Justice for All Task Force and its 5 work groups conducted a comprehensive, broad assessment of 15 civil justice system components by engaging and collecting information and data from traditional and non-traditional justice system stakeholders across the state. Members of the public, judges, court staff, attorneys, and community organization staff members participated in focus groups, surveys, town hall style gatherings, meetings, and planning sessions. The 15 component assessments are provided in the Inventory section of this report.

In October 2020, the Task Force hosted four virtual half-day planning sessions with over 100 stakeholders to develop a comprehensive strategic plan to fill gaps and address barriers to access to justice that were identified in the assessments. In the first two sessions Task Force and work group members collaborated to develop a shared vision for the future and strategic goals to attain that future state. In each of the second two sessions about 40 stakeholders from a wide variety of legal, government, and community organizations provided feedback on a draft strategic plan and helped prioritize work to achieve its goals. This planning process resulted in an ambitious strategic plan that will undoubtedly improve Michigan's civil justice system as it is carried out over the next several years.

## Michigan Justice for All Task Force Members

**Jenifer Bentley**
Michigan State Bar Foundation

**Kevin Bowling**
Ottawa County Circuit Court Administrator

**Lee Ann Gasper**
State Court Administrative Office

**Martha Gonzalez-Cortez**
Kalamazoo Community Foundation

**Kathryn Hennessey**
State Bar of Michigan

**Nicole Huddleston**
Detroit Justice Center

**Elinor Jordan**
Michigan Coalition Against Domestic and Sexual Violence

**Kim Koscielniak**
Library of Michigan

**Ashley Lowe**
Lakeshore Legal Aid

continued on next page …

3

# Strategic Plan

The Justice for All Task Force developed this Strategic Plan with the overarching goal of ensuring 100% access to justice for people in Michigan. The civil justice system includes the courts, lawyers, legal aid programs, and many other community partners that provide a wide variety of important services. They work together so people can address their civil legal problems, which may involve money, housing, family issues, employment, or many other non-criminal problems.

The civil justice system is important because last year seven out of ten low-income households had at least one civil legal problem. Since the right to a lawyer applies only in criminal cases, at least one side represented themselves in 75% of civil cases because they could not afford a lawyer. As a result, people who have done nothing wrong may lose life-changing cases in court because they don't have the legal information or help they need.

Through this Strategic Plan the JFA Task Force has created a path to a better civil justice system - one that provides a safe, trusted, and inclusive experience for addressing problems and strengthening communities.

## Michigan Justice for All Task Force Members

**Chief Judge Mabel J. Mayfield**
Berrien County Trial Courts

**Jill Nylander**
Legal Services of Eastern Michigan

**Jessica Parks**
State Court Administrative Office

**Judge Matthew Stewart**
Shiawassee County Circuit Court

**Angela Tripp**
Michigan Legal Help Program

**Judge Raymond Voet**
64A District Court (Ionia)

**Jennifer Warner**
State Court Administrative Office

**Janet Welch**
State Bar of Michigan

**Justice Brian Zahra**
Michigan Supreme Court



# Vision

Michigan's civil justice system provides a safe, trusted, and inclusive experience for addressing problems and strengthening communities.

Our envisioned future for Michigan's Civil Justice System is described by these characteristics:

|  Welcoming |  Understandable |  Collaborative |  Adaptive | Trusted |
|---|---|---|---|---|
| Engaging with the civil justice system is not intimidating; if you need help it is available and accessible. | People can meaningfully engage with the civil justice system and use its tools to help address their problems, regardless of their level of experience. | Community organizations are integral partners to achieve better outcomes for people's civil legal problems. | All partners in the civil justice system embrace a culture of service to address people's individual needs. | Regardless of legal outcome, people believe they were heard, respected, and treated fairly. |
| Courthouses are accessible, pleasant, and convenient places to conduct business. | At every step people feel informed, understand what happened, and know what to do next. | A wide variety of diverse partners work together to solve people's legal and other related problems. | People get quality legal help, which may include new and innovative services, based on the complexity of their problems and their specific needs. | People see the civil justice system as necessary and useful; it is a place to help resolve their problems. |
| All people, regardless of race, gender, sexual orientation, ability, language, and social or economic status, are treated with dignity and feel like they belong. | | | The system is frequently evaluated and, as appropriate, new processes and technology are incorporated to enhance its effectiveness. | The civil justice system is accountable to its communities and responsive to community needs. |

# Strategic Pillars (Goals)



**Pillar 1**

**A service culture is pervasive across the Michigan civil justice system:** stakeholders are focused on serving and strengthening their communities.



**Pillar 2**

**Simplify and streamline processes, rules, and laws:** the civil justice system is easy to navigate, understand, and use to address all legal problems.



**Pillar 3**

**People can get what they need when they need it to address their problems:** a spectrum of easy-to-access affordable legal resources to match individual needs is available to everyone.



**Pillar 4**

**An inclusive collaborative network of diverse partners works together to solve problems:** the civil justice system effectively works with and integrates local resources and community-based organizations.

Outcome Measures and Tactics for each Strategic Pillar are set out on the next 5 pages. They represent many ideas suggested through the Justice for All inventory process. The tactics are ambitious by design and are likely to advance the goals of the JFA Task Force. It is not imagined that all tactics will be achieved or even necessarily undertaken in the next few years, and progress in 2021 especially may be impacted by the Coronavirus pandemic. Tactics designated by the Task Force as a high priority are highlighted.

It is anticipated that this Strategic Plan will be reviewed, evaluated, and updated on an annual basis. As a result, tactics may be updated, modified, and replaced according to the ever-changing needs of those whom the civil justice system serves and impacts.

# Strategic Pillar 1

**A service culture is pervasive across the Michigan civil justice system:** stakeholders are focused on serving and strengthening their communities.

| Outcome Measure | Tactics |
|---|---|
| **Outcome Measure 1:** People across the state feel respected and treated fairly throughout their interactions with the civil justice system, regardless of the outcome of their case. | ▪ **(High Priority)** Reimagine courthouses (physical and virtual) to be welcoming, safe places where people can easily find where they need to go and get the services they need (for example, multilingual plain language signage, courthouse concierge, self-help center, computers/printers in courtrooms, etc.). |
| | ▪ Provide easy access to court records and documents for everyone, including members of the public. |
| | ▪ Expand access to quality interpreter and language services across the civil justice system. |
| **Outcome Measure 2:** All stakeholders understand the importance of their role and provide exceptional service to system users. | ▪ **(High Priority)** Train all stakeholders on access to justice topics, including: |
| |     ▪ communication and customer service skills; |
| |     ▪ the difference between legal advice and legal information; |
| |     ▪ triage and referral strategies and tools; |
| |     ▪ diversity, equity, and inclusion principles applied to the civil justice system; |
| |     ▪ strategies to address power imbalances; |
| |     ▪ issues affecting people in poverty; |
| |     ▪ trauma-informed responses and de-escalation; and |
| |     ▪ how to grow public trust and confidence in the courts through building strong community and court relationships. |
| | ▪ Expand local courts' understanding of their roles and expectations in increasing access to justice through trial court performance measure results and best practices. |
| | ▪ Through the combined leadership of the judiciary, the bar, and other justice system stakeholders, shift the culture of the civil justice system toward a greater focus on collaboration and holistic problem solving. |

## Strategic Pillar 2

**Simplify and streamline processes, rules, and laws:** the civil justice system is easy to navigate, understand, and use to address all legal problems.

| Outcome Measure | Tactics |
|---|---|
| **Outcome Measure 1:** Simplify procedures so that all users – even first-time users – understand processes and their underlying purposes. | • *(High Priority)* Simplify, streamline, and create uniform statewide processes for a specific case type through a pilot project; document the project process to be replicated in other substantive areas. |
| | • *(High Priority)* Educate and assist the public on remote access to courts and coordinate with community partners to ensure that people can access required technology. |
| | • *(High Priority)* Identify, simplify, and clarify needlessly complex or difficult-to-understand legal procedures (for example, streamline information exchange between parties to allow them to make informed decisions about their cases early in the process). |
| | • Expand the use of text-messaging and other technology-based reminder systems for court dates and deadlines. |
| **Outcome Measure 2:** When appropriate, people can address their legal problems on their own. | • *(High Priority)* Develop and translate plain language court forms. |
| | • *(High Priority)* Advance the partnership between SCAO and Michigan Legal Help to create a statewide one-stop plain language forms portal. |
| | • Make the statewide e-filing system easily accessible to all self-represented people, including those who do not speak English. |
| | • Enhance courtroom assistance services throughout the state. |

# Strategic Pillar 3

**People can get what they need when they need it to resolve their problems:** a spectrum of easy-to-access affordable legal resources to match individual needs is available to everyone.

| Outcome Measure | Tactics |
|---|---|
| **Outcome Measure 1:** A robust statewide triage and referral system connects people to the right resources for their problems. | • (High Priority) Define triage and referral, map existing triage and referral systems, and identify priority areas for improvement. |
| | • (High Priority) Improve existing triage and referral systems through usability testing. |
| | • (High Priority) Reach out to and educate stakeholders and the public about the availability of the Guide to Legal Help as a triage tool to connect people with appropriate resources. |
| | • Develop a common framework for ongoing assessment and data sharing for triage and referral systems. |
| | • Increase language access and remote access in triage and referral services. |
| **Outcome Measure 2:** People can access the level of assistance needed to resolve their legal problems through an expanded continuum of services. | • (High Priority) Seek funding from the state legislature and other sources for access to justice improvements, including increased funding for legal aid representation of lower-income individuals. |
| | • (High Priority) Demystify Limited Scope Representation for lawyers, judges, and the public through a pilot project that demonstrates its value in a specific legal area. |
| | • (High Priority) Allow virtual hearings and revise procedures to promote the ability of attorneys to provide legal assistance wherever it is needed, throughout the state. |
| | • Develop a statewide centralized online repository of training materials and practice resources for pro bono attorneys. |
| | • Optimize existing systems and develop new services for people with moderate income to access affordable legal advice and representation. |
| | • Increase public and stakeholder awareness of Alternative Dispute Resolution (ADR) and the MI-Resolve online dispute resolution system; when appropriate, integrate ADR and MI-Resolve resources with partners' service models. |
| | • Develop training and mentorship programs for private attorneys on how to design a modern practice that provides affordable legal services. |
| | • Study successful problem-solving courts and how their strategies can be adapted for the civil justice system; develop recommendations for new or expanded problem-solving courts for civil legal problems. |

# Strategic Pillar 3

**People can get what they need when they need it to resolve their problems:** a spectrum of easy-to-access affordable legal resources to match individual needs is available to everyone.

| Outcome Measure | Tactics |
|---|---|
| **Outcome Measure 3:** Some services related to addressing legal problems are delivered by allied professionals at affordable prices. | ▪ (High Priority) Study the feasibility of deploying new and innovative business models and services to expand the continuum of services related to addressing legal problems. |
| | ▪ Authorize and develop a legal advocate/navigator role; determine what entity is best suited to oversee this role and set standards. |
| | ▪ Implement initial legal advocate/navigator role. |
| **Outcome Measure 4:** Self-help services exist in every county and are available in many courthouses where people can access self-help materials and, in most cases, in-person assistance. | ▪ (High Priority) Increase funding for Self-Help Centers (SHCs) to operate full time and where feasible, combine them with E-filing service centers. |
| | ▪ (High Priority) Expand outreach to the public to increase awareness of SHCs and their services. |
| | ▪ Strengthen courts' relationships with and support of self-help centers to improve their effectiveness; foster connections between SHCs and local justice system partners, including legal aid, libraries, Community Dispute Resolution Programs, and local bar associations. |
| | ▪ Develop consistent statewide standards for services provided by SHCs. |
| | ▪ In partnership with legal aid, bar associations, and others, offer legal clinics at Self Help Centers to increase access to limited scope, pro bono, and low-cost legal representation. |
| | ▪ Improve technology used at SHCs, including for volunteer management, data collection and sharing, office productivity, and remote services. |
| | ▪ Consistently collect SHC data and make it available in one place for SHCs' and other stakeholders' use. |

## Strategic Pillar 4

**An inclusive collaborative network of diverse partners works together to solve problems:** the civil justice system effectively works with and integrates local resources and community partners.

| Outcome Measure | Tactics |
|---|---|
| **Outcome Measure 1:** People can lessen the severity of their legal problems through education and early intervention as a result of traditional civil legal system stakeholders' engagement with community partners. | **(High Priority)** Create shared frameworks for collaboration, including systems for data sharing, in order to develop and strengthen partnerships between traditional civil legal system stakeholders and community partners. |
| | Create legal check-ups that can be deployed by community partners to help identify peoples' legal issues and make connections to needed information and help. |
| | Identify and replicate existing successful community integration programs and projects; share the best community integration and prevention practices and models statewide. |
| | Place self-help kiosks and provide access to trained navigators at community partner locations. |
| **Outcome Measure 2:** All partners in the civil justice system work collectively to improve access to justice for everyone in Michigan. | **(High Priority)** Create a permanent Justice for All Commission to ensure that the infrastructure is in place for effective and sustained community and stakeholder engagement and to maximize collaboration and coordination. |
| | **(High Priority)** Capture compelling real-life stories to use for advocacy, for example, to propose court rules changes, to gain support from the legislature, etc. |
| | Improve stakeholder willingness and capacity to use and share data by creating data sharing standards, executing information sharing agreements, hiring data analysts, and creating a staffed central repository for civil justice system data. |
| | Improve the ability to share court data to increase efficiency and ensure consistent collection of quality data. |
| | Conduct stakeholder training on how to assess consumer needs and experiences; share knowledge from organizations that successfully acquire consumer needs data and use it to inform their work. |
| | Partner with higher education institutions on scientific research to better understand how marginalized populations experience the courts and the legal system. |
| | Connect justice system stakeholders to broader community efforts to provide people with access to digital services, the internet, and online resources. |

# Inventory of the Michigan Civil Justice System

The development of the Justice for All Strategic Plan was preceded by and relied upon thorough assessments of 15 interrelated civil justice system components that are defined in the National Center for State Courts' JFA Guidance Materials. The assessments were designed to determine how well developed each component is in Michigan and what is the current level of adoption. This inventory contains the 15 component assessments, along with a list of gaps and barriers to adoption that were identified for each.

The JFA Task Force first divided the 15 system components into five groups, and for each appointed a work group of stakeholders with subject matter expertise to conduct the assigned component assessments (see the chart of components listed by group on the next page). Thirty-seven professionals from across the state participated in one or more work groups. The chairpersons of each work group comprised the core planning team that oversaw and coordinated stakeholder engagement, event planning, communications, survey design, and data collection for the project.

Work group members relied upon their experience and expertise to provide relevant information about how each component is currently deployed in Michigan. A vast amount of specific data and information was collected from the public and a wide variety of diverse stakeholders from every part of the state in several ways, including the following methods:

- January to July 2020 – In-person and virtual focus groups with 10 types of stakeholders; 139 people participated in 11 focus groups.

- February 2020 – Town hall meetings to engage members of the public hosted by Chief Justice McCormack and Justice Zahra; 57 people attended in Grand Rapids and 158 attended in Detroit; 46 people completed a short paper survey about their experiences with the civil justice system.

- May 2020 – Online survey of members of the public regarding their experiences with the civil justice system; 556 people completed the survey.



Participants at the Detroit Justice for All Town Hall Meeting in February 2020.

