Melvin Jones Jr - Pro Se Plaintiff

1935 Hosler St - Flint, Michigan 48503

Ph #810-962-6225

Email: meljonesjr@gmail.com

IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT MICHIGAN

CASE # 2:21-cv-10937  AJT  EAS

Transferred to Judge Levy

_____ Jones' additional MOTION as to Ethical

_____ Issues for the MI Supreme Court [and] MI

Attorney General (i.e. AG Dana Nessel) to "weigh-in"on:



Melvin Jones Jr, Federal EPA, City of Flint, Wells Fargo Bank, HUD, and The State of Michigan - Plaintiffs

v.

NAPOLI LAWFIRM, attorney Patrick Lanciotti and attorney Hunter and Attorney Corey Stern -- Defendants

-------------------------------------------------------------------------------------------

## *Additional --- ETHICAL ISSUES (at issue):*

*As and for additional 'context' for this (additional) MOTION for ADVISORY OPINION from the Michigan (MI) State Supreme Court, and the Michigan State AG (i.e. AG Dana Nessel) ---- please see the three (3) attachments affixed hereto.*

*Specifically ---- it seriously appears that the named attorney defendants (i.e. Napoli Lawfirm, Attorney Stern, Hunter and Lanciotti... i.e. "Lead Plaintiffs' Attorneys" in the companion FWC # 16-cv-10444) HAVE FAILED their ethical obligation as 'lead class council' which MANDATES proper and fair/sufficient NOTICE (e.g. as to the 1st and 2nd phase of the FWC).   For example, class certification as to the VEOLIA, at al (2nd phase*

*of the FWC) is PUT IN JEOPARDY as to such due to "improper notice"; AND the 1st phase of the FWC lawsuit is SIMILARLY PUT IN JEOPARDY as to such:*

*For example:*

*a.) It appears that the "undocumented" (e.g. Hispanic and/ or Latinx) population of the Adult Flint Residents HAVE NOT received proper Notice,*

*b.) It appears that the sight – impaired population of the Adult Flint Residents HAVE NOT received proper Notice,*

*c.) It appears that the mobility – impaired population of the Adult Flint Residents HAVE NOT received proper Notice,*

*d.) It appears that person with "informational – processing disorders" as to the population of the Adult Flint Residents HAVE NOT received proper Notice,*

*e.) It appears that persons whom are "house-bound" due to disability as to the*

*population of the Adult Flint Residents HAVE NOT received proper Notice,*

*f.)   It appears that persons who have medical issues surrounding COVID-19 as to the population of the Adult Flint Residents HAVE NOT received proper Notice, and*

*g.) It appears that persons who have immune systems issues as to reduced ability to fend-off infection as to the population of the Adult Flint Residents HAVE NOT received proper Notice,*

*h.)  It appears that persons who have some sort of learning disability  as to the population of the Adult Flint Residents HAVE NOT received proper Notice,*

*i.) It appears that persons who have their Michigan State Drivers License "medically suspended" due to underlying serious medical issues as to the population of the Adult Flint Residents HAVE NOT received proper Notice.*

*Please note: by notice.... Such includes LACK of sufficient time [and/ or] ability to register, or OPT -IN or OPT OUT of the 1st phase of the FWC settlement.*

*For example,*
*Federal Rules of Civil Procedure Rule 23 has been used to address alleged improper solicitation of putative class members in the context of determining whether to certify a class. See Busby v. JRHBW Realty, Inc., 513 F.3d 1314, 1323–24 (11th Cir. 2008), declined to extend Howland v. First Am. Title Ins. Co., 672 F.3d 525 (7th Cir. 2012); cf. Ramos, 325 F.R.D. at 394 n.6; Spagnuoli, 20 F. Supp. 3d at 358–59; German v. Fed. Home Loan Mortg. Corp., 885 F. Supp. 537, 556 (S.D.N.Y. 1995) [some courts have held that the ethical conduct of counsel is relevant to the issue of adequacy of counsel] (siting Brame v. Ray Bills Fin. Corp., 85 F.R.D. 568 (N.D.N.Y. 1979); see also William B. Rubenstein, Newberg on Class Actions, Ethical*

*Concerns In Class Action Practice*, § 19:4 (Westlaw, Nov. 2018 Update).