# Inventory of the Michigan Civil Justice System



Opening the public town hall meeting in Detroit: (l to r) Jennifer Bentley, executive director of Michigan State Bar Foundation; Chief Justice Bridget McCormack; and Justice Brian Zahra.

- July 2020 - Online survey of 16 different types of stakeholders about 15 justice system components; 991 people completed the survey.

The stakeholder survey was modeled on standard component assessments provided in the National Center for State Courts' JFA Guidance Materials, but they were significantly customized to reflect the Michigan civil justice landscape. The 15 component surveys were programmed as one very large online survey that used logic to deliver only appropriate questions to each type of respondent. Stakeholders that took this survey included state court judges, magistrates, and referees; court administrators and clerks; legal aid directors and attorneys; community organization directors and staff members; domestic violence survivor advocates; librarians, self-help center navigators; bar association leaders; pro bono counsel; limited scope lawyers; law school clinicians, and Community Dispute Resolution Program managers.

After this extensive amount of information was collected, the work groups analyzed relevant data to produce the component assessments that follow in this report (see Appendix for the Component Rating Scale).

# Justice System Components (listed by group)

## GOVERNANCE & INNOVATION

Jurisdictional Infrastructure

Stakeholder Capacity & Governance

Emerging Practices & Innovations

## CONSUMER NEEDS & COMMUNITY INTEGRATION

Consumer Needs & Experience

Community Integration & Prevention

## ASSISTANCE WITHOUT A LAWYER

Self-Help Centers

Triage & Referral

Alternative Dispute Resolution

Navigator Services

## REPRESENTATION BY A LAWYER

Full Representation

Limited Scope Representation

## COURT SERVICES & EDUCATION

Judicial & Court Staff Education

Plain Language Forms

Courtroom Assistance Services

Compliance Assistance

APPENDIX

COURT SERVICES & EDUCATION

REPRESENTATION BY A LAWYER

ASSISTANCE WITHOUT A LAWYER

CONSUMER NEEDS & COMMUNITY INTEGRATION

**GOVERNANCE & INNOVATION**



# Jurisdiction Infrastructure

## COMPONENT KEY ELEMENTS

- The infrastructure should include all civil access to justice stakeholders (traditional and non-traditional).

- Stakeholder profiles should be written and published, and should include state- and local-level information, where possible.

- The inventory should document current technological, social, economic, and transportation infrastructure and identify issues for consideration in planning, such as rural areas with inadequate broadband to support video or consistent web-based services.

## CUMULATIVE COMPONENT ASSESSMENT



PARTIAL

GOVERNANCE & INNOVATION

CONSUMER NEEDS & COMMUNITY INTEGRATION

ASSISTANCE WITHOUT A LAWYER

REPRESENTATION BY A LAWYER

COURT SERVICES & EDUCATION

APPENDIX

## Assessment

Jurisdiction Infrastructure was evaluated by cataloging how key justice system stakeholders are currently organized and how their organization impacts innovation and change. Stakeholders assessed include Michigan courts, the bar, legal aid, and other institutions that help people address their civil legal needs.

## Courts

Michigan's constitution organizes the judicial branch into "One Court of Justice" with several divisions including a supreme court, court of appeals, and trial courts which consist of the circuit and probate courts, and any courts of limited jurisdiction created by the legislature, currently the district court and municipal courts. The Michigan Supreme Court has superintending control over the court of appeals and trial courts.

Michigan currently has 242 trial courts, which includes 57 circuit courts, 78 probate courts, 103 district courts, and



Marquette County Courthouse

4 municipal courts.[1] Each circuit court also has a specialized Family Division that requires participation and coordination between the circuit and probate courts, and is aimed at providing more efficient and effective services to families and individuals.

Michigan utilizes judges and quasi-judicial officers, including magistrates, referees, and probate registers to conduct the court's business. Judges are elected (or appointed when a seat is vacated), while quasi-judicial officers are hired and employed by the court, and their authority is limited. As

of 2019, Michigan had 559 judges, not including quasi-judicial officers. In each judicial circuit a Friend of the Court (FOC) office exists. The FOC is an employee of the circuit court who serves under the direction of the Chief Judge to provide general Title IV-D (child support) services and other duties as set forth by law. A Friend of the Court Bureau is also established within the State Court Administrative Office to provide guidance and support to FOC offices.

Locally, a court administrator manages the business of each court under the

COURT SERVICES & EDUCATION

REPRESENTATION BY A LAWYER

ASSISTANCE WITHOUT A LAWYER

CONSUMER NEEDS & COMMUNITY INTEGRATION

**GOVERNANCE & INNOVATION**

supervision of the Chief Judge. The elected county clerk is designated as Clerk of the Circuit Court. County clerk employees, court clerks, and other court staff are responsible for the day-to-day interaction with the public, processing court filings, managing court records, and providing support during court proceedings.

Michigan's State Court Administrative Office (SCAO) has sought to ensure that trial courts are equipped with the necessary technology to serve the public in a connected world, including video conferencing technology and Zoom licenses.[2] To standardize operations across Michigan's trial courts, SCAO has developed various technology standards and guidelines, including for courtroom technology and virtual courtrooms. Michigan courts are currently engaged in the development and implementation of a statewide e-filing system. There currently is no online access to court records, and local trial courts use approximately 20 different case management systems, which makes it difficult to collect, share, and analyze data. Additionally, some locations don't have reliable internet service, further impeding their

ability to deliver consistent services. The level of public transportation available near and around Michigan's courts varies by each location.[3]

Funding responsibility for Michigan's trial courts is distributed among state, county, and municipal governments with federal funding adding a critical component of many court-administered services such as child support administration. While localized funding of courts has enabled laboratories of innovation in various locations, it also creates challenges in implementing collective and consistent change on a statewide level. The financial realities and priorities of local units of government make it difficult to implement change that requires additional funding. In September 2019, the Trial Court Funding Commission issued a report recommending the establishment and transition to a new court funding model.[4]

## The Bar

The State Bar of Michigan (SBM) was created by statute in 1935. It operates pursuant to the direction and rules of



Due to the size of our county, traveling to services can be difficult. We have limited public transportation and there is too much reliance on "in person" services.

- District Court Deputy Court Administrator in Western Michigan



State Bar of Michigan, Lansing, Michigan.

the Michigan Supreme Court, which defines the mission of the state bar to *"aid in promoting improvements in the administration of justice and advancements in jurisprudence, in improving relations between the legal profession and the public, and in promoting the interests of the legal profession in this state."* As with other integrated bars whose membership encompasses all licensed attorneys in the state, the SBM is governed by leadership elected by the entire membership. The SBM has several committees within its structure that focus on access to justice issues.[5]

The state bar has an integral role in the regulatory functions of the state concerning the practice of law, but has no direct decision making authority over regulation. It assists and collaborates with local and affinity bars on initiatives consistent with its public mission, including access to justice. Most rural, suburban, urban, and affinity bars, like the State Bar of Michigan, are led by elected leadership and offer initiatives in support of access to justice, but as voluntary, limited bars, these bars have limited strategic range and impact.

The State Bar of Michigan has a longstanding reputation for supporting innovation in the administration of justice and the delivery of legal services.[6] It has helped develop and promote fundamental improvements, such as Michigan Legal Help and problem-solving courts. The SBM helps attorneys connect with high-quality pro bono opportunities and administers several pro bono programs that assist low-income clients with various legal problems. The SBM also recognizes attorneys who contribute pro bono services through its A Lawyer Helps website and Pro Bono Honor Roll. The stability of its financial structure, scope of membership, and ability to effectively communicate with all licensed Michigan attorneys makes the State Bar of Michigan an important partner in advancing innovation in the civil justice system.

## Legal Aid

Michigan has five regional legal aid programs, several statewide legal aid organizations, and some smaller locally based legal aid programs that provide

COURT SERVICES & EDUCATION

REPRESENTATION BY A LAWYER

ASSISTANCE WITHOUT A LAWYER

CONSUMER NEEDS & COMMUNITY INTEGRATION

GOVERNANCE & INNOVATION

specialized services. Regional programs collectively have approximately 35 staffed offices with 200 full time attorneys located throughout Michigan. One program serves the metro Detroit area, three regional programs have a mix of large, mid-size, and rural areas, and one program serves 36 primarily rural counties, covering the top half of the Lower Peninsula and the entire Upper Peninsula.

Legal aid organizations do not have the financial and human resources needed to represent everyone who needs and qualifies for their services. The 2017 Justice Gap Report prepared by the Legal Services Corporation (LSC) found that nationwide, 86 percent of civil legal problems reported by low-income individuals received inadequate or no legal help. This problem is mirrored in Michigan.

Regional legal aid programs currently handle approximately 42,000 cases a year. About half of those cases involve housing and family law issues, with a priority on representing domestic violence survivors. These programs also prioritize cases involving access to public benefits, consumer debt,

education, barriers to employment, and elder abuse. Each legal aid program sets its own case priorities and may have specific funding to expand services in a particular substantive area or to assist a particular vulnerable population. There are also a variety of statewide programs that serve specific populations, including migrant and seasonal farmworkers, Native Americans, immigrants, and older adults. Service delivery in rural areas is especially challenging because there are fewer available resources.

Legal aid programs that coordinate statewide services also participate in a centralized fundraising campaign and are described further on the Access to Justice Campaign website. In addition to this campaign, Michigan civil legal aid organizations receive funding from LSC, the Michigan State Bar Foundation, and other foundations. There is not a state appropriation for civil legal aid.

Michigan's civil legal aid programs have a long history of collaboration and innovation. Three statewide programs provide the infrastructure for the statewide delivery system: Michigan



We are still developing accommodations related to COVID - It has been difficult due to the availability of high-speed internet and technology in the rural service area.

- Domestic Violence Survivor Service Provider

GOVERNANCE &
INNOVATION

CONSUMER NEEDS &
COMMUNITY INTEGRATION

ASSISTANCE WITHOUT
A LAWYER

REPRESENTATION
BY A LAWYER

COURT SERVICES
& EDUCATION

APPENDIX

Legal Help (MLH), Counsel and Advocacy Law Line (CALL), and Michigan Poverty Law Program (MPLP). MLH and CALL provide statewide centralized triage, referral, information, and advice, which frees up regional legal aid programs to devote their resources to cases that need full representation.

## Other Institutions

Several other organizations are central partners in the Michigan access to justice community. The Michigan State Bar Foundation provides grants to legal aid programs and convenes and leads statewide efforts in collaboration with its grantees. The Legal Services Association of Michigan is a nonprofit composed of leaders from the largest 13 civil legal services providers, which develop and pursue a legislative agenda to advance the civil legal rights of low-income individuals in Michigan. The State Planning Body is an association of leaders from the judiciary, legal aid, the private bar, the public defender community, immigration advocates, domestic violence advocates, and community service organizations, which collaborate

to address access to justice issues through policy advocacy, amicus briefs, and as advisors to the courts and other stakeholders. Michigan's five law schools have over 30 clinical programs that have the combined purpose of teaching lawyering skills to students and serving members of the public who can't afford to pay for legal services in a variety of case types.

## Access to Justice Community

To date, Michigan's Access to Justice community has been organized as an informal group of core justice system leaders, not as a formal entity. During the data and information gathering process for this inventory, the Justice for All Task Force recognized a need for a more defined and permanent infrastructure for access to justice work in Michigan. The Task Force decided and has been working to create a formal statewide **Justice for All Commission** that is an independent coalition led by the State Court Administrative Office, the State Bar of Michigan, and the Michigan State Bar Foundation. The newly formed

Commission will build upon the relationships and infrastructure that already exist to develop a more organized permanent structure that leverages the strengths of individual partners. Stakeholders from a wide variety of communities across the state will be invited to serve on the new commission in the fall of 2020. The Justice for All strategic plan will serve as a roadmap for the new Commission's work.

APPENDIX

COURT SERVICES
& EDUCATION

REPRESENTATION
BY A LAWYER

ASSISTANCE WITHOUT
A LAWYER

CONSUMER NEEDS &
COMMUNITY INTEGRATION

GOVERNANCE &
INNOVATION

# Gaps & Barriers

**1**

Localized funding of courts makes system change difficult to implement.

**2**

Decentralized court technology, and lack of online court records and a uniform case management system makes data-oriented change in the courts difficult.

**3**

The State Bar of Michigan's complexity and procedural requirements may hinder quick action and prevent taking full advantage of opportunities for innovation and change.

**4**

Legal aid service delivery in rural areas is extremely challenging because there are few resources available.

**5**

Too many different access to justice groups that overlap in purpose, resulting in redundancy, lack of coordination, and a lack of clarity about who is responsible for assessment and priority setting across the state.

**6**

There is not one entity that is responsible for, or a process developed to prioritize, requests for statewide funding initiatives for legal aid through the state legislature or state agencies.

**7**

Because of a lack of sufficient resources, legal aid programs are forced to prioritize their services, which can create challenges to funding crucial statewide initiatives with broader access to justice goals.



CONSUMER NEEDS & COMMUNITY INTEGRATION

ASSISTANCE WITHOUT A LAWYER

REPRESENTATION BY A LAWYER

COURT SERVICES & EDUCATION

APPENDIX

GOVERNANCE & INNOVATION

# Stakeholder Capacity & Governance

## COMPONENT KEY ELEMENTS

- An established forum and process for collaboration among stakeholder groups.

- Clear understanding of access to justice roles and responsibilities within and among stakeholder groups.

- Dedicated attention to funding, resources, and partnerships to support growing stakeholder and ecosystem capacity.

## CUMULATIVE COMPONENT ASSESSMENT



PARTIAL

**GOVERNANCE & INNOVATION**

## Assessment

The JFA Task Force assessed the capacity and structure of all stakeholders engaged in the Michigan civil justice system, and the optimal role for each stakeholder. The Task Force recognized that as a more robust continuum of legal help develops, the roles and capacity of stakeholders will become more clearly defined. Surveys of stakeholders engaged in the civil justice system revealed their various roles:

- **Legal aid programs** deliver a broad range of legal services to low-income individuals and vulnerable populations;

- **Self-help centers** provide legal information and tools to help self-represented litigants navigate the court system;

- **Community organizations** empower individuals and help them find the legal help they need;

- **Community Dispute Resolution Centers** facilitate the resolution of legal problems;

- **Libraries** provide access to legal information;

- **Law firms and private attorneys** deliver pro bono services to lower-income clients; and

- **Courts and judges** serve the public by administering justice.



**Which of these access to justice activities is your organization permitted to do? (n = 383)**

Source: Stakeholder Survey, July 2020

GOVERNANCE & INNOVATION | CONSUMER NEEDS & COMMUNITY INTEGRATION | ASSISTANCE WITHOUT A LAWYER | REPRESENTATION BY A LAWYER | COURT SERVICES & EDUCATION | APPENDIX

There currently are several statewide entities in Michigan that engage in civil justice system governance and promote collaboration among stakeholders, including several committees of the State Bar of Michigan, the Legal Services Association of Michigan, the State Planning Body, Michigan Court Administrative Office workgroups, and the Integrated Technology work group. Each of these bodies has a distinct purpose, however there is overlap in their focus and work, and a lack of coordination between groups that are working on similar issues. These entities consist largely of traditional justice system stakeholders from legal aid programs, courts, and the private bar, and do not generally include non-traditional stakeholders like community organizations.