And,

Further, an attorney-client relationship is "different in the class context than it is in a traditional, nonclass situation," whereas a relationship between class counsel and named class members is "one of private contract, whereas the relationship between absent class members and class counsel is one of court creation." In re Chicago Flood Litig., 289 Ill. App. 3d 937, 942 (1st Dist., 2d Dep't 1997)).; also,

a. Adequacy of representation implicates "plaintiffs as class representatives and counsel, and the impact of alleged improper or unethical conduct by each." Meachum v. Outdoor World Corp., 171 Misc. 2d 354, 358 (Sup. Ct. Queens Cty. 1996). b. Such representation "depends on two factors: (a) the plaintiff's attorney must be qualified,

*experienced, and generally able to conduct the proposed litigation." Susman v. Lincoln Am. Corp., 561 F.2d 86, 90 (7th Cir. 1977) (quoting Wetzel v. Liberty Mut. Ins. Co., 508 F.2d 239, 247 (3rd Cir. 1975)). c. Furthermore, "[t]he conduct of plaintiff's counsel, particularly the ethical considerations of such conduct, is a factor in considering the adequacy of representation." Meachum, 171 Misc. 2d at 358 (citing Cannon v. Equitable Life Assurance Soc'y of U.S., 106 Misc. 2d 1060, 1068 (Sup. Ct. Queens Cty. 1980)).; moreover:*

> *A few possible repercussions for violating relevant ethical rules A. Denial of attorney's fees. See Rodriguez v. Disner, 688 F.3d 645 (9th Cir. 2012) B. Denial of class certification. Reliable Money Order, Inc. v. McKnight Sales Co., 704 F.3d 489 (7th Cir. 2013); Creative Montessori Learning Ctrs. v. Ashford Gear, LLC, 662 F.3d 913 (7th Cir. 2011).*

*Respectfully Submitted.*

*Thank you,*

*Date: May 18th, 2021*

*..................................................*
*Disabled Pro Se Plaintiff Melvin Jones Jr.*

DONATE

← OUR STORIES

# Spanish-speaking Community Ignored in Flint Water Crisis Response

Among the hardest hit in Flint's water crisis are the Spanish-speaking, undocumented residents who live in the shadows, often isolated from public outreach and information campaigns. (Spanish language version available).

By Earthjustice | October 19, 2016



**Among the hardest-hit in Flint's water crisis are the Spanish-speaking undocumented residents who live in the shadows, often isolated from public outreach and information campaigns.**

BARBARA KALBFLEISCH/SHUTTERSTOCK

*Este blog está disponible en español aquí.*

*Written by San Juana "Juani" Olivares, president of the Genesee County Hispanic Latino Collaborative.*

It's already been way too long.

Our lead crisis began in April 2014 when, in a misguided effort to save money, Flint began drawing water for the municipal water system from the Flint River. The lead in older water pipes began to flake off into our drinking water. Almost immediately, residents began complaining about its acrid smell and bitter taste.

Evidence of serious lead contamination was confirmed in February 2015, and then it took 11 months for Governor Rick Snyder to acknowledge the public health disaster and declare a state of emergency. President Obama followed up quickly, declaring a federal state of emergency two weeks later.

Now, the U.S. Congress finally is poised to pass a measure that would help the city fix the defective water system.

The urgency of this situation is difficult to exaggerate, and yet the response has been staggeringly slow.

Officials from local agencies to the federal government seem satisfied with providing short term solutions, like providing bottled water, as if that were enough.

But for many in Genesee County, the poisoned water continues to threaten their health.

Among the hardest-hit in the community are the Spanish-speaking undocumented residents who live in the shadows, often isolated from public outreach and information campaigns.

Long after news organizations began reporting about the dangerously high levels of lead in the water, many in the Hispanic-Latino community continued to use it, unaware of the risks to their children's health. And even after they became aware of the contamination, many families were reluctant to appear at bottled water distribution centers for fear of having to produce identification cards or of being harassed, humiliated or even deported. Furthermore, public health advisories about the availability of water filters and bottled water were not provided in Spanish.

Children in Flint and the wider Genesee County have been exposed to levels of lead that are to known to cause developmental disorders, hearing loss, seizures, and behavioral problems. For many of the children who've been drinking lead in the earliest part of their lives, their families won't be able to see the full health impacts of lead exposure for their child for several years.