The Michigan State Bar Foundation provides funding to legal aid organizations for numerous projects that involve collaboration with a wide variety of stakeholder groups. Examples of successful collaboration include the Michigan Poverty Law Program hosting and managing the case management systems for most legal aid programs, keeping this critical resource very low-cost for each program; the Michigan Legal Help Program creating online intake portals for three legal services programs at no cost to them; and the Michigan Poverty Law Program and six legal aid programs working together to support the statewide Michigan Foreclosure Prevention Program (since 2008) and the Crime Victim Legal Assistance Program for domestic violence survivors and victims of elder abuse (since 2016).

Beyond these examples, and largely due to resource constraints, most civil justice system stakeholders have limited engagement with other stakeholder types and instead tend to work within their own silos, although there is a strong desire to collaborate more. Many stakeholders do not have a clear understanding of what other stakeholders do and what services they provide.

Michigan has a history of collaboration to provide financial resources for access to justice efforts. Since 2018, fifteen legal aid programs have participated in a centralized fundraising campaign to raise money from the legal community, administered by the Michigan State Bar Foundation in collaboration with the State Bar of Michigan. However, there is not currently a single entity or staff position in Michigan that is dedicated to funding, resources, and partnerships to support growing stakeholder and ecosystem capacity.

Legal aid programs in Michigan frequently partner with each other to identify new funding sources and implement cost-saving opportunities by operating statewide. The most recent example of collaboration regarding funding occurred in the spring of 2020 when the Michigan State Bar Foundation, all legal aid programs, SCAO, and the State Bar of Michigan worked together to acquire funding from the state Coronavirus Relief Fund. Through this effort a new statewide Eviction Diversion Program was created to provide legal assistance to tenants facing eviction during the COVID-19 pandemic.

GOVERNANCE & INNOVATION | CONSUMER NEEDS & COMMUNITY INTEGRATION | ASSISTANCE WITHOUT A LAWYER | REPRESENTATION BY A LAWYER | COURT SERVICES & EDUCATION | APPENDIX

# Gaps & Barriers

**1**

Too many work groups and committees that address overlapping access to justice related issues, with a lack of clarity about roles and responsibilities and a lack of coordination between groups.

**2**

Courts are unclear and of many different opinions regarding what their role is related to civil access to justice.

**3**

Fragmented funding for courts makes it difficult to develop and implement new programs and innovations related to access to justice.

**4**

Lack of communication between local courts and other stakeholders about access to justice initiatives, along with a lack of cooperation by some stakeholders to try new ideas.

**5**

Lack of consistency between courts in their data collection methods and technology and a lack of data sharing and analysis between stakeholders perpetuates silos and inhibits collaboration.

**6**

Most stakeholders do not have the time, human resources, and expertise needed to collect and analyze data effectively, although they recognize that they could use data in many more ways to improve their services.

GOVERNANCE & INNOVATION

CONSUMER NEEDS & COMMUNITY INTEGRATION

ASSISTANCE WITHOUT A LAWYER

REPRESENTATION BY A LAWYER

COURT SERVICES & EDUCATION

APPENDIX



# Emerging Practices and Innovations

## COMPONENT KEY ELEMENTS

- Process simplification
- Upstream interventions
- Regulatory reform
- Online Dispute Resolution (ODR)
- Legal portals
- Artificial intelligence and machine learning





- Data privacy and confidentiality
- Electronic filing and online access to court records
- Cybersecurity

## CUMULATIVE COMPONENT ASSESSMENT



MINIMAL

GOVERNANCE & INNOVATION

CONSUMER NEEDS & COMMUNITY INTEGRATION

ASSISTANCE WITHOUT A LAWYER

REPRESENTATION BY A LAWYER

COURT SERVICES & EDUCATION

APPENDIX

## Assessment

This justice system component represents the forefront of innovation. The seven emerging practices and innovations assessed by the JFA Task Force varied slightly from the key elements identified in the Justice for All framework, and include the following:

- Process simplification
- Regulatory reform
- Online Dispute Resolution (ODR)
- Legal portals
- Artificial intelligence and machine learning
- E-Filing and online access to court records
- Problem-Solving Courts

These seven emerging practices and innovations are all currently being considered in Michigan, even if some have not yet been deployed. Information and data needed to assess each of these elements was gathered from identified subject matter experts for each element.



MichiganLegalHelp.org provides online do-it-yourself tools for people who can't afford a lawyer.

## Process Simplification

There is demonstrated commitment to the concept of process simplification, which is currently underway in courts, legal aid programs, and Community Dispute Resolution Programs across the state. Process simplification is taking place in many parts of Michigan to make legal and court processes and procedures easier in landlord-tenant, debt collection, mortgage foreclosure, small claims, and family cases. A great deal of technology has been deployed to assist with this effort, including e-filing software, video conferencing, websites, and platforms for automated document preparation and online dispute resolution. The COVID-19 pandemic has increased the speed at

GOVERNANCE &
INNOVATION

CONSUMER NEEDS &
COMMUNITY INTEGRATION

ASSISTANCE WITHOUT
A LAWYER

REPRESENTATION
BY A LAWYER

COURT SERVICES
& EDUCATION

APPENDIX

which change is occurring, especially as court processes have been moved online. Specific initiatives that are moving the needle on process improvement and simplification include the Michigan Legal Help website, the MiFILE statewide e-filing system, the MI-Resolve online dispute resolution platform, virtual court proceedings via Zoom, and a variety of online traffic ticket resolution services. In addition, the State Court Administrative Office provides technical assistance to and engages with trial courts to review and revise court processes to promote efficient and streamlined court operations.

## Regulatory Reform

While the Michigan Supreme Court and the State Bar of Michigan have been actively supportive of and engaged in innovation, there have been no changes to the definition of the practice of law, expansion of regulation to non-attorney legal providers, or changes in the rules governing the practice of law. The State Bar of Michigan's 21st Century Practice Task Force embraced several regulatory reform goals and recommended the

adoption of regulatory objectives preceding specific recommendations on reform, but the State Bar has not advanced a set of regulatory objectives to the Michigan Supreme Court. SCAO is currently participating in research activities related to regulatory reform. The area that has emerged most frequently in the JFA process as possible for regulatory reform is the authorization of non-lawyer practitioners in cases with a high volume of self-represented persons. In addition to the larger-scale regulatory reform efforts being contemplated and tested in other states, the inventory process has brought to light other opportunities for smaller-scale reform, especially related to Self-Help Centers, Navigator Services, and Courtroom Assistance Services (see those component assessments for details).

## Online Dispute Resolution (ODR)

The statewide online dispute resolution platform, MI-Resolve, was launched in all counties on July 1, 2020. By offering the nation's first statewide online dispute resolution tool, Michigan has emerged as the clear leader in court-

sponsored ODR. The program is administered through Michigan's network of 17 Community Dispute Resolution Programs, and is free to all users. MI-Resolve is available 24/7 and can be accessed through mobile devices. Disputes that can be resolved currently, with or without the help of a mediator, include small claims, debt collection, landlord-tenant (only represented tenants, or for cases not involving eviction), neighborhood disputes, and general civil money damage claims. Other case types may be added in the future. While there are features that may be added and improvements made, the MI-Resolve system has already demonstrated its potential to greatly increase efficiencies in and simplify the dispute resolution process for people who can't afford to pay for a lawyer (see ADR component assessment for more details about MI-Resolve).

## Legal Portals

Michigan is fortunate to have one of the best and most well-developed websites in the nation for people seeking legal information and assistance - MichiganLegalHelp.org.

APPENDIX

COURT SERVICES
& EDUCATION

REPRESENTATION
BY A LAWYER

ASSISTANCE WITHOUT
A LAWYER

CONSUMER NEEDS &
COMMUNITY INTEGRATION

GOVERNANCE &
INNOVATION

The Guide to Legal Help is a legal portal (triage and referral system) on the website that is being used in all counties. The Guide quickly gathers a minimal amount of information from users, helps them determine the nature and stage of their legal problem, and then refers them to appropriate services, including legal aid information resources, legal aid programs, private lawyer referral services, and community or government resources tailored to their individual needs. The Guide saves users and service providers time by giving users the best possible resources in their geographic area, and reducing inappropriate referrals that cause people to talk to several agencies before reaching one that can help them. The system is connected to all legal aid programs, law school clinics, and lawyer referral systems in the state, as well as many other helpful agencies. While the Guide is an established and successful tool, there are improvements that can be made to serve people who do not speak English, collect case outcome data, upgrade the technology to utilize artificial intelligence and machine learning, and integrate it with other systems.

Additionally, more outreach and education of community partners and the public is necessary to make The Guide the online place where people turn when they need help.

## Artificial Intelligence and Machine Learning

Artificial intelligence and machine learning are currently not being used in Michigan's civil justice system. However, there are instances of its use in systems that are adjacent to the civil justice system, primarily in state agency systems that evaluate people's eligibility for public benefits and unemployment assistance and attempt to detect fraud. Significant problems have been found in these systems due to a lack of transparency and their over-detecting of fraud. Other uses of AI and machine learning in courts include automated systems that help judges determine a litigant's ability to pay a fine or fee, and traffic ticket negotiation platforms.



Our organization did not have a discreet Legal Advocacy role until 2016. Since then, the role of a non-lawyer Legal Advocate has significantly modified the way that all direct service professionals function in regards to clients' legal needs.

- Domestic Violence Survivor
Service Provider

Case 5:21-cv-10937-JEL-EAS ECF No. 52, PageID.691 Filed 05/17/21 Page 73 of 134

31

APPENDIX

COURT SERVICES
& EDUCATION

REPRESENTATION
BY A LAWYER

ASSISTANCE WITHOUT
A LAWYER

CONSUMER NEEDS &
COMMUNITY INTEGRATION

GOVERNANCE &
INNOVATION

# E-filing and Online Access to Court Records

Electronic filing has been implemented in the Michigan Supreme Court, Court of Appeals, and 8 trial courts - in five discrete pilots and three that model a statewide standard solution, MiFILE, that will be implemented in the rest of the state's trial courts over the next several years.[7] In the future e-filing may integrate with the MI-Resolve online dispute resolution system. E-filing is funded by an Electronic Fund System filing fee that is collected on certain types of cases. SCAO is considering using the MiFILE e-filing system to collect case-related data, and continues to enhance the functionality of the system. Online access to court records is currently limited to case history and is managed locally. There is no statewide repository of case history or documents for public online access. SCAO will be adding a document management system to MiFILE, which might be leveraged to provide online access to court records.

# Problem-Solving Courts

Problem-Solving Courts are heavily deployed in criminal cases, however, they exist only in a few counties for civil cases. Family Dependency Treatment Courts are used when parental substance abuse is a contributing factor in child abuse and neglect cases. Judges, attorneys, child protection services, and treatment personnel unite with the goal of providing safe, nurturing, and permanent homes for children, while simultaneously providing parents with the necessary support and services they need to become drug and alcohol abstinent. Much can be learned about community engagement from criminal problem-solving courts and replicated to create more types of civil problem-solving courts.

COURT SERVICES & EDUCATION

REPRESENTATION BY A LAWYER

ASSISTANCE WITHOUT A LAWYER

CONSUMER NEEDS & COMMUNITY INTEGRATION

GOVERNANCE & INNOVATION

# Gaps & Barriers

**1**

Court processes and the legal system in general are overly complicated and not navigable by people who can't afford a lawyer. [Process Simplification]

**2**

Disparate court rules and processes create inefficiencies and make it more difficult for legal aid attorneys to do their jobs, recruit volunteers to take pro bono cases, and advise clients statewide. [Process Simplification]

**3**

Justice system improvements that would increase access may be impeded by unauthorized practice of law concerns and private bar protectionism and resistance to change. [Regulatory Reform]

**4**

Most stakeholders, including judges, do not know that MI-Resolve exists statewide and how people can access it; MI-Resolve is not well integrated with court websites and Michigan Legal Help. [Online Dispute Resolution]

**5**

The Guide to Legal Help is an effective triage tool that currently has limited impact because it is only available in English, there is a lack of awareness and usage of it, and it is not integrated with some key systems. [Legal Portals]

**6**

Artificial intelligence and machine learning are currently not being used in Michigan's civil justice system. [Artificial Intelligence and Machine Learning]

**7**

There is no statewide repository of case history or court documents for public online access; online access to court records is limited to case history and is managed locally. [E-filing and Online Access to Court Records]

**8**

While everyone is allowed to create an account and e-file documents, the e-filing system may not be accessible to all self-represented persons and it is not accessible to people who do not speak English. [E-filing and Online Access to Court Records]

**9**

Although problem-solving courts are used in most counties for certain criminal case types, the only problem-solving court in civil cases, Family Dependency Treatment Courts, exist in only a few counties. [Problem-Solving Courts]

GOVERNANCE & INNOVATION

CONSUMER NEEDS & COMMUNITY INTEGRATION

ASSISTANCE WITHOUT A LAWYER

REPRESENTATION BY A LAWYER

COURT SERVICES & EDUCATION

APPENDIX



# Consumer Needs & Experience

## COMPONENT KEY ELEMENTS

- Strong feedback loops with the public, service providers, and other community partners.

- User-focused quantitative and qualitative data measures are identified and captured.

- Utilization of publicly available datasets from prominent government, non-profit, and commercial sources to better understand population characteristics and vulnerabilities.

- Utilization of geospatial analysis.

- Mechanisms for integrating user voice in strategic and operational access to justice decisions.

## CUMULATIVE COMPONENT ASSESSMENT



MINIMAL

## Assessment

Gathering the public voice in the civil justice system in a systematic way is a challenge, but it is critical to drive user-focused improvements. Through the JFA inventory process, several themes emerged about how the Consumer Needs and Experience component has been deployed and used in Michigan:

- There is broad awareness by stakeholders that assessing consumer needs and experiences is important and necessary, along with a desire to engage more in this work; but organizations lack capacity to do so.

- Some stakeholder organizations have done significant assessing of consumer needs and conducted user experience testing, but most do not get robust feedback from users about their services, nor do they engage in needs assessments.

- Courts have difficulty compiling and sharing user data across courts because they lack compatible technology systems.

**How often do you or your organization obtain feedback about your work and the services you provide from the public in the following ways? (select all that apply) (n = 299)**



Legend: Never ■  Monthly ■  Quarterly ■  Yearly ■  Less than Yearly ■

Categories: Community advisory council, Community meetings, Surveys, Observational studies/user testing, Focus groups, Participatory design process, Comment boxes

Source: Stakeholder Survey, July 2020

- It is especially difficult to acquire feedback and input from people who don't realize that they have legal problems; many people fall into this category.[8]

Specific organizations were found to have more capacity and more advanced deployment of this component. For example, the

Michigan Legal Help Program (MLH) regularly assesses the needs of people who use its legal assistance website, MichiganLegalHelp.org, by conducting user testing studies several times a year. MLH also receives a great deal of user feedback through numerous online surveys embedded in its legal resources, and through its Live Help

GOVERNANCE & INNOVATION

**CONSUMER NEEDS & COMMUNITY INTEGRATION**

ASSISTANCE WITHOUT A LAWYER

REPRESENTATION BY A LAWYER

COURT SERVICES & EDUCATION

APPENDIX

chat service. The State Court Administrative Office and Judicial Information Services engage partners with user experience and multimedia design experience to conduct user research and assist with system design.