All families in Flint are worried about the impact the poisoned water has had on their children, but for undocumented parents, gaining access to health care for their children creates another challenge.

They don't know where to turn for help.

The Genesee County Hispanic Latino Collaborative has mobilized volunteers to distribute informational flyers in Spanish, assist families in gaining access to safe water and work to address health problems as they appear.

But in the waning days of the 114th Congress, our leaders must find the courage to provide funding to help pay the estimated $1.5 billion cost of replacing Flint's corroded, dangerous water infrastructure. Just last week, the House passed a water resources bill that included provisions with federal aid to help pay for repairs in Flint. The Senate passed a similar bill earlier in September. As the two chambers meet to conference the bills together, members must remain vigilant in advocating for funding for Flint.

In the bigger picture, it's time for leadership on lead issues in the United States. We have known that lead is a dangerous neurotoxin for our children for decades. The Environmental Protection Agency has also acknowledged that communities of color are hit hardest by lead poisoning. Now, we need a prevention strategy to get the lead out of our water, our soil, and our air before it gets into our children and hurts their bright futures.

In the meantime, the crisis continues. Local, state and federal agencies have failed to respond aggressively to the public health emergency that has gone on for more than two years.

No amount of free bottled water can change that sickening reality.

We must equip families with the tools they need to respond in an environmental crisis like the lead contamination in Flint. If we have learned one thing, it should be that providing access to information in linguistically and culturally appropriate ways

is critical to equip families with the tools they need to respond in a crisis. This is an issue of environmental justice.

Our government must make an effort to provide information in whatever way necessary to reach all of its people, rather than leaving the most vulnerable to fend for themselves.

*This blog was first published by* El Diario *on October 12, 2016.*

## COMUNIDAD LATINA IGNORADA EN LA RESPUESTA A LA CRISIS DEL AGUA EN FLINT

Ya ha pasado demasiado tiempo.

Nuestra crisis por el plomo empezó en abril del 2014 cuando, en un esfuerzo erróneo para ahorrar dinero, Flint empezó a extraer agua del Río Flint para el sistema municipal de agua. El plomo en la tubería antigua empezó a descascararse y a arrojar esas escamas a nuestra red hidráulica. Casi inmediatamente, los residentes empezaron a quejarse de un olor a azufre y de un sabor amargo.

La evidencia de la seria contaminación por plomo fue confirmada en febrero del 2015, pero luego le tomó 11 meses al Gobernador Rick Snyder admitir el desastre de salud pública y declarar un estado de emergencia. El Presidente Obama le dio seguimiento rápidamente, proclamando un estado de emergencia federal dos semanas más tarde.

Ahora, el Congreso de Estados Unidos finalmente está listo para aprobar una medida que ayudaría a la ciudad a arreglar su defectuoso sistema de agua potable.

La urgencia de esta situación es difícil de exagerar, sin embargo la respuesta ha sido pasmosamente lenta.

Funcionarios de agencias locales y del gobierno federal parecen estar satisfechos con brindar soluciones a corto plazo, como la de dar agua embotellada, como si eso fuera suficiente.

Pero para muchos en el Condado de Genesee, el agua envenenada sigue amenazando su salud.

Entre los más afectados en la comunidad están los residentes indocumentados de habla hispana que viven en las sombras, a menudo aislados del alcance de la difusion pública y de las campañas de información.

Mucho tiempo después de que las agencias de noticias empezaron a reportar sobre los niveles peligrosamente altos de plomo en el agua, muchas personas en la comunidad hispana-latina siguieron usando esa agua, sin saber de los riesgos que representaba para la salud de sus hijos. Incluso después de haberse enterado de la contaminación, muchas familias estuvieron reacias a presentarse a los centros de distribución de agua embotellada por miedo a tener que presentar documentos de identificación o miedo a ser acosados, humillados o incluso deportados. Aparte, las advertencias de salud pública sobre la existencia de filtros de agua y agua embotellada no fueron ofrecidas en español.

Los niños de Flint y del resto del Condado de Genesee han sido expuestos a niveles de plomo que se sabe causan desórdenes de desarrollo, pérdida del oído, ataques epilécticos, y problemas de conducta. Para muchos de los niños que han estado ingiriendo plomo en la primera etapa de sus vidas, sus familias no podrán ver las repercusiones de la exposición del plomo en la salud de sus hijos por varios años.