The most popular ways that stakeholders said they learn about characteristics of the public and their needs for services are by analyzing administrative data they collect, conducting user surveys, and analyzing public data sets. Fewer than 25% of stakeholders surveyed utilize focus groups, participatory design meetings/sessions, and observational studies, and almost none use geospatial analysis. It was noted that the use of surveys may exacerbate the privilege of people who take them by highlighting the opinions of those who are most willing and able to participate.

Stakeholder survey respondents indicated that the most common data sets used to understand population characteristics and inform their work and services are State Court Administrative Office data, local court

administrative data, and US Census Bureau data.

When asked how they learn about client/user outcomes for their legal problems, 43% of respondents indicated they do not learn about outcomes and 36% said they learn about outcomes from analyzing court records. Only 3% of respondents have engaged in discrete randomized control trials or longitudinal studies with professional researchers. To better understand how more marginalized populations interact with the legal system and experience the courts, more scientific research may be warranted.



Our region has a desperate need for [incorporating the public voice in our work and services], however with so many small/limited agencies trying to serve very high need populations it is not feasible - we would benefit greatly from a collective impact strategy but there is no one willing/able to coordinate.

    – A Northern Michigan County Housing Commission Director

**CONSUMER NEEDS & COMMUNITY INTEGRATION**

# Gaps & Barriers

## 1

Most justice system stakeholders do not get robust feedback from users about their services, and they do not have meaningful ways to conduct needs assessments.

## 2

Stakeholders lack capacity (knowledge and resources) to assess consumer needs and experiences, although they recognize it is important and they have a desire to do this more.

## 3

The most commonly used feedback method (surveys) may exacerbate the privilege of those willing and able to speak up and participate.

## 4

Stakeholders do not currently share what little data they collect with other entities that serve the same populations; there is very little information on how this data is used to improve services and as a result, access.

## 5

Despite having the capability to share data across courts, they have difficulty sharing and comparing data with each other because of the lack of consistency in what data is tracked and compiled.

## 6

It is especially hard to receive feedback and get input from the many people who don't realize that they have legal problems.

GOVERNANCE & INNOVATION

CONSUMER NEEDS & COMMUNITY INTEGRATION

ASSISTANCE WITHOUT A LAWYER

REPRESENTATION BY A LAWYER

COURT SERVICES & EDUCATION

APPENDIX

# Community Integration & Prevention

## COMPONENT KEY ELEMENTS

- A robust information exchange between stakeholders, including cross-training.

- Community resources should be integrated into provider services.

- Information on user experience should be collected and shared across providers.

- Collaborative partnerships should be formed involving both legal and social services providers.

- Community outreach should be enabled by a robust communication strategy.

- Cross-training among organizations should take place.

- Early issue identification and proactive referrals in a range of areas and between partners.

- Education for community stakeholders and litigants about dispute resolution without legal action.

## CUMULATIVE COMPONENT ASSESSMENT

PARTIAL

## Assessment

This vital component connects the legal system to communities and empowers increased access to the civil justice system through engaged and educated community stakeholders and trusted intermediaries that people most often first seek help from when they have a problem. Successful deployment of the key elements of Community Integration and Prevention will improve the effectiveness of those organizations' responses to peoples' legal issues. Addressing civil legal issues before they progress and worsen will save people time, money, and help them avoid what may be burdensome court processes. Integrating community stakeholders into the civil justice system is about getting people the help they need, when they need it, and in a format they can use.

The JFA inventory process revealed important findings about how Community Integration and Prevention is currently carried out in Michigan. First and foremost, the information gathered through surveys and focus groups demonstrates that stakeholders recognize that early intervention and

prevention is a necessary strategy to provide justice for all. Access to justice is not court-centered, and an upstream focus on engaging a wide variety of community stakeholders is crucial to successfully helping people resolve their legal problems.

While community integration is key to increasing access to justice, there is much room for improvement in Michigan. A survey of nearly 600 members of the public showed that when people have personal or legal problems, they very frequently seek assistance from community organizations with no or weak ties to



The lack of one clear resource area in the local courthouse, or anywhere in the community, has been a barrier when the public needs to find who, what, and where they need to go for assistance with the courts. I am currently in the preliminary stages of creating a court resource center at the local public library as a first step to better access to the courts.

    - Probate Register/Family Court Administrator in the Upper Peninsula

the legal community. These entities include health care providers, religious leaders, government offices, community centers, social services agencies, libraries, the Michigan 211 service, and schools. The survey also revealed that about one-third of respondents chose not to go to court because they don't trust courts to provide a fair decision, and about 50% didn't understand what to do next to resolve their legal problem after they were in court. To bridge these shortcomings and the disconnects between social services, legal services providers, and courts, more and better partnerships must be forged.

Community organizations are often the front door into the civil justice system. There are examples of successful community integration in all parts of the state, but there is not currently an effort underway to evaluate and replicate the most effective partnerships.

Nearly 1000 participants in the JFA stakeholder survey were asked a series of questions about Community Integration and Prevention. Only about 40% responded to these questions, and the most common response to

**CONSUMER NEEDS & COMMUNITY INTEGRATION**



In which ways does your organization exchange information and/or training with community organizations, courts, legal organizations, and government agencies? (n = 284)

Stakeholder Survey, July 2020; Community organizations share information and training more often than other stakeholders.

most questions was "I don't know". Comments revealed confusion among respondents about the concept of community integration and their role as a community partner, especially among judges and court personnel, many who viewed the court's role as not amenable to community partnerships. Overall, when broken down by type of stakeholder, survey respondents indicated that some sharing of information and training takes place between stakeholder types, but generally they work primarily within their own silos.

Successful and effective community partnerships are showcased by problem-solving courts, including treatment courts and diversion programs. Similarly, existing divorce adjustment classes bring together multiple community organizations and the Friend of the Court to help families resolve their legal issues.

Accurate and appropriate referrals to and between stakeholders are a hallmark of successful community integration. Despite established and useful referral systems, including Counsel and Advocacy Law Line and

Michigan Legal Help's Guide to Legal Help, most stakeholders expressed a desire for better referral options for clients. Often there are no viable referrals for legal representation available. Additionally, a problem mentioned often in stakeholder focus groups was that there is no centralized, comprehensive list of community resources in Michigan. The

Michigan 211 service provides social service referrals and is a possible hub for community integration and prevention. However, most stakeholders did not know much about the usefulness of 211 for people with legal problems, and those who were familiar with it expressed that it works well in some areas but not in others.

CONSUMER NEEDS &
COMMUNITY INTEGRATION

ASSISTANCE WITHOUT
A LAWYER

REPRESENTATION
BY A LAWYER

COURT SERVICES
& EDUCATION

APPENDIX

# Gaps & Barriers

**1**

There is a general lack of understanding of the system component Community Integration and Prevention and what types of organizations participate in activities related to it.

**2**

Traditional and non-traditional stakeholders tend to work within their own silos, with limited interactions with other types of organizations.

**3**

Courts generally don't see themselves as community partners, and are reluctant to get involved in access to justice efforts with other stakeholders. Specific barriers to partnerships with courts include their resistance to change and lack of focus on customer service.

**4**

There is a lack of statewide, systematic collaboration between traditional and non-traditional justice system stakeholders which results in disparate outcomes for clients, and which is exacerbated in rural communities.

**5**

There is no agreed upon central referral directory of community resources. The Michigan 211 service and many other organizations have compiled their own lists, which is a duplication of efforts.

**6**

Community organizations struggle to engage in early identification of legal issues and are not well educated about when a problem has a legal solution and how to access self-help, legal advice, and direct representation services.

**CONSUMER NEEDS & COMMUNITY INTEGRATION**

## Gaps & Barriers (continued)

**7**

People living in rural communities have more difficulty getting help for their legal needs because there are fewer available community and legal resources.

**8**

Data is not collected about community integration activities, although there is anecdotal evidence of successful partnerships that may be replicable.

**9**

Relationships between stakeholders are often based on personal contacts, not institutional relationships; when staff leaves, those relationships are lost.

**10**

The inability of community services agencies to share data with partners limits collaboration.

**11**

Legal aid programs have restrictive grant funding rules about who they can serve, a lack of interpreters, and little attorney time to build relationships with community organizations, all which are barriers to collaboration with them.

**12**

Libraries are an important door into the civil legal system, with courts often referring people to libraries for help, but they typically lack partnerships with courts and legal aid programs.

GOVERNANCE & INNOVATION

CONSUMER NEEDS & COMMUNITY INTEGRATION

ASSISTANCE WITHOUT A LAWYER

REPRESENTATION BY A LAWYER

COURT SERVICES & EDUCATION

APPENDIX



# Self-Help Centers

## COMPONENT KEY ELEMENTS

- Concierge and/or non-lawyer navigator services.

- All information should be provided in plain language.

- Easily accessible instructions and flow charts on legal processes, applicable law, and how to prepare for and present a case.

- Links to information and forms on specific subject matters, including out-of-court resolution of problems.

- Online materials that are optimized for mobile viewing.

- Information on which courts hear what kinds of cases along with court access information (e.g., transportation and parking).

- Staffed self-help centers are located in or near the courthouse or otherwise accessible in the community.

- There are multiple channels for providing information (e.g., one-on-one, workshops, online).

## CUMULATIVE COMPONENT ASSESSMENT

PARTIAL

## Assessment

Legal Self-Help Centers (SHCs) in Michigan are part of a "no wrong door" continuum of service. Courts and related Friend of the Court offices, attorneys, and community organizations are all encouraged to send anyone with a legal need to a center for legal information, a variety of services, and further referrals. The intention is that SHC patrons gain a better understanding of their problem and how they can solve it, and if they must seek services elsewhere they can do so confidently and with the knowledge they need.

Self-Help Centers are integral to the justice system and provide essential services and resources. Although, they are not considered an essential court service in all areas of the state, and as a result, there is generally a lack of collaboration between courts and centers. There are 25 SHCs in Michigan, with 75% of the state's population living in a county with a center.[9]

Models of operation differ drastically; some centers are well-staffed and offer

a continuum of services, while others are merely computers/kiosks where members of the public can access MichiganLegalHelp.org and other online resources. Because of a lack of coordination between SHCs, there is inconsistent availability, practices, services, and quality at centers across the state. Disparities in the type and amount of services offered are largely based on the availability of financial resources.

Self-help centers are primarily located in courthouses and public libraries, depending on the jurisdiction; some are housed in community organizations. Court-based centers are all located in Friend of the Court offices or Circuit Courts. There are typically no attorneys on site at SHCs in Michigan. Centers primarily serve people with family matters, but probate is a growing area. Services provided at SHCs may include the following, but all may not be currently provided at every center:

- Public access computers with printers, internet, scanners



A comprehensive training program from a reputable source and designed for non-lawyers would go a long way to improving service both in the self-help center and among court staff in general.

- Self-Help Center Director

APPENDIX

COURT SERVICES & EDUCATION

REPRESENTATION BY A LAWYER

ASSISTANCE WITHOUT A LAWYER

CONSUMER NEEDS & COMMUNITY INTEGRATION

GOVERNANCE & INNOVATION



People using the Legal Assistance Center at the Kent County Courthouse in Grand Rapids.

- Legal information and resources (online and in paper/book format), including MichiganLegalHelp.org, Michigan Divorce Book (outdated but still used), NOLO guides, ICLE, Westlaw, etc.

- Foreign language legal resources and interpretation for languages spoken locally

- Paper and automated court forms (especially for family law)

- Trained staff to assist with issue spotting; help finding and navigating legal resources

- Directions re: where to go in the courthouse

- Checklists or explanations of court processes

- Help with form preparation (not legal advice)

- Know your rights presentations by lawyers and SHC staff members

- Access to pro bono lawyers through legal clinics

- Referrals to bar lawyer referral service, legal aid, government programs, and other help

- Social services resource directory

Data collected in a survey of 556 members of the public indicates that outreach is needed to promote self-help centers to people who could benefit from their services. Respondents were asked what they did in the past to resolve their legal problems, and only 12% said they got help at a legal self-help center. An additional 8% reported getting help at a library, which may have included library-based SHCs.

GOVERNANCE & INNOVATION

CONSUMER NEEDS & COMMUNITY INTEGRATION

ASSISTANCE WITHOUT A LAWYER

REPRESENTATION BY A LAWYER

COURT SERVICES & EDUCATION

APPENDIX

# Gaps & Barriers

**1**

Many courts do not consider Self-Help Centers an essential court/community service, resulting in insufficient collaboration between them.

**2**

There is not a SHC in every court or county, especially in rural areas and district courts; existing centers are not all staffed, and unstaffed centers are more limited in the help they can provide.

**3**

There are inconsistent practices, services, and quality across SHCs as a result of varying amounts of resources being allocated for them; more support is needed from courts, the bar, and other partners for advocacy and funding for SHCs.

**4**

Many people with special needs and who are experiencing trauma visit SHCs, so services should be designed to be accessible by these individuals.

**5**

Self-help is not appropriate for some people, e.g., domestic violence survivors, people with low literacy, limited English proficiency, etc., and SHCs often lack the means to assess when self-help is feasible for a person.

**6**

Self-Help Centers are not very accessible to people with limited English proficiency; few language access services are available at most centers.

**7**

Data collection across SHCs is inconsistent and data is generally not shared with partners.

**8**

Few SHCs have a close connection to free or affordable legal representation by pro bono and private attorneys, assistance by trained navigators, and alternative dispute resolution services.

**9**

Staff members at SHCs need a standardized way to identify people's legal problems and training on how to efficiently screen and triage clients.

GOVERNANCE &
INNOVATION

CONSUMER NEEDS &
COMMUNITY INTEGRATION

ASSISTANCE WITHOUT
A LAWYER

REPRESENTATION
BY A LAWYER

COURT SERVICES
& EDUCATION

APPENDIX

46

# Gaps & Barriers (continued)

## 10

Family issues are prioritized at SHCs, which results in some legal subject areas not being addressed at many centers.

## 13

Few Self-Help Centers offer remote services, even after the COVID-19 pandemic.

## 11

There may be operational differences between SHCs that were established by the Michigan Legal Help Program and those established by other entities; additional work is required to learn the impact of this and how to address it.

## 12

In many places coordination and collaboration is lacking between SHCs and libraries, which often function as SHCs and would benefit by being connected to courts and legal aid programs.

GOVERNANCE & INNOVATION

CONSUMER NEEDS & COMMUNITY INTEGRATION

ASSISTANCE WITHOUT A LAWYER

REPRESENTATION BY A LAWYER

COURT SERVICES & EDUCATION

APPENDIX



# Triage & Referral

## CUMULATIVE COMPONENT ASSESSMENT

**PARTIAL**

## COMPONENT KEY ELEMENTS

- Intake systems that contemplate assessment, sorting, and referral needs.

- Identified, consistent, and transparent triage and referral protocols and practices.

- Ensuring that triage is supported by automation (e.g., a portal).

- Making sure that all stakeholders, including non-traditional ones, are aware of referral information.

- Effective referrals (e.g., entity can take the matter without time, income, or subject-matter restrictions precluding service).

- Central court and legal aid telephone hotlines and e-mail or live chat services, as well as market-based equivalents, to diagnose legal issues/potential solutions and resolve less complex issues at an early stage.

## Assessment

This component focuses on how service providers (including courts, civil legal aid and pro bono providers, and trusted intermediaries) assess and sort requests for service from the public to best allocate their resources and get people the legal help they need, when they need it, and in a format they can use. Many individual legal aid and community organizations engage in their own forms of triage and referral. Triage is less common in courts, but they often make referrals to litigants without attorneys.