Todas las familias en Flint están preocupadas por el impacto que el agua envenenada ha tenido en sus hijos, pero para los padres indocumentados, tener acceso a servicios médicos para sus hijos crea otro reto.

No saben a dónde acudir para pedir ayuda.

*San Juana "Juani" Olivares es presidenta del grupo Hispanic Latino Collaborative del Condado de Genesee.*

Tags: Clean Water Act, Diversity, Equity & Inclusion, Español, Lead, Water

Oil and Gas Threat Map Shows At-Risk Populations

*Next Blog Post* 

 *Previous Blog Post*

A Sinking Feeling about Florida's Phosphate Mines

MLive

Subscribe

Facts-first reporting from the source you trust. Subscribe now.

Flint

# Flint again most impoverished city in the nation, new census data shows

Updated Jan 29, 2019; Posted Sep 17, 2018



(Jake May | MLive.com )

By Zahra Ahmad | zahmad1@mlive.com

FLINT, MI--More than half of Flint's children are living in poverty.

According to new U.S. Census Bureau data from 2017, Flint is the poorest city of its size in the nation. Nearly 39 percent of the city's residents and 60 percent of its children are living in poverty.

The national average of children living in poverty is 21 percent, according to the National Center for Children in Poverty.

Detroit was the sixth-most impoverished city and Dearborn was 10th, according to the data.

Advertisement

The bureau released its estimate of 2017 poverty rates last week for 608 municipalities nationwide with a population of at least 65,000.

Flint also had the nation's highest poverty rate in 2016.

Overall, the percentage of residents living in poverty decreased by 6 percentage points but the number of children living in poverty increased by 2 percentage points since 2016.

The U.S. Department of Health and Human Services lists living below the poverty line as an annual income of $12,140 for a single individual.

The overall number of children living in poverty in Flint actually decreased from 15,360 in 2016 to 12,357 in 2017, according to census data.

However, the number of kids under the age of 5 living in poverty increased from 4,854 in 2016 to 5,027 in 2017, according to census data from the American Fact Finder.

A decrease in the city's population could inflate the child poverty rate despite a decrease in the number of kids living in poverty, said Data and Policy Advisor for Poverty Solutions at the University of Michigan Joshua Rivera.

According to census data, the population in Flint has steadily declined since 2010. The population of whom poverty status is determined went down from 95,508 in 2016 to 94,144 in 2017.

With the population of Flint shrinking, those with lower incomes are making a larger percent of the population.

"As Flint's population gets smaller, the people who remain are facing more difficulties," Rivera said. "We know those who stay may be poorer so there are more kids that are poor."

It could be that those who are leaving the city don't have kids or have more years of education making them more mobile, and those that don't have the means to leave are staying and having more kids, Rivera explained.

"What we know is poverty among children under the age of five increased last year," Rivera said.

According to Rivera, childhood poverty is strongly tied to the economic status of their parents.

Overall, the number of people 16 years and older who are unemployed in the city has decreased. However, the demographics of those who are unemployed gives a mixed message on the economy in Flint.

The number of men who are unemployed and facing poverty increased to nearly 3,400 in 2017, up from roughly 2,500 in 2016. The number of women unemployed and facing poverty shrunk to roughly 1,900 residents in 2017, down from nearly 3,000 the year prior.

Rivera said it is hard to reach accurate conclusions on what the numbers mean because of Flint's changing population.

Instead, Rivera said someone can draw assumptions from the data based on what they do know and then use those assumptions to guide future research on the issue.

Note to readers: if you purchase something through one of our affiliate links we may earn a commission.

Subscribe

Facts-first reporting from the source you trust. Subscribe now.

Flint

# Federal court asked to give Flint residents more time to register for water crisis settlement

Updated Mar 25, 2021; Posted Mar 25, 2021



Flint resident Patricia Starks hands out water bottles to her nephews to keep them hydrated as they wait for dinner on April 10, 2018. Starks said bottled water is the only water any of them have ever drank, since each is under the age of four and born after the water crisis had already started. (Jake May | MLive.com)  Jake May | MLive.com

120
shares

By Ron Fonger | rfonger1@mlive.com

FLINT, MI -- Attorneys for some residents in the Flint water crisis settlement are asking a federal court judge to give adults and children more time to register to opt-in or opt-out of the settlement with a Monday, March 29, deadline looming.