A goal of triage is to not leave anyone out or behind, but to find the right path to the resolution of legal problems for everyone. For courts the focus may be on case management; for legal aid the focus may be on case acceptance and referral; and for community organizations and self-help centers the focus may be on finding out how much help a person needs and getting them matched with resources.

The online Guide to Legal Help, the triage feature of the Michigan Legal Help website, serves as a central point

for triage of people needing help with legal problems in Michigan. The Guide quickly gathers a minimal amount of information from users and then refers them to appropriate resources that are tailored to their needs, including legal information (online educational materials and form-completing tools), legal aid programs, private lawyer

referral services, dispute resolution centers, and/or community or government resources available in their community. Two-thirds of users earn less than 200% of the Federal Poverty Guidelines.



In which of the following triage activities do you or your organization participate? (n = 586)

Source: Stakeholder Survey, July 2020

The Guide saves both users and service providers time by giving users the best possible resources in their geographical area—only those that are compatible with their needs and are likely to be helpful. This efficiency eliminates inappropriate referrals and prevents people from trying several agencies before reaching one that can help them. On average, 8,660 people a month begin a triage process in the Guide to Legal Help and 88% of them finish, thereby getting the resources and referrals they need through this automated system. That is an average of 245 people per day that benefit from the Guide.

In the JFA stakeholder survey, nearly all stakeholder types were asked questions about their triage and referral activities. Most questions had approximately 580 responses. It is clear from survey responses that stakeholders do not have a shared definition or understanding of triage and referral services. Only 30-40% of respondents said they engage in any triage, and there is much inconsistency in the availability, scope, quality, and intent of triage and referral. Survey results revealed that courts and court

clerks are especially unclear about what triage and referral activities are permissible, what resources are available to implement them, and how to effectively guide people to appropriate resources for help.

As with other justice system components, collaboration is key to successful triage and referral, and stakeholders tend to work in their own silos, which inhibits collaboration and reduces their impact. Many stakeholders and members of the public do not know about the Guide to Legal Help. As a result, stakeholders often create their own triage and referral processes and networks, when a central, coordinated effort may be more effective.



Ideas on creating triage teams within the community that contribute to a resource-driven court IN A RURAL AREA is something we need desperately

- Probate Court Judge in South Central Michigan

GOVERNANCE &
INNOVATION

CONSUMER NEEDS &
COMMUNITY INTEGRATION

ASSISTANCE WITHOUT
A LAWYER

REPRESENTATION
BY A LAWYER

COURT SERVICES
& EDUCATION

APPENDIX

# Gaps & Barriers

**1**

An up-to-date, centralized directory of referral resources does not exist.

**2**

There is a general lack of collaboration between stakeholders; programs work in silos, reducing their impact and the public's access to their services.

**3**

There is often a lack of adequate services to refer people to at the end of the triage processes, particularly for those who have specialized civil legal needs, including survivors of domestic violence, prisoners, and people in rural areas.

**4**

Public libraries are not well connected to resources that can help people with legal problems.

**5**

There is no shared definition or understanding of triage and referral services and only ⅓ of stakeholders surveyed reported that they engage in triage activities.

**6**

It is difficult to measure and evaluate the effectiveness of referrals because there is no consistent data collection and analysis of triage and referral activities.

GOVERNANCE & INNOVATION

CONSUMER NEEDS & COMMUNITY INTEGRATION

ASSISTANCE WITHOUT A LAWYER

REPRESENTATION BY A LAWYER

COURT SERVICES & EDUCATION

APPENDIX

# Gaps & Barriers (continued)

## 7

A lack of understanding about what triage and referral activities are permissible for courts and what resources there are to implement them.

## 8

Many stakeholders don't know about the Guide to Legal Help; it is not clear if this is a marketing problem or lack of partner buy-in.

## 9

Training is needed for all stakeholders on triage and the difference between legal advice and legal information (including for court clerks, who are not court staff).

## 10

There is a lack of resources dedicated to communicating with and educating the public about where to find and get services and what the differences are in those services.

## 11

Alternative Dispute Resolution options are not well integrated into many stakeholders' systems of referrals for clients.

## 12

Triage can be complicated because people often have multiple problems that may be hard to diagnose, they are in crisis, they want answers that may not be available, and there may be no resources available for them.

APPENDIX

COURT SERVICES & EDUCATION

REPRESENTATION BY A LAWYER

ASSISTANCE WITHOUT A LAWYER

CONSUMER NEEDS & COMMUNITY INTEGRATION

GOVERNANCE & INNOVATION



# Alternative Dispute Resolution

## COMPONENT KEY ELEMENTS

- Plain language information is provided by case type about Alternative Dispute Resolution (ADR) modes and processes.

- Information is provided about the impact of power imbalances on the success of resolutions through ADR and strategies to address these concerns.

- Clear codes of ethics are made available for the non-judicial neutrals.

- Access to Alternative Dispute Resolution modes are provided within procedural context, possibly through self-help.

- Ethically appropriate collaborations between access to justice stakeholders and ADR providers.

## CUMULATIVE COMPONENT ASSESSMENT



**PARTIAL**

GOVERNANCE &
INNOVATION

CONSUMER NEEDS &
COMMUNITY INTEGRATION

ASSISTANCE WITHOUT
A LAWYER

REPRESENTATION
BY A LAWYER

COURT SERVICES
& EDUCATION

APPENDIX

# Assessment

Alternative Dispute Resolution (ADR) as a service stands in contrast to other civil justice system components being assessed, in large part because it has been overseen for over 30 years with consistent leadership by the Supreme Court Administrative Office (SCAO) and the Supreme Court, and in collaboration with local courts. This established infrastructure makes it much more possible to move toward more advanced techniques, such as online dispute resolution (ODR), and to identify and address issues that have been challenges, such as enforcement of mediation agreements.

Michigan courts annually refer over 10,000 cases to Community Dispute Resolution Program (CDRP) Centers. Michigan's Community Dispute Resolution Program was legislatively created in 1988 to provide citizens with an alternative to the judicial process. Currently, 17 non-profit organizations serving all 83 counties receive grant funding to provide mediation and other dispute resolution services. Mediation - as offered through CDRP centers - is a voluntary process in which two or more

**How often does your CDRP provide Alternative Dispute Resolution services to people with the following problems? (n = 12)**



Stakeholder Survey, July 2020; Small Claims and Family cases are the highest volume cases at CDRP Centers, followed by Landlord/Tenant and Debt Collection cases.

parties meet with a trained neutral mediator and together find a solution to resolve their problem. In mid-March 2020, except for mediations conducted by conference call, all centers transitioned to providing mediation via Zoom due to the pandemic.

The Community Dispute Resolution Program has routinely proven to be

effective. Agreements are reached in approximately 75 percent of the cases in which both parties agree to mediate. The average amount of monetary settlements is approximately $5,000. Cases are typically resolved within 23 days of intake, and the average mediation lasts about 1.5 hours. In follow-up surveys, the centers report that

parties kept their agreements in about 85 percent of civil and family division cases, and about 95 percent of the time in school-related cases. Annually, volunteers provide about 17,000 hours of mediation and other services, which has a market value contribution of approximately $2.5 million.

In late 2019, SCAO began piloting MI-Resolve, an online system for parties to negotiate a mutually agreeable resolution themselves, or with the help of a mediator, both before and after a case is filed in court. After registering on the system, parties briefly describe their issues, propose options for resolution, upload and download documents, sign agreements, and print any forms required to resolve a pending court case. In July 2020, the MI-Resolve service was implemented statewide in every county. It was originally piloted with the capacity to resolve only two-party disputes (e.g., small claims, general civil, and neighborhood disputes), but it is expanding to accommodate multi-party disputes, including eviction diversion cases, and will permit parties in post-judgment domestic relations matters to use the system by year-end.

In addition to the CDRP Centers, there are many private, for-profit mediation services available in Michigan. Because it is very difficult to inventory all of those resources, and because they are often out of reach for many low- and moderate-income families (typically charging normal attorney fee rates), this report only includes information about CDRPs and other SCAO-regulated mediation services.

The JFA stakeholder survey collected data about the use of ADR services from judges, court and self-help center staff, legal aid attorneys, and community organizations. Responses showed that mediation is underutilized



Our pioneering online dispute resolution platform, MI-Resolve, has made Michigan the first state in the nation to provide a way for every resident to resolve disputes without a lawyer. Going forward, we need to be just as creative to make sure that all self-represented litigants can resolve their legal issues without the burden of taking off work, getting child care and going to court.

- Chief Justice Bridget McCormack, The Hill, June 22, 2020

by all stakeholders, many who said they do not know about available ADR services and do not integrate ADR into their workflows. While this uncovered the need for closer relationships between CDRP Centers and the judiciary/courts, bar, and community organizations, there are existing successful partnerships that can be used as models. For example, in Kent, Oakland, and Wayne Counties ADR services are accessible to more people because the CDRP Center sends mediators to the courthouse on specific days to help resolve disputes in small claims court, general civil cases, and/or landlord tenant cases.

Public awareness of mediation seems high, however usage of mediation services is very low. According to the JFA public survey, when faced with a legal problem, only 2% of people reported going to a CDRP or other mediator for assistance. However, when asked, "Are you aware that there are ways to resolve some legal problems without going to court, which are called Mediation and Alternate Dispute Resolution?" 71% of 543 respondents answered "yes."

# Gaps & Barriers

**1**

Mediation is underutilized to resolve disputes even though the majority of people are aware it is an option.

**2**

ADR services in Michigan are inconsistent and vary widely across the state – 17 CDRP centers serve 83 counties, but a center may not be near and may not have a relationship with the courts it serves.

**3**

MI Resolve and other online dispute resolution platforms are used inconsistently across the state.

**4**

Information about the impact of power imbalances in ADR is not consistently provided to people, and there is a lack of consistency in how power imbalances are addressed; this has a chilling effect on various stakeholders' willingness to refer people to ADR.

**5**

ADR is not accessible for individuals with limited English proficiency.

**6**

CDRPs need additional funding to support ODR because MI Resolve handles for free the cases that CDRP centers would have earned fees from.

GOVERNANCE &
INNOVATION

CONSUMER NEEDS &
COMMUNITY INTEGRATION

ASSISTANCE WITHOUT
A LAWYER

REPRESENTATION
BY A LAWYER

COURT SERVICES
& EDUCATION

APPENDIX

# Gaps & Barriers (continued)

## 7

Mediators are often not as well versed in legal issues as they need to be.

## 8

Cultural barriers to ADR exist for lawyers, litigants and courts. Mediation may reduce lawyers' fees, litigants may expect to have their 'day in court', courts treat every case as if it will go to trial even though that is unlikely, and case types other than family cases are rarely encouraged to try mediation.

## 9

There is widespread concern about procedural due process protections and substantive rights and responsibilities in ADR processes. There isn't enough distinction between cases that are appropriate for mediation and those that aren't based on lack of a true middle ground and/or legal protections exist that would change the case outcome, e.g., eviction cases or debt collection cases with defenses that may relieve the defendant from the debt.

## 10

Supreme Court time guidelines can cause judges to be overly focused on report cards and unwilling to engage in ADR because cases may last beyond time limits; existing case evaluation rules and practices also disincentivize ADR.

## 11

Adversarial court processes are more familiar than ADR, may be easier to access because a case can be initiated by one party without the consent of the other, and they usually escalate conflict, which may make it harder to envision a less adversarial process.



GOVERNANCE & INNOVATION

CONSUMER NEEDS & COMMUNITY INTEGRATION

ASSISTANCE WITHOUT A LAWYER

REPRESENTATION BY A LAWYER

COURT SERVICES & EDUCATION

APPENDIX

# Navigator Services

## CUMULATIVE COMPONENT ASSESSMENT



**NONE**

## COMPONENT KEY ELEMENTS

- Navigational direction and information.

- Referrals to other appropriate services.

- Assist litigants with legal and procedural information.

- Assist litigants in selecting and filling out forms.

- Accompany people to court, especially to help in complying with legal processes for cases with large numbers of self-represented litigants.

- Feedback for service providers.

GOVERNANCE &
INNOVATION

CONSUMER NEEDS &
COMMUNITY INTEGRATION

ASSISTANCE WITHOUT
A LAWYER

REPRESENTATION
BY A LAWYER

COURT SERVICES
& EDUCATION

APPENDIX

## Assessment

This component relates to the development of services provided by professionals who are not licensed attorneys, as well as the possible formation of new tiers of legal services providers. There is overlap between Navigator Services and several other justice system components. For instance, Self-Help Center staff members are often called navigators. Analysis of their services is not included in this component, but is instead included in the Self-Help Center assessment. Navigator Services are also closely related to Triage and Referral, Courtroom Assistance Services, and Compliance Assistance, as navigators may provide those services. The Emerging Practices and Innovations component relates to Navigator Services in the context of Regulatory Reform and the licensing of allied professionals to provide limited legal services. Navigator Services are mentioned in the assessment of each of these components and evaluated in more detail here as an important component of a strong civil justice system.



**When I left court I understood what I had to do next. (n = 287)**

- Strongly Agree — 14%
- Agree — 37%
- Neither Agree or Disagree — 15%
- Disagree — 18%
- Strongly Disagree — 16%

Survey of Members of the Public, May 2020; Only 51% of respondents who had been party to a court case understood what to do next.

Navigators are an underutilized resource in Michigan, however the idea of navigator services provided by allied professionals is a complex one since there currently is no official recognition of non-lawyer navigators. The definition of Navigator Services can be unclear as it may include a continuum of services, from giving directions at the courthouse (like a concierge) on one end of the spectrum, to new categories of licensed individuals who provide limited legal services on the other end. Without a specific definition and a regulatory structure for new types of providers of legal services, this component is hard to name and

COURT SERVICES & EDUCATION

REPRESENTATION BY A LAWYER

ASSISTANCE WITHOUT A LAWYER

CONSUMER NEEDS & COMMUNITY INTEGRATION

GOVERNANCE & INNOVATION

59

describe. The definition may have been interpreted differently by different stakeholders taking surveys and participating in focus groups for this assessment, or even within individuals' minds between questions.

The results of the public survey demonstrate that there is a need for some kind of navigator services in Michigan. Only slightly more than half of respondents stated that they understood what happened in their case after they left court and only half understood what to do next. Additionally, only 60% of respondents said that the judge and court staff spoke to them in a way they understood.

There is precedent for the use of navigators in Michigan. One common use of Navigator Services identified by virtually all stakeholders was domestic violence victim advocates (also called PPO advocates), which have a special statute[10] that authorizes courts to provide them. However, the statute only authorizes practices that are not the practice of law and facially it only applies to advocates who have a special designation from a court.

Community organizations that provide services and support to domestic violence survivors have long provided advocates in court who provide emotional support, explain court processes and consequences, help with paperwork, and provide foreign language interpretation when necessary.

Housing counselors and paralegals at legal aid programs have also served as effective navigators, but reduced organizational budgets have cut those roles. The Detroit Justice Center has Community Legal Workers who perform legal research and investigate the tax assessment appeal process and water shut off process, conduct client interviews, help community members complete forms, accompany clients to hearings and department meetings, and educate the community about their rights. Other navigator-type services are provided by accredited immigration representatives, refugee navigators, and long term care ombudspersons.