Philadelphia attorney Mark Cuker, who represents approximately 1,300 Flint residents in federal water cases, asked to extend the registration period to May 17, and U.S. District Court Judge Judith E. Levy has set a hearing for his request on Friday, March 26.

Advertisement

Cuker's court motion asking for the additional time says the extension is needed to accommodate "a sustained increase of public interest in registering" and because of a lack of access to bone scan testing other than an existing test site operated by another law firm.

"Without this additional time, many of Flint residents could either be excluded from the partial settlement process all together, while others will not be able to properly assess how to proceed now that there will be no alternative (bone) scanning available, if shown to be safe," Cuker's motion says.

The state of Michigan and lead attorneys for individuals represented by their own lawyers oppose the 60-day extension, the motion filed Wednesday, March 25 says, while lead attorneys representing individuals in a class action tied to the settlement favor it.

On Thursday, March 26, two additional attorneys who represent Flint residents filed motions supporting the requested deadline extension.

Cuker said only a few days ago, "in the midst of registration fever," he learned that an alternative site to scan residents' bones to determine their lead exposure "would not be feasible" and said portable scanning equipment being used in Flint by the law firm Napoli Shkolnik has not been shown "by qualified professionals to be safe for humans."

Adults and children with completed bone scans can earn significantly more than others in the same age categories, according to the settlement. Blood and neurological testing results can also be used to prove lead exposure in those making claims.

The $641-million water crisis settlement was reached by attorneys for Flint residents and the state of Michigan in August and was later joined by the city of Flint, McLaren Regional Medical Center and Rowe Professional Services, each of which agreed to pay millions of dollars to excuse themselves and their employees from more than 100 water crisis lawsuits pending in state and federal courts.

The settlement has received preliminary approval from Levy. It provides for nearly 80 percent of settlement funds -- after attorney fees and expenses -- to be paid to children who were younger than 18 when they were first exposed to Flint River water, which contained elevated levels of lead, bacteria and chlorination byproducts in 2014 and 2015.

As the registration deadline has approached, Cuker said response from the public "has grown exponentially" with his own law firm having scheduled more than 100 appointments with citizens seeking to register, with dozens more seeking appointments for the remainder of this week and into the weekend.

As of Monday, March 22, the U.S. District Court claims administrator reported that there were approximately 29,220 registrants that had been entered into the settlement database with an additional 4,121 registration forms that have been received but that are still being processed.

"Additionally, a major qualifying proof for higher monetary awards -- bone scan testing -- is all but removed from the grid categories for thousands of citizens," who have not been able to get access to the procedure, the motion says.

Bone scans have been a major point of contention in the settlement agreement and Cuker said efforts to set up a safe clinic for the procedure have failed, in part because doctors who investigated the possibility "were never able to obtain a device from the

manufacturer that would be able to be modified (for human testing) because the manufacturer refused to provide one if it was going to be used on people."

Dr. Mona Hanna-Attisha and Dr. Lawrence Reynolds, key figures in having the water crisis recognized as a federal emergency, have each advised against the procedure for children, particularly the use of a portable X-ray fluorescence device, or XRF, that was originally not designed for use on humans.

Hunter Shkolnik of Napoli Shkolnik and Corey Stern of Levy Konigsberg LLP, who were appointed as lead attorneys for individually represented Flint residents in the settlement, have defended use of the XRF, saying it is not being used to diagnose, prevent or treat any disease, and "poses no risk to children or adults to exposure to radiation."

**Read more on MLive:**

**Monday registration deadline looms for Flint water crisis settlement**

**Flint pediatrician who blew the whistle on water crisis won't recommend bone scans for kids**

**Flint mayor's health advisor calls water settlement bone lead testing 'a human rights violation'**

**Youngest Flint water crisis victims to get 80 percent of historic $600 million settlement**

Note to readers: if you purchase something through one of our affiliate links we may earn a commission.

## Around the web



Registration on or use of this site constitutes acceptance of our **User Agreement**, **Privacy Policy and Cookie Statement**, and **Your California Privacy Rights** (User Agreement updated 1/1/21. Privacy Policy and Cookie Statement updated 5/1/2021).

**Cookie Settings**

© 2021 Advance Local Media LLC. All rights reserved (**About Us**).
The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Advance Local.

**Community Rules** apply to all content you upload or otherwise submit to this site.

Ad Choices