We need to increase the role non-lawyer legal advocates can play in our system. A non-lawyer expert is better than a lawyer non-expert. Someone who knows a specific area of the law and what resources are in the community is going to be far more valuable to people seeking to resolve their legal issues.

— Detroit Justice for All Town Hall participant, February 2020.

GOVERNANCE &
INNOVATION

CONSUMER NEEDS &
COMMUNITY INTEGRATION

ASSISTANCE WITHOUT
A LAWYER

REPRESENTATION
BY A LAWYER

COURT SERVICES
& EDUCATION

APPENDIX

## Gaps & Barriers

**1**

Michigan does not have non-lawyer navigators, except in limited circumstances, but would benefit from them, particularly at the beginning and the end of a case.

**2**

There is not a clear, consistent definition of Navigator Services; the line between "navigator" and "engaged and educated community partner providing direction" may be a thin one and confusing to all stakeholders.

**3**

There are no entities currently identified to lead and define what Navigator Services are, act as a regulatory body, and provide training and education to navigators; this is a regulatory reform issue that may prevent this service from reaching its potential and may put some services at risk of providing the unauthorized practice of law.

**4**

The current regulatory environment in Michigan, particularly the private bar, seems unlikely to support new categories of non-lawyer legal services providers.

**5**

Unauthorized practice of law issues, private bar resistance, competition with under-employed lawyers, and *notarios* as a bad example of navigator services are considerable barriers to adoption and acceptance of some types of navigators.

**6**

The use of navigators in situations where power imbalances exist may be inappropriate.

**7**

Funding for non-lawyer navigators is essentially non-existent.



APPENDIX

COURT SERVICES & EDUCATION

REPRESENTATION BY A LAWYER

ASSISTANCE WITHOUT A LAWYER

CONSUMER NEEDS & COMMUNITY INTEGRATION

GOVERNANCE & INNOVATION

# Full Representation

## COMPONENT KEY ELEMENTS

- Assessment of existing service capacity in the state, factoring in geographic differences.

- Identification of effective pro bono, civil legal aid, and market-based delivery strategies with potential for replication/scaling.

- Training and mentoring for pro bono volunteers, both on substantive issues and on how to work with low-income clients.

- Building triage and referral systems to identify when full representation is needed or required and ensuring traditional and non-traditional

stakeholders know how to make referrals for full representation.

- Advancing right-to-counsel initiatives, coupled with self-help, in cases involving basic human needs.

- Training and assistance with implementation of best practices for improving internal office automation and efficiencies, as well as client and court-facing interactions.

- Incorporation of litigation strategies that have the potential to impact many people and decrease the need for full representation in the future.

## CUMULATIVE COMPONENT ASSESSMENT



PARTIAL

GOVERNANCE &
INNOVATION

CONSUMER NEEDS &
COMMUNITY INTEGRATION

ASSISTANCE WITHOUT
A LAWYER

REPRESENTATION
BY A LAWYER

COURT SERVICES
& EDUCATION

APPENDIX

62

## Assessment

While full representation is a well developed component of the Michigan civil justice system, overall progress was rated "partial" due to a lack of sufficient legal aid and affordable legal services to meet the need.

Approximately 1.8 million people qualify for free civil legal aid in Michigan because their income falls below 125% of the federal poverty level. To meet the civil legal needs of these individuals, there are five regional and two statewide legal aid programs that are funded by the Legal Services Corporation (LSC). The two statewide programs – Michigan Indian Legal Services and Farmworker Legal Services – serve Native Americans and migrant farmworkers respectively. In addition, the Michigan State Bar Foundation (MSBF) provides funding to other statewide and regional programs that provide civil legal aid, including the Center for Civil Justice, Michigan Immigrant Rights Center, Michigan Legal Services, and Michigan Poverty Law Program.[11]

Legal aid offices do not have the resources to represent everyone who

qualifies for and needs their help. There are approximately 9500 people living in poverty for every legal aid lawyer in Michigan. More often than not, low-income families receive limited or no legal help because legal aid programs lack resources. In 2019, regional legal aid programs completed 42,412 cases. All clients received legal advice tailored to their specific issue; however, due to limited resources, legal aid programs were only able to provide full representation in approximately 25% (10,700) of those cases. Also in 2019, approximately 19,700 low-income families with priority cases[12] sought full representation from legal aid and did not receive it because programs did not



Legal Aid can represent a very small portion of the parties on my domestic docket who would benefit from their services. This is due in part to budget issues and more to conflict of interest issues. Mental health cases and parents in neglect / abuse cases have the right to court appointed counsel.

- Family Court Referee in
Southwest Michigan

have the resources to take those cases.

Legal aid organizations administer pro bono programs to engage private bar attorneys in representing low-income clients. In 2019, regional legal aid programs referred 1,787 cases to pro bono attorneys. Pro bono attorneys provided 13,696 hours of pro bono assistance. Of statewide programs, the Michigan Immigrant Rights Center (MIRC) has the most robust panel of pro bono attorneys. In 2019, volunteer attorneys donated 4457 hours of pro bono services to MIRC clients and completed 21 cases. In addition to referring cases to pro bono lawyers for full representation, legal aid programs also conduct legal clinics that allow limited one-time engagement with pro bono attorneys.

Several large law firms and corporate legal departments in Michigan (primarily based and with offices in Detroit, Oakland County, Grand Rapids, and Lansing) have robust pro bono programs and several have dedicated pro bono counsel to oversee those programs. They represent pro bono clients in a variety of case types, including class actions, impact litigation, appellate litigation, limited

APPENDIX   COURT SERVICES & EDUCATION   ASSISTANCE WITHOUT A LAWYER   CONSUMER NEEDS & COMMUNITY INTEGRATION   GOVERNANCE & INNOVATION

63

**REPRESENTATION BY A LAWYER**

**To what extent have you seen or provided Full Representation in the following types of cases in your geographic area? (n = 283)**



Legend: Never, Rarely, Sometimes, Often, Always, I Don't Know

Categories: Family (inc. divorce, custody, protection orders); Landlord/tenant (for tenants); Debt collection (for debtors); Mortgage foreclosure (for homeowners); Small Claims; Tort/injury/property damage; Probate; Real Property; Mental Health (inc. civil commitment, guardianship); Child abuse and neglect

Stakeholder Survey, July 2020; Respondents reported a very low percentage of court cases with full representation provided 'Always' or 'Often' (range = 3 - 41% of the time, depending on case type).

scope representation, and at legal clinics. They also provide legal education for the public, help with legal aid intake, and mediate disputes. Many firms offer full billable hour credit for pro bono work, and some make pro bono a performance objective.

Michigan attorneys can connect to pro bono opportunities through the State Bar of Michigan (SBM) and 120 local and affinity bar associations. SBM administers several pro bono programs that assist low-income clients with various legal needs and provides malpractice insurance to Michigan attorneys handling pro bono cases if they apply for coverage before initiating representation of a low-income client. The SBM also maintains a pro bono calendar for clinics and other volunteer opportunities. In 2019, SBM launched "A Lawyer Helps" Pro Bono Honor Roll to recognize Michigan attorneys who provide 30 or more hours of pro bono legal services in a calendar year. More than 500 Michigan attorneys qualified for recognition in the first year, reporting a combined 2018 total of 51,880 hours of pro bono service to 9,441 pro bono clients.

While there are many law firm and legal department pro bono efforts,

there is a persistent disconnect between the need for pro bono services and what volunteer lawyers want to do. For example, family law is an area of highest need but those cases are hard to place with pro bono lawyers, especially with corporate attorneys. This disconnect causes legal aid to expend additional resources to develop alternative pro bono programs

to engage firms. Even so, there is a need for more training and mentorship for attorneys engaged in pro bono and affordable legal services.

Michigan has five law schools with legal clinics that provide legal services: University of Michigan Law School, Michigan State University College of Law, Wayne State Law

GOVERNANCE & INNOVATION

CONSUMER NEEDS & COMMUNITY INTEGRATION

ASSISTANCE WITHOUT A LAWYER

REPRESENTATION BY A LAWYER

COURT SERVICES & EDUCATION

APPENDIX

School, Detroit Mercy Law School, and Western Michigan University Cooley Law School. These law school clinics provide a wide array of legal services, including for consumer, housing, family, child welfare, civil rights, juvenile justice, veteran, immigration, and disability cases. Law school clinics are an important element of the civil justice system in Michigan, expanding the availability of legal services to vulnerable communities while providing students with a valuable experiential learning opportunity. However, they are limited in the number of individuals they can serve.

As part of its Lawyer Referral Service, SBM has a Modest Means Program to connect low- to moderate-income individuals with attorneys who offer reduced fee legal assistance. To qualify, participants' must have limited assets and household income of less than 250% of the federal poverty guidelines. Currently, the program provides assistance with consumer issues, including Chapter 7 bankruptcy, and family law issues. A flat fee of $500 is charged for Chapter 7 bankruptcy. Other matters are handled at a reduced fee of $75 per hour. Given the effectiveness of the program, SBM

would like to expand it in the future to offer reduced cost legal services for expungements, driver's license restoration, and probate, as well as expanded services for consumer and family law. SBM is also considering whether and to what extent to expand eligibility beyond its current income thresholds. Legal assistance for moderate income individuals is also provided by the Washtenaw Bar Association Family Law Modest Means Program.

A few for-profit and nonprofit law firms have adopted sliding scale fee models to help make their legal services more accessible to low- and moderate-income individuals. For example, Collaborative Legal Services is a nonprofit law firm that handles family law, landlord-tenant, and wills on a sliding scale from $75-$150 per hour based on income level. Sliding scale fees help ensure that clients are being treated equally based on their ability to pay.

Some law firms offer fixed or flat fee options, which provide people the ability to better understand how much it will cost to hire a lawyer. According to the 2020 State Bar of Michigan

Economics of Law Survey, 67% of lawyers who responded indicated that they provide fixed and flat fee services; however, for the vast majority of respondents, these services comprised 25% or less of their practice.



More resources (especially staff funding) [are needed] to do high-quality legal work while trying to address the crippling volume of cases we face.

– Legal aid program staff attorney

Despite extensive efforts being made in Michigan to provide free and affordable legal services to low- and moderate-income individuals, more is needed. Tellingly, all stakeholder types stressed in focus groups the need for more resources to hire legal aid attorneys to handle cases throughout the state, especially in rural areas and for survivors of domestic violence. There was also considerable support for providing attorneys for all tenants in eviction court.

GOVERNANCE &
INNOVATION

CONSUMER NEEDS &
COMMUNITY INTEGRATION

ASSISTANCE WITHOUT
A LAWYER

**REPRESENTATION
BY A LAWYER**

COURT SERVICES
& EDUCATION

APPENDIX

# Gaps & Barriers

**1**

There is a lack of funding and resources for legal aid organizations to address the overwhelming demand for their services, especially in rural areas.

**2**

There is a disconnect between the need for attorneys and the types of cases that pro bono attorneys want to handle; pro bono attorneys are reluctant to take cases outside of their expertise and large firm corporate attorneys may not be a good fit for every day legal aid cases.

**3**

Affordable options for legal help are extremely limited. Modest means panels have few lawyers participating. Sliding scale and fixed fees, and other innovative delivery models are still in their infancy, with a relatively small number of attorneys offering affordable legal services.

**4**

Legal aid programs do not share much data with each other, and competition for funding is a barrier to increased data sharing.

**5**

The lack of consistent, uniform court processes and procedures makes it very difficult for attorneys to represent low-income clients by video-conference or phone in locations where they don't regularly practice.

GOVERNANCE &
INNOVATION

CONSUMER NEEDS &
COMMUNITY INTEGRATION

ASSISTANCE WITHOUT
A LAWYER

**REPRESENTATION
BY A LAWYER**

COURT SERVICES
& EDUCATION

APPENDIX

# Limited Scope Representation

## COMPONENT KEY ELEMENTS

- Adoption of rules that support limited scope representation.

- Full acceptance by the judiciary of the practice, and court rules and procedures to ease attorney entry and withdrawal.

- Education and advertising to recruit lawyers.

- Training and resources to support participating lawyers, including templates for representation agreements and contemporaneous record keeping.

- Community of practice for limited scope representation attorneys to share best practices and problem-solve.

- Screening, triage and referral pipelines from self-help centers, legal aid organizations, and community partners to limited scope representation attorneys to connect them with self-represented litigants.

- Online education and advertising connected to lawyer referral services.

## CUMULATIVE COMPONENT ASSESSMENT



MINIMAL

## Assessment

Following extensive research and advocacy by the State Bar of Michigan (SBM) and collaboration between justice system stakeholders to enact limited scope court and ethics rules, the Michigan Supreme Court adopted rules that support limited scope representation (LSR), effective January 1, 2018. Despite these new rules, deployment of LSR in Michigan has been minimal, with only about 25 – 30 attorneys promoting LSR practices. To date, LSR has not been fully understood and accepted by the judiciary, the bar, and the public.

Most JFA stakeholder survey respondents and relevant focus group participants indicated that LSR is never or rarely practiced in Michigan. However, anecdotal information reveals that LSR may be practiced more frequently than indicated, but it may not be identified as or called LSR. In the annual SBM Economics of the Practice of Law Survey, 44% of respondents indicated that they provided limited scope services; however, for the vast majority, LSR accounted for only 10% or less of their

practice. Respondents indicated that they provided LSR for a wide-array of tasks, including court appearances, drafting documents, reviewing documents, and negotiations.

The State Bar of Michigan (SBM) has undertaken many efforts to promote LSR among its members, including hosting a virtual community of over

100 attorneys interested in LSR; integrating LSR into the triage and referral systems for its Lawyer Referral and Information Service and Michigan Legal Help's Guide to Legal Help; and creating a Limited Scope Tool Kit with resources to help attorneys with LSR practices, including practice forms, court forms, marketing tools, and free on-demand LSR webinars. SCAO is



**What percentage of your docket includes Limited Scope Representation cases, where either an attorney is appearing on a limited basis or a self-represented person has received other limited scope services, like document drafting/review or legal advice? (n = 172)**

- Less than 10% — 48%
- 10% to 25% — 15%
- 26% to 50% — 2%
- 51% to 75% — 2%
- More than 75% I never or rarely have Limited Scope Representation cases on my docket — 32%
- 0%

Stakeholder Survey, July 2020; 80% of responding judges reported that less than 10% of their docket includes limited scope representation.

**REPRESENTATION BY A LAWYER**

currently reviewing SBM-proposed forms and will make those LSR forms available on SCAO's website after they are approved.

The SBM has also conducted extensive outreach to educate members of the bar and Michigan law schools about LSR, and has more programs scheduled in the future. It partnered with the Institute of Continuing Legal Education to create a free, comprehensive training video for Michigan attorneys, which is required to be viewed for an attorney to include Limited Scope as a practice area in the Bar's Lawyer Referral and Information Service.

Michigan Legal Help has been a vital partner to SBM's efforts to reach out to and educate the public by posting articles about LSR on its website and including limited scope as a referral option in its Guide to Legal Help. MLH plans to create videos about LSR and automate LSR-related forms for the public in the future, along with creating a brochure for courts to give to self-represented persons so they know that it may be an option.

Despite these efforts, LSR is still a fledgling practice in Michigan. There is a lack of awareness by judges, although survey responses indicate that they do see LSR in their courtrooms, but they do not identify it as such. To help the judiciary embrace LSR, SBM has engaged in extensive efforts to educate judges and court staff on the benefits of LSR by presenting at numerous continuing education events and conferences.



LSR has not really caught on yet in our county. Occasionally, we see some attorneys from out of county who file LSR appearances, but thus far this has been rare.

- Probate Court Judge in South Central Michigan

# Gaps & Barriers

**1**

The term Limited Scope Representation is not widely known and the practice has not been widely adopted by lawyers; attorneys may provide limited scope services more informally, but many are not aware of it and very few report providing significant amounts of LSR.

**2**

Judges are often not supportive of attorneys providing limited scope representation or do not know about LSR.

**3**

Members of the public are generally not aware of limited scope representation, nor that it may be an option for them.

**4**

There is little data available related to limited scope representation and the extent to which LSR services are provided.



APPENDIX

COURT SERVICES & EDUCATION

REPRESENTATION BY A LAWYER

ASSISTANCE WITHOUT A LAWYER

CONSUMER NEEDS & COMMUNITY INTEGRATION

GOVERNANCE & INNOVATION

# Judicial and Court Staff Education

## COMPONENT KEY ELEMENTS

Judicial and court staff education programs should follow adult learning principles, be dynamic and interactive, and address the following topics:

- Engagement with self-represented litigants.

- Availability of court-based self-represented litigant resources, community resources, and referral systems.

- Variability of approaches depending on case type.

- Cultivating access to justice leadership within the bench and court leadership related to change.

- The role of judicial officers and court staff in process simplification initiatives.

- The distinction between legal information and legal advice.

- Procedural fairness.

- Language access requirements and procedures.

- Disability access requirements and procedures.

- Diversity, equity and inclusion.

## CUMULATIVE COMPONENT ASSESSMENT



PARTIAL

**COURT SERVICES & EDUCATION**

## Assessment

This justice system component focuses on educating judges and court staff about access to justice issues and how to engage with self-represented litigants (SRLs) ethically and effectively. It is necessary to have accessible courtrooms that are presided over by judges who can effectively handle cases where one or both sides are self-represented. Court staff provide another critical support role as they are often "on the front lines" interacting with SRLs.

Educational programs are a cost-effective way of supporting judges and court staff as they carry out these important roles.

The primary source of judicial branch education in Michigan is the Michigan Judicial Institute (MJI). As the continuing education division of the State Court Administrative Office, MJI is responsible for providing training courses and materials for nearly 600 state judges and more than 8,000 judicial branch employees. Much content is provided through live seminars, distance learning opportunities, and publications.



**To what extent have you participated in training on the following Access to Justice topics? (n = 258)**

Stakeholder Survey, July 2020; responses from judges, magistrates, referees, court administrators, and court clerks who answered this question reveals that most participate in training on access to justice issues less than yearly or never.

Resource limitations, however, severely hamper the ability of MJI to cover all the necessary judicial branch education in Michigan. As a result, numerous public and private educational providers are in competition for the limited time and training funds Michigan judges and court employees can access.

The JFA Task Force assessed the capacity of numerous sources of judicial branch education, specifically related to the civil justice system. Through the assessment process, including surveys, focus groups, town hall meetings, and interviews, it became clear that overall progress on this component is only partial and there are many gaps and barriers to be addressed.

**COURT SERVICES & EDUCATION**

Some of the critical stakeholders engaged in the civil justice system identified their roles and interest in the furtherance of judicial branch education as follows:

- **Michigan Judicial Institute** (MJI) delivers a broad range of judicial branch education to judges and court staff.

- **State Court Administrative Office** provides procedural guidance and standards for an array of court operational systems, as well as informal education through direct assistance from SCAO.

- **Judges** often participate in judicial branch education as faculty as well as participants.

- **Trial Court Administrators** plan and facilitate the professional development of court staff through on the job training, mentoring, providing time to attend external training events provided by MJI, court management associations, Institute for Court Management, and other continuing education providers. Many court administrators also serve as faculty for a variety of judicial branch education courses.

- **Attorneys, Advocacy Groups, Legal Aid Offices, and the general public** are some of the many "customers" for whom well trained judges and court staff are needed to properly administer justice and assist with the processing of their individual cases.

- **Judicial Branch Education Providers** are numerous within Michigan and nationally. Some providers are non-profit organizations, associations, or educational institutions, while others are for-profit companies.

MJI provides new court employees (judges, magistrates, referees, court administrators/probate registers) with orientation seminars that offer content on access to justice topics, including effective interactions with SRLs, procedural fairness, MichiganLegalHelp.org and other community resources, language access procedures and resources, ADA requirements, and implicit bias. Experienced judges and court staff may receive additional education on these topics through sessions offered during MJI judicial, court professional and court management programs, with participants self-selecting to attend.



The continued availability of attending education via Zoom or other online access [would] improve judicial and court staff education on access to justice issues]. Due to the travel time and time away from the office, seldom is support staff provided with current training opportunities. Remote access and recorded webinars will aid in keeping all staff current in all areas of education and training.

- Court Administrator in the Upper Peninsula

Resource constraints limit how often courses on access to justice topics are offered beyond the new court employee training. Some topics may be offered yearly, and some less often. Prior to the Coronavirus pandemic MJI did not offer a significant amount of remote learning opportunities, but there will be more offered in the future.

Since there currently is no mandatory judicial education requirement in Michigan, it is not known how many judges take additional courses beyond those offered by MJI. Judicial and court staff training may be provided locally at the county level. Wayne, Kalamazoo, Kent and Ottawa counties are known to have local education programs for judges and court staff. However, during the pandemic local training budgets have largely been redirected to pay for other items needed to reopen courthouses (e.g., plexiglass shields), and training has been focused on how to operate courts remotely.

Civil justice system stakeholders were clear about the need to improve the quantity and quality of continuing education for Michigan judges and

court employees. Multiple stakeholder focus groups identified gaps and barriers which continue to interfere with the ability to provide robust judicial branch education, as well as numerous topics related to access to justice which require more focused training. For example, participants in a focus group of violence survivor advocates, along with members of the public who spoke at the Detroit Town Hall Meeting both stated that many judges do not empathize with domestic violence and sexual assault survivors. They further reported that judges often do not understand issues that survivors face in court, including stereotypes, power imbalances, a perceived lack of credibility, and a general survivor blaming perspective.

A survey of the public found that a sizable portion of people lack trust and confidence in the courts, which highlights a need for more training on these issues. 60% of survey respondents who had been a party in a court case said their case was not handled fairly, and 31% of all respondents did not go to court because they do not trust the court system to provide a fair decision. Some

respondents also expressed fear of retaliation by some judges and were concerned about judicial bias. In addition, 40% of respondents who had been a party in a court case reported not understanding the judges and court staff, 44% reported not understanding what occurred in their case, and 49% reported not understanding what their next steps were. These findings reflect a need for more training for judges and court staff on communications and the role of the court.

GOVERNANCE &
INNOVATION

CONSUMER NEEDS &
COMMUNITY INTEGRATION

ASSISTANCE WITHOUT
A LAWYER

REPRESENTATION
BY A LAWYER

**COURT SERVICES
& EDUCATION**

# Gaps & Barriers

## 1

Focus group comments and survey data reported a lack of customer service and communication skills at all levels of court staff and the judicial branch, and a need for comprehensive training for all court staff and judicial branch members on customer service and removing barriers for litigants.

## 2

Confusion exists among court staff, judges, and community partners about what information can be provided to members of the public and litigants without providing legal advice. There is a lack of consistent participation by court staff and judges in training on what information court staff can provide while avoiding the unauthorized practice of law, and how judges can effectively interact with self-represented litigants while remaining impartial; library and other community stakeholders also need training on the appropriate boundaries between giving unauthorized legal advice and providing procedural information.

## 3

There is a lack of direction to make civil case process training a priority for judges and court staff.

## Gaps & Barriers (continued)

**4**

Many judges and court staff do not understand and are not trained on issues facing survivors of violence and people living in poverty, including the trauma that they experience.

**5**

A focus group of self-help center navigators asserted that there are no court "point persons" with whom local self-help centers may connect, and most judges and court staff do not know what services are provided by self-help centers and what resources are available through Michigan Legal Help.

**6**

Family court judges lack knowledge and training on issues that frequently arise in family court, including:

- establishing appropriate child support orders for individuals with means tested income;

- grandparent visitation rules and the validity of Probate Court custody decisions;

- adult/child family dynamics; and

- the impact of court orders, which may increase recidivism, homelessness, evictions, etc.

**7**

Public experience with the court system reflects a need for judicial and court staff training on public trust and confidence and the role of the court.

**8**

There is a need for increased and sustainable funding for judicial branch education.

APPENDIX

**COURT SERVICES & EDUCATION**

REPRESENTATION BY A LAWYER

ASSISTANCE WITHOUT A LAWYER

CONSUMER NEEDS & COMMUNITY INTEGRATION

GOVERNANCE & INNOVATION



# Plain Language Forms

## COMPONENT KEY ELEMENTS

- User-centered design that is grounded in process-mapping by case type.

- Embedded plain language instructions.

- Universal implementation and adoption of standardized plain language forms.

- Field testing for comprehensibility and usability.

- Integration and alignment of data elements and processes between forms, court and legal aid case management systems, and e-filing systems.

- Protocols for ongoing assessment and updating of forms and related materials.

- A statewide standardized plain language glossary of legal terms.

- Both printed and automated versions of forms are available.

## CUMULATIVE COMPONENT ASSESSMENT

**MINIMAL**

GOVERNANCE &
INNOVATION

CONSUMER NEEDS &
COMMUNITY INTEGRATION

ASSISTANCE WITHOUT
A LAWYER

REPRESENTATION
BY A LAWYER

APPENDIX

**COURT SERVICES
& EDUCATION**

## Assessment

Standardized Plain Language Forms are a foundational component of an effective civil justice system. Without them other system components are more difficult to deploy, e.g., self-help centers may not have necessary resources. This component encompasses the implementation and maintenance of standardized, plain language forms that are available both in printed and automated formats.

The JFA Plain Language Forms stakeholder survey was completed by two stakeholders with expertise on this topic: the State Court Administrative Office (SCAO) and Michigan Legal Help (MLH). SCAO has developed over 800 court forms[13] which are written to comply with the law. Some SCAO forms are standardized and required by law to be used in all courts across the state.[14] However, SCAO currently does not have any designated plain language versions of its forms. Statutory language that is used in forms is often dense and confusing, which may lead to some forms that are dense and confusing. In the survey of members of the public, only 36% of



Plain language Small Claims forms on MichiganLegalHelp.org. Users are guided through a series of questions about their case, then their forms are automatically populated with their information and are ready to print and file with the court.

respondents agreed or strongly agreed that Michigan court forms were easy to understand.

MLH has a robust library of over 50 plain language forms available via a document assembly platform on the Michigan Legal Help website in the areas of family law, protection from abuse, landlord-tenant, small claims,

debt collection, small estates, and name change. All forms are developed using plain language and they are automated, which means that users are asked questions and enter answers electronically about their problem, and the appropriate information is then populated in the form. Users can save or print their completed forms, but they cannot

APPENDIX

COURT SERVICES & EDUCATION

REPRESENTATION BY A LAWYER

ASSISTANCE WITHOUT A LAWYER

CONSUMER NEEDS & COMMUNITY INTEGRATION

GOVERNANCE & INNOVATION

print a blank version for all but one form set (small claims). Some MLH automated forms are also accessible in Spanish. At this time, e-filing of completed forms from MLH's system is not available.

In 2019 Michigan Legal Help's forms were used over 200,000 times, resulting in 114,165 completed documents, an average of 312 form sets prepared each day. Usage in 2020 has increased – through the third quarter just shy of 100,000 forms were prepared, an average of 365 a day. While these do-it-yourself form preparation tools are clearly very useful for many people, MLH would like to do more observational user testing to better assess and improve their usefulness.

Stakeholders that frequently interact with members of the public, including libraries and self-help centers, reported in focus groups that forms are one of the most popular resources that people seek, yet they do not have a source for up to date printed forms. While these stakeholders often help people use MLH automated forms, one challenge they identified is that some users want to

use paper forms or at least want to see a blank paper version of forms before they complete an online automated forms interview.



This was such a huge help because I can't afford a lawyer and I don't understand court papers and their legal terms. Thank you so much.

– User of Michigan Legal Help's divorce forms

**COURT SERVICES & EDUCATION**

REPRESENTATION BY A LAWYER

ASSISTANCE WITHOUT A LAWYER

CONSUMER NEEDS & COMMUNITY INTEGRATION

GOVERNANCE & INNOVATION

## Gaps & Barriers

**1**

Plain language forms are not available for any civil case type through SCAO; Michigan Legal Help does not have plain language forms available in all subject areas.

**2**

Technology tools are not currently used by SCAO for plain language forms; e-filing of Michigan Legal Help's plain language forms is not available statewide.

**3**

Plain language court forms are not fully accessible to people who do not speak English. SCAO provides a limited number of court forms in other languages. Michigan Legal Help offers some automated plain language forms in Spanish. Interpretation services are also not available for plain language forms.

**4**

User testing of Michigan Legal Help's plain language forms is conducted on a limited basis due to resource constraints.

**5**

There is very little data collected and shared on plain language forms.

**6**

Court forms are confusing when statutory language is closely followed in the forms. SCAO must deviate from statutory language to make forms plain language, or convince the legislature to use plain language when making laws.

**7**

There is a lack of continuity in court forms across all counties. Use of local court forms exacerbates problems created when forms are not in plain language because local courts rarely have resources to focus on plain language.



APPENDIX

**COURT SERVICES & EDUCATION**

REPRESENTATION BY A LAWYER

ASSISTANCE WITHOUT A LAWYER

CONSUMER NEEDS & COMMUNITY INTEGRATION

GOVERNANCE & INNOVATION

# Courtroom Assistance Services

## COMPONENT KEY ELEMENTS

- Adoption of attorney-for-the-day services.

- In-person assistants, facilitators, or navigators to help with the preparation of necessary documentation or information.

- Technology tools to support the work of assistants, such as automated forms and triage tools.

- Technology tools for judges to prepare and explain final orders in the courtroom.

- Information and resources that are provided to explain next steps in the case and answer questions about orders entered.

- Referrals to additional help or services, including limited scope legal services and social services.

## CUMULATIVE COMPONENT ASSESSMENT



MINIMAL

GOVERNANCE &
INNOVATION

CONSUMER NEEDS &
COMMUNITY INTEGRATION

ASSISTANCE WITHOUT
A LAWYER

REPRESENTATION
BY A LAWYER

APPENDIX

**COURT SERVICES
& EDUCATION**

## Assessment

This component involves the assistance given to litigants in a courtroom at the time of a proceeding. These services can be provided by almost any of the many trusted justice system professionals, including self-help center staff, court clerks or case managers, judicial staff, non-attorney navigators, community volunteers, mediators, and pro bono attorneys.

The information and data collected through surveys and focus groups reveal that the availability of Courtroom Assistance Services varies widely, depending on location. Some courts have multiple people who help self-represented litigants in the courtroom, while most courts have few or no resources. The most common response in the stakeholder survey to questions about Courtroom Assistance Services was "I don't know," indicating a general lack of knowledge about and availability of such services. Some judges and court personnel affirmatively stated that they are not allowed to provide assistance to litigants as that would be legal advice.

In a focus group, judges provided

insight into the types of courtroom assistance they can provide and facilitate that will make the civil justice system more accessible:

- Use plain language to explain court rulings to self-represented persons.

- Explain the law to self-represented persons.

- Ask questions of self-represented people to pull out the info needed to decide the issues before them.

- Meet with (both) parties in chambers to talk with them so they feel they are heard.

- Train court staff to be courteous and helpful to people who have questions.



**Who provides Courtroom Assistance Services in your area?** (select all that apply) (n = 347)

Stakeholder Survey, July 2020; judges and court staff are most likely to provide courtroom assistance to self-represented people.

APPENDIX

**COURT SERVICES & EDUCATION**

REPRESENTATION BY A LAWYER

ASSISTANCE WITHOUT A LAWYER

CONSUMER NEEDS & COMMUNITY INTEGRATION

GOVERNANCE & INNOVATION

- Direct people to self-help centers to get legal info they need to present their cases.

- Prepare orders in advance or from the bench so people leave the courtroom with their order.

While there are some effective court interpreter services, the consensus of all stakeholder groups about these services is that they are frequently not available and generally of poor quality. Community organizations reported that their clients often have negative experiences with court interpreters. Judges are generally aware of language access problems and work to make sure that they can understand people who do not speak English. Most judges use Language Line in the courtroom, which works most of the time, especially for common languages and shorter hearings, but there are consistency issues with Language Line as well. The lack of availability of interpreters in court may also slow cases, which may negatively impact the outcome.

Various stakeholders provide other courtroom assistance services, including Friend of the Court Office

staff, self-help center navigators, Court Appointed Special Advocates (CASA), law school clinics, and other advocates. Domestic violence survivor advocates have long served an important role helping survivors in court by providing emotional support, explaining court process and consequences, helping with paperwork, and interpreting when necessary. However, there must be clearly defined boundaries regarding what they can and can't do so they don't overstep into providing legal advice. Self-help center navigators provide courtroom assistance, but they typically work outside the courtroom and may or may not be affiliated with the court.



Having a clerk in the courtroom to prepare the more simple orders would be extremely helpful and more timely. Sometimes people have to wait days or weeks to get an order as only one or two people are doing orders and serving them.

- Probate Court Clerk in central Michigan

GOVERNANCE & INNOVATION · CONSUMER NEEDS & COMMUNITY INTEGRATION · ASSISTANCE WITHOUT A LAWYER · REPRESENTATION BY A LAWYER · **COURT SERVICES & EDUCATION** · APPENDIX

83

# Gaps & Barriers

**1**

There are numerous gaps in court interpreter services, including a general lack of availability, poor or inconsistent quality, limited availability of interpreters for some languages/dialects, and in some courts they are not considered essential.

**2**

There are not enough Self-Help Centers to provide assistance and there is not always a strong relationship between existing SHCs and courts.

**3**

Courts are not well connected with libraries, and they refer people with legal problems to them without knowing what services libraries provide; these referrals are not effective.

**4**

Not all judges use courtroom technology to prepare orders. Zoom hearings may make it harder for judges to prepare orders using technology because there is a technology overload in remote hearings, and it is hard to pay attention to litigants and use all the technology.

**5**

Domestic violence survivor advocates are not a substitute for attorneys; there must be clearly defined boundaries re: what they can and can't do in court.

**6**

Members of the public often leave court not understanding what the judge or court staff said to them, what happened in their case, and what the next steps are. They also frequently do not receive reminders about deadlines, hearing dates, and payment due dates.

COURT SERVICES
& EDUCATION

REPRESENTATION
BY A LAWYER

ASSISTANCE WITHOUT
A LAWYER

CONSUMER NEEDS &
COMMUNITY INTEGRATION

GOVERNANCE &
INNOVATION

## Gaps & Barriers (continued)

**7**

Technology tools are often not available or not used for Courtroom Assistance Services because of lack of buy in, funding, knowledge, and resources. There is also a lack of time to learn new systems if the docket is heavy.

**8**

There is minimal data collection and sharing for Courtroom Assistance Services.

GOVERNANCE & INNOVATION

CONSUMER NEEDS & COMMUNITY INTEGRATION

ASSISTANCE WITHOUT A LAWYER

REPRESENTATION BY A LAWYER

COURT SERVICES & EDUCATION

APPENDIX



# Compliance Assistance

## COMPONENT KEY ELEMENTS

- Written orders and compliance information are made available immediately after hearings.

- Plain language is used in orders and judgments.

- Translation of plain language orders and judgments is made available.

- Explanations should be provided by judges, court staff or other professional helpers.

- Reminders are sent prior to deadlines.

- Online tools are provided to assist with compliance and enforcement.

- FAQs are provided on post-judgment issues.

- Collaboration with stakeholders and users to identify common problems and ways to address them.

## CUMULATIVE COMPONENT ASSESSMENT



PARTIAL

GOVERNANCE & INNOVATION

CONSUMER NEEDS & COMMUNITY INTEGRATION

ASSISTANCE WITHOUT A LAWYER

REPRESENTATION BY A LAWYER

COURT SERVICES & EDUCATION

APPENDIX

## Assessment

This component directly addresses strategies for increasing comprehension of and compliance with legal processes and court orders, and how to handle post-judgment considerations. A lack of comprehension about legal processes can lead to non-compliance and costly continuances for users and courts during the process and even more costly enforcement actions after a judgment has been rendered. Lack of knowledge about post-judgment options and issues also leads to self-represented persons not being able to fully exercise their legal rights.

The data and information collected about Compliance Assistance in Michigan reveals that it is available in a number of courts, but likely in a minority of them statewide. Larger, more well-funded jurisdictions are more likely to provide compliance services, as are those courts with access to legal self-help centers. While the majority of stakeholders responded to survey questions about compliance assistance with "I don't know," anecdotal descriptions of compliance

Does your courts or the courts you practice in have a policy or standard practice that requires explanation of orders and compliance requirements to self-represented persons? (n = 318)



| | | |
|---|---|---|
| Yes | No | I Don't Know |
| 23% | 39% | 38% |

Stakeholder Survey, July 2020; compliance assistance policies and practices either do not exist or are not known.

assistance suggests there is more activity in courts with sufficient staff and funding to provide additional, non-mandated services, and in those courts with more sophisticated technology support that allows for text messaging, website chat features, and other online services.

Where it is available, compliance assistance exists primarily in general civil, domestic, civil infraction, traffic, landlord-tenant, and probate cases. Services are typically available in the pre-hearing and post-judgment stages of a case where litigants may receive compliance assistance through educational resources about court processes, reminder notices for upcoming dates and/or payments due,

**COURT SERVICES & EDUCATION**

GOVERNANCE & INNOVATION    CONSUMER NEEDS & COMMUNITY INTEGRATION    ASSISTANCE WITHOUT A LAWYER    REPRESENTATION BY A LAWYER

at self-help centers, or via payment calculators. Compliance assistance is sometimes available remotely through court websites, MichiganLegalHelp.org, text messages, and video conferencing with court staff, attorneys, or self-help centers.

The results of the public survey demonstrate that there is a need for more Compliance Assistance services in Michigan. As reported in the Navigator Services section, only 60% of respondents said that the judge and court staff spoke to them in a way they understood, only slightly more than half stated that they understood what happened in their case after they left court, and only half understood what to do next. These conditions strongly suggest that it is likely that a majority of people will not be able to fully comply with court processes and orders. Additionally, less than half (48%) of respondents received reminders about deadlines, hearing dates, payments, or appointments.

Relatively little data seems to be collected about Compliance Assistance, with nearly 37% of Stakeholders reporting "None" and 58% reporting "I don't know" about data collected. To

ensure quality data that is reliably collected, courts will need additional staff resources and training to help staff appreciate the need for data, how it will be used, and clear definitions of necessary data elements. To whatever extent court data will be shared with outside agencies/stakeholders, clear data sharing agreements should be in place.



I think it would be extremely helpful if we had the technology to text reminders to litigants for upcoming court dates. I understand the courts that have purchased this technology have found it extremely effective and well worth the investment.

– Circuit Court Judge in Macomb County

GOVERNANCE &
INNOVATION

CONSUMER NEEDS &
COMMUNITY INTEGRATION

ASSISTANCE WITHOUT
A LAWYER

REPRESENTATION
BY A LAWYER

**COURT SERVICES
& EDUCATION**

# Gaps & Barriers

**1**

Court processes and forms are complicated and should be simplified so people can understand them.

**2**

Lack of support and training about court procedures and legal referral resources for self-represented litigants, non-lawyer navigators, and community partners who may assist people with compliance.

**3**

Limited use of text message reminders about deadlines and dates for litigants.

**4**

Insufficient training for judges on providing complete and compassionate explanations to litigants about future compliance.

**5**

Judges find it difficult to pay enough attention to litigants when dealing with technology issues, remote hearings, interpreter problems, etc.

**6**

Court staff often avoid helping litigants draft and/or understand court orders because they don't understand the difference between legal information and legal advice.

**7**

There is a need for more resources for existing Self-Help Centers and to create new ones in communities that don't have one.

**8**

Most members of the public who appear in court do not understand the judge and court staff, do not understand what happened in court, don't know what to do next, and can't understand court forms.

**9**

Online payment of court fees and fines is limited and should be expanded.

# Appendix A: Component Rating Scale[15]

## Cumulative Component Assessment

Rate the overall progress for each civil justice system component using the following scale, based on data and information compiled through the inventory process:



### NONE

Component key elements, content or services are not available; no data is being collected; there is no sustained funding and there are many gaps to providing this service or content.

### MINIMAL

Very little demand for component key elements, content, or services is estimated to be met, potentially only in a few counties. There may be only a few (1-2) case types or litigation stages in which component key elements, content, or services are available. The majority of survey responses focusing on technology, language supports, access requirements, and safeguards, are 'I Don't Know' or 'Rarely' with a few 'Sometimes' selections. There are limited examples of diversity, equity, and inclusion as well as weak, unsustainable financing structures and data collection practices.

GOVERNANCE & INNOVATION  CONSUMER NEEDS & COMMUNITY INTEGRATION  ASSISTANCE WITHOUT A LAWYER  REPRESENTATION BY A LAWYER  COURT SERVICES & EDUCATION



## PARTIAL

It is estimated that between a quarter and half of the demand for component key elements, content, or services is estimated to be met. Component key elements, content or services may not be statewide and in less than half of all counties. There may be only three to four case types and few litigation stages in which component key elements, content or services are available. The majority of survey responses focusing on technology, language services, access requirements and safeguards are 'Sometimes' with a few 'Rarely' or 'Often' selections. Additionally, only a few examples of diversity, equity and inclusion are present. Financing structures are somewhat stable while data collection is sporadic and rarely informs strategy or policy.

## SUFFICIENT

It is estimated that more than half of the demand for component key elements, content or services is being met. The component key elements, content or services may exist statewide and if not statewide, in many of the counties. Component key elements, content or services are provided to most case types and at multiple stages in the case. The majority of survey responses focusing on technology, language supports, access requirements, and safeguards are 'Often' with a few 'Always' or 'Sometimes' selections. Additionally, there are more than 2-3 examples of diversity, equity, and inclusion present. Stable and sustainable financing structures are listed; data collection may be established and occurring but there is room for advancement in how it informs the design, delivery and sustainability of the component.

## ADVANCED

Greater than 75% of the demand for component key elements, content or services is being met. The component key elements, content or services are statewide and are provided to almost all cases and at every feasible stage in the case. The majority of responses focusing on technology, language services, access requirements and safeguards are 'Always' with a few 'Often' or 'Sometimes' selections. Additionally, there are numerous examples of diversity, equity, and inclusion. Financing structures are described as robust and sustainable. Data collection and sharing occur regularly to inform component design and delivery with strong feedback loops in place to guide future development.

GOVERNANCE & INNOVATION

CONSUMER NEEDS & COMMUNITY INTEGRATION

ASSISTANCE WITHOUT A LAWYER

REPRESENTATION BY A LAWYER

COURT SERVICES & EDUCATION

APPENDIX

## Endnotes

[1] The Michigan Trial Court Administration Reference Guide provides a comprehensive overview of court operations at https://courts.michigan.gov/Administration/SCAO/Resources/Documents/Publications/Manuals/carg/carg.pdf.

[2] When the COVID-19 pandemic hit the U.S in March 2020, Michigan courts were well equipped and able to swiftly respond by shifting to remote court proceedings. See https://courts.michigan.gov/News-Events/press_releases/Documents/1%20Million%20Zoom%20Hours%20news%20release.pdf.

[3] Information about the 82 transportation agencies serving Michigan's residents can be found at http://www.michigan.gov/mdot/0,1607,7-151-9625_21607-31837--00.html.

[4] See Trial Court Funding Commission Final Report (9/6/19) at https://courts.michigan.gov/Administration/SCAO/Documents/TCFC%20Final%20Report.pdf.

[5] Michigan State Bar Committees include the Access to Justice Policy Committee, Justice Initiatives Committee, Affordable Legal Services Committee, Diversity and Inclusion Advisory Committee, and Public Outreach and Education Committee.

[6] See "Envisioning a New Future Today," a report of the 21st Century Practice Task Force of the State Bar of Michigan at https://www.michbar.org/file/future/21c_WorkProduct.pdf.

[7] The 5 trial court pilots are in the 3rd Circuit Court (Wayne County), 6th Circuit Court (Oakland County), 13th Circuit Court (Antrim County, Grand Traverse County, and Leelanau County), 16th Circuit

Court (Macomb County), and 20th Circuit Court (Ottawa County). The 3 statewide standard solution models are in Ottawa County Probate Court, 37th District Court (Warren), and 22nd Circuit Court (Washtenaw County).

[8] The JFA Task Force did not assess the number of people who don't recognize they have a legal problem, but relied on a body of research about this topic. See a seminal study, "Accessing Justice in The Contemporary USA: Findings from the the Community Needs and Services Study" (2014) at http://www.americanbarfoundation.org/uploads/cms/documents/sandefur_accessing_justice_in_the_contemporary_usa_aug._2014.pdf.

[9] Self-help centers are established in the following counties: Alcona, Allegan, Alpena, Berrien, Calhoun, Cass, Genesee, Grand Traverse, Gratiot, Ingham, Jackson, Kent, Livingston, Macomb, Marquette, Monroe, Muskegon, Oakland, Oscoda, Ottawa, Saginaw, SW Detroit, Tuscola, Washtenaw, and Wayne.

[10] MCL 600.2950c

[11] For more information about Michigan State Bar Foundation funded programs, see MSBF Annual Report.

[12] While each LSC recipient sets their own priorities for the provision of legal services, the Legal Services Corporation published a Suggested List of Priorities for LSC Recipients, which includes support for families; preserving the home; maintaining economic stability; safety, stability, and health; and populations with special vulnerabilities.

APPENDIX

COURT SERVICES
& EDUCATION

REPRESENTATION
BY A LAWYER

ASSISTANCE WITHOUT
A LAWYER

CONSUMER NEEDS &
COMMUNITY INTEGRATION

GOVERNANCE &
INNOVATION

# Endnotes

[13] All SCAO approved court forms are available at https://courts.michigan.gov/administration/scao/forms/pages/search-for-a-form.aspx.

[14] Mandatory SCAO forms can be found at https://courts.michigan.gov/Administration/SCAO/Forms/Pages/Mandatory-Use.aspx.

[15] Component rating scale provided in JFA Guidance Materials, https://www.ncsc.org/jfa/guidance-and-tools/guidance-materials